**UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

| | |
|---|---|
| SIERRA CLUB, NW ENERGY COALITION, WASHINGTON CONSERVATION ACTION, CLIMATE SOLUTIONS, and ENVIRONMENTAL DEFENSE FUND,    Petitioners      v. U.S. DEPARTMENT OF ENERGY, and CHRIS WRIGHT, in his official capacity as Secretary of Energy,    Respondents. | ) ) ) ) ) ) ) ) ) ) ) )    Case No. ___ |

**PETITION FOR REVIEW**

Sierra Club, NW Energy Coalition,[1] Washington Conservation Action, Climate Solutions, and Environmental Defense Fund (collectively, "Public Interest Organizations") petition the Court, as also described in the attached Form 3 (Exhibit A), for review of the Department of Energy and Secretary of Energy Christopher Wright's (collectively, "DOE") Order No. 202-25-11, dated December 16, 2025 (the "Order") (Exhibit B); DOE's Notice of Denial of Rehearing by Operation of Law and Providing for Further Consideration, Order No. 202-25-11A, dated February 19, 2026 (the "Rehearing Denial Order") (Exhibit C), and any amendment or modification of the Order or the Rehearing Denial Order. Public Interest Organizations petition under Section 313 of the Federal Power Act, 16 U.S.C. § 825*l*(b), and Section 502 of the DOE Organization Act of 1977, 42 U.S.C. § 7192(a), along with Federal Rule of Appellate Procedure 15(a) and Circuit Rule 15-1.

The prerequisites for judicial review of this petition have been met. On January 14, 2026, Public Interest Organizations timely moved to intervene and sought rehearing of the Order (Exhibit

---

[1] Appendix 1 lists the NW Energy Coalition members that have disassociated from this litigation.

D), and DOE has denied Public Interest Organizations' request for rehearing. *See* Rehearing Denial

Order. Public Interest Organizations' petition is filed within sixty days after the denial of rehearing.

16 U.S.C. § 825*l*(b). This Court has subject matter jurisdiction, Public Interest Organizations are

aggrieved by the Order, and venue is proper. *Id.* § 825*l*(a)–(b).

Dated: March 3, 2026

Respectfully Submitted,

<u>/s/ Michael Lenoff</u>[2]
Michael Lenoff
Jennifer Yun
1250 I (Eye) St NW, Fourth Floor
Washington, DC 20005
(202) 660-0519
mlenoff@earthjustice.org
jyun@earthjustice.org

Patti Goldman
Nico Wedekind
810 Third Ave., Suite 610
Seattle, WA 98104
(206) 578-5868
pgoldman@earthjustice.org
nwedekind@earthjustice.org

*Counsel for NW Energy Coalition,*
*Washington Conservation Action,*
*and Climate Solutions*

<u>/s/ Gregory E. Wannier</u>
Gregory E. Wannier
Sanjay Narayan
Sierra Club Environmental Law Program
2101 Webster St., Suite 1300
Oakland, CA 94612
(415) 977-5646
greg.wannier@sierraclub.org
sanjay.narayan@sierraclub.org

*Counsel for Sierra Club*

<u>/s/ Ted Kelly</u>
Ted Kelly
Environmental Defense Fund
555 12th St. NW, #400
Washington, DC 20004
(919) 449-4600
tekelly@edf.org

*Counsel for Environmental Defense Fund*

---

[2] Counsel represents that the other parties listed in the signature blocks on this document consent to this filing.

**CERTIFICATE OF SERVICE**

I hereby certify that on this day, I electronically filed the foregoing Petition for Review and all attachments with the Clerk of the Court using the Court's ACMS system.

I further certify that I have on this 3rd day of March, 2026, caused copies of the foregoing to be served via certified priority mail, return receipt requested, on:

Chris Wright
Secretary, U.S. Department of Energy
1000 Independence Ave., SW
Washington, DC 20585

Pamela Bondi
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530

Jeffrey Novak
Acting General Counsel
Office of the General Counsel
U.S. Department of Energy
1000 Independence Ave., SW
Washington, D.C. 20585

I also caused copies of the foregoing to be sent today via electronic mail to AskCR@hq.doe.gov and The.Secretary@hq.doe.gov.

In addition, I caused copies of the foregoing to be sent today via electronic mail to the following parties to the DOE proceeding.

Nicholas W. Brown,
  Attorney General of Washington
Kelly T. Wood
  Senior Counsel
1125 Washington St. SE
P.O. Box 40100
Olympia, Washington 98504
kelly.wood@atg.wa.gov

Travis R. Lindsey
Avista Corporation
1411 E Mission Ave, MSC-33
Spokane, WA 99202
travis.lindsey@avistacorp.com

Stephen M. Spina
  Counsel for Avista Corporation
Patrick R. Penella
  Counsel for Avista Corporation
Morgan, Lewis & Bockius LLP
1111 Pennsylvania Avenue NW
Washington, DC 20004
stephen.spina@morganlewis.com
patrick.penella@morganlewis.com

Nancy Brennan
  Executive Vice President, Legal and External Affairs
TransAlta Corporation
TransAlta Place
Suite 1400, 1100 1 St SE
Calgary, Alberta T2G 1B1
nancy_brennan@transalta.com

Marcus Chong Tim
  Executive Vice President, General Counsel
Bonneville Power Administration
P.O. Box 3621
Portland, OR 97208-3621
mhchongtim@bpa.gov

Roger Collanton
  Vice President, General Counsel
California Independent System Operator Corporation
P.O. Box 639014
Folsom, CA 95630
rcollanton@caiso.com

Dated: March 3, 2026

Respectfully submitted,

*/s/Michael Lenoff*
Michael Lenoff

# Appendix 1

NW Energy Coalition's bylaws provide organizational members an opportunity to disassociate from litigation. The following organizations have disassociated from this litigation: Abundant Montana; Affiliated Tribes of NW Indians; BlueGreen Alliance; Bonneville Environmental Foundation; City of Portland Bureau of Planning & Sustainability; Clean Energy Transition Institute; CleanTech Alliance; Coffman Engineers, Inc.; District XI Human Resource Council; Elevate Energy; Energy Trust of Oregon; Greenlight America; League of Women Voters of Oregon; Multnomah County Office of Sustainability; Northern Plains Resource Council; Opportunity Council; Oracle; Oregon Climate Trust; Oregon Solar + Storage Industries Association; Portland General Electric; Renewable Hydrogen Alliance; Snohomish County PUD; Sustainable Connections; The Nature Conservancy; UMC, Inc.; Washington State University Energy Program; Yellowstone-Teton Clean Cities; Community Action Center; Washington State Department of Commerce; Airworks, Inc.; Solar Washington, and Smart Grid Northwest d/b/a Grid Forward.

# Exhibit A

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT
### Form 3. Petition for Review of Order of a Federal Agency, Board, Commission, or Officer

Name of Federal Agency, Board, Commission, or Officer:

United States Department of Energy, Secretary Wright in his official capacity

Date of judgment or order you are challenging: Dec 16, 2025; Feb 19, 2026

Fee paid for petition?  ● Yes  ○ No

**List all Petitioners** (List **each** party filing the petition. Do not use "et al." or other abbreviations.)

Sierra Club, NW Energy Coalition, Washington Conservation Action, Climate Solutions, and Environmental Defense Fund

For immigration cases:

Alien Number(s):

Is petitioner(s) detained?  ○ Yes  ○ No

Has petitioner(s) moved the BIA to reopen?  ○ Yes  ○ No

Has petitioner(s) applied to the district director for an adjustment of status?  ○ Yes  ○ No

Have you filed a previous petition for review from this agency? ○ Yes  ● No

If Yes, what is the prior 9th Circuit case number?

Your mailing address:

1250 I (Eye) St NW, Fourth Floor

City: Washington  State: DC  Zip Code: 20005

Prisoner Inmate or A Number (if applicable):

**Signature**  s/ Michael Lenoff  **Date** Mar 3, 2026

*Complete and file with the attached representation statement and the order being challenged. See, e.g., Circuit Rule 15-4.*

Feedback or questions about this form? Email us at forms@ca9.uscourts.gov

## Representation Statement for Petition for Review

**Petitioner(s)** *(List **each** party filing the petition, do not use "et al." or other abbreviations.)*
Name(s) of party/parties:

NW Energy Coalition, Washington Conservation Action, and Climate Solutions

Name(s) of counsel (if any):

Michael Lenoff, 202-660-0519, mlenoff@earthjustice.org
Jennifer Yun, 202-797-5252, jyun@earthjustice.org
Patti Goldman, 206-578-5868, pgoldman@earthjustice.org
Nico Wedekind, 206-639-2492, nwedekind@earthjustice.org

Address: 1250 I (Eye) St NW, Fourth Floor, Washington, DC 20005

Telephone number(s): 202-660-0519

Email(s): mlenoff@earthjustice.org, jyun@earthjustice.org, pgoldman@earthjusti

Is counsel registered for Electronic Filing in the 9th Circuit?   ⊙ Yes   ○ No

**Respondent(s)** *(List only the names of parties and counsel (if known) who will oppose you in the petition. List separately represented parties separately.)*
Name(s) of party/parties:

United States Department of Energy, Chris Wright in his official capacity as Secretary of Energy

Name(s) of counsel (if any known):

Address: 1000 Independence Ave. SW, Washington, DC 20585

Telephone number(s): 202-586-5000

Email(s): The.Secretary@hq.doe.gov, AskCR@hq.doe.gov

*To list additional parties and/or counsel, attach additional pages as necessary.*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 3**                         *2*                         *Rev. 12/01/2018*

## Representation Statement for Petition for Review

**Petitioner(s)** *(List **each** party filing the petition, do not use "et al." or other abbreviations.)*
Name(s) of party/parties:

Sierra Club

Name(s) of counsel (if any):

Greg Wannier, 415-977-5646, greg.wannier@sierraclub.org
Sanjay Narayan, 415-977-5769, sanjay.narayan@sierraclub.org

Address: 2101 Webster St., Suite 1300, Oakland, CA 94612

Telephone number(s): 415-977-5646

Email(s): greg.wannier@sierraclub.org, sanjay.narayan@sierraclub.org

Is counsel registered for Electronic Filing in the 9th Circuit?   ◉ Yes   ○ No

**Respondent(s)** *(List only the names of parties and counsel (if known) who will oppose you in the petition. List separately represented parties separately.)*
Name(s) of party/parties:

United States Department of Energy, Chris Wright in his official capacity as Secretary of Energy

Name(s) of counsel (if any known):

Address: 1000 Independence Ave. SW, Washington, DC 20585

Telephone number(s): 202-586-5000

Email(s): The.Secretary@hq.doe.gov, AskCR@hq.doe.gov

*To list additional parties and/or counsel, attach additional pages as necessary.*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

## Representation Statement for Petition for Review

**Petitioner(s)** *(List **each** party filing the petition, do not use "et al." or other abbreviations.)*
Name(s) of party/parties:

| |
|---|
| Environmental Defense Fund |

Name(s) of counsel (if any):

| |
|---|
| Ted Kelly, 202-572-3317, tekelly@edf.org |

Address: 555 12th St. NW, #400, Washington, DC 20004

Telephone number(s): 202-572-3317

Email(s): tekelly@edf.org

Is counsel registered for Electronic Filing in the 9th Circuit?  ⊙ Yes  ○ No

**Respondent(s)** *(List only the names of parties and counsel (if known) who will oppose you in the petition. List separately represented parties separately.)*
Name(s) of party/parties:

| |
|---|
| United States Department of Energy, Chris Wright in his official capacity as Secretary of Energy |

Name(s) of counsel (if any known):

| |
|---|
| |

Address: 1000 Independence Ave. SW, Washington, DC 20585

Telephone number(s): 202-586-5000

Email(s): The.Secretary@hq.doe.gov, AskCR@hq.doe.gov

*To list additional parties and/or counsel, attach additional pages as necessary.*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 3**        *2*        *Rev. 12/01/2018*

Exhibit B



**Department of Energy**
Washington, DC 20585

**Order No. 202-25-11**

Pursuant to the authority vested in the Secretary of Energy by section 202(c) of the Federal Power Act (FPA),[1] and section 301(b) of the Department of Energy Organization Act,[2] and for the reasons set forth below, I hereby determine that an emergency exists within the Western Electricity Coordinating Council (WECC) Northwest assessment area due to a shortage of electric energy, a shortage of facilities for the generation of electric energy, and other causes, and that issuance of this Order will meet the emergency and serve the public interest.

*EMERGENCY SITUATION*

In its 2025–2026 Winter Reliability Assessment, NERC finds that the WECC Northwest region, which includes Montana, Oregon, Washington, and parts of northern California and northern Idaho, is at elevated risk during periods of extreme weather.[3] The assessment notes that "there is sufficient capacity in the area for expected peak conditions; however, [balancing authorities] are likely to require external assistance during extreme winter weather that causes thermal plant outages and adverse wind turbine conditions for area internal resources. External assistance may not be available during region-wide extreme winter conditions. Winter peak demand for the area is forecast to be 2.9 GW higher (9.3%) compared to last year."[4]

In a September 2025 report evaluating Resource Adequacy in the Pacific Northwest, Energy + Environmental Economics (E3) determined that "[a]ccelerated load growth and continued retirements create a resource gap beginning in 2026 and growing to 9 GW by 2030"[5] and that "[l]oad growth and retirements mean the region faces a power supply shortfall in 2026."[6] E3 reported that nearly 9000 MW of new capacity will be needed in the region by 2030, but currently only 3000 MW of projects for new capacity are in active development.[7] Overall, E3 found that "[p]referred resources such as wind, solar and batteries make only small contributions to meeting resource adequacy needs" and "[t]imely development of all resources is extremely challenging due to permitting and interconnection delays, federal policy headwinds, and cost pressures."[8]

TransAlta Centralia Generation ("Centralia") is an electric generating facility in Centralia,

---

[1] 16 U.S.C. § 824a(c).

[2] 42 U.S.C. § 7151(b).

[3] *NERC 2025-2026 Winter Reliability Assessment*, at 6 (November 2025), https://www.nerc.com/globalassets/our-work/assessments/nerc_wra_2025.pdf.

[4] *Id.*

[5] E3, *Resource Adequacy and the Energy Transition in the Pacific Northwest: Phase 1 Results*, at 2 (Sept. 22, 2025), https://www.utc.wa.gov/sites/default/files/2025-10/Revised%20V3%20E3%20Presentation%20RA%20Study%20September%2022%20WA%20RA%20Meeting.pdf. *See also id.* for the list of E3's study sponsors, which include certain "regional utilities and generation owners."

[6] *Id.* at 10.

[7] *Id.*

[8] *Id.* at 2.

Washington. Centralia is owned and operated by the TransAlta Centralia Generation LLC ("TransAlta"). Centralia consists of one remaining coal-fired generation unit, Unit 2, with a nameplate capacity of 729.9 MW.[9] Unit 2 began operations in 1973 and is slated to cease operations in December 2025. Unit 1 was retired in 2020. Unit 2 is slated to cease operation in December 2025, based on a 2011 Washington law[10] and a subsequent agreement between TransAlta and the State of Washington.[11] TransAlta has announced plans to convert the unit to natural gas by 2028.[12]

More broadly, Executive Orders issued by President Donald J. Trump on January 20, 2025, and April 8, 2025, underscored the dire energy challenges facing the Nation due to growing resource adequacy concerns. President Trump declared a national energy emergency in Executive Order 14156, "Declaring a National Energy Emergency," in which he determined that the "United States' insufficient energy production, transportation, refining, and generation constitutes an unusual and extraordinary threat to our Nation's economy, national security, and foreign policy."[13] The Executive Order adds: "Hostile state and non-state foreign actors have targeted our domestic energy infrastructure, weaponized our reliance on foreign energy, and abused their ability to cause dramatic swings within international commodity markets."[14] In a subsequent Executive Order 14262, "Strengthening the Reliability and Security of the United States Electric Grid," President Trump emphasized that "the United States is experiencing an unprecedented surge in electricity demand driven by rapid technological advancements, including the expansion of artificial intelligence data centers and increase in domestic manufacturing."[15]

Further, the Department detailed the myriad challenges affecting the Nation's energy systems in its July 2025 "Resource Adequacy Report: Evaluating the Reliability and Security of the United States Electric Grid," issued pursuant to the President's directive in Executive Order

---

[9] U.S. Energy Information Administration, Form EIA-860, Schedule 3: Generator Data (2024) (2024 Form EIA-860), https://www.eia.gov/electricity/data/eia860/.

[10] Act of Apr. 29, 2011, Ch. 180, 2011 Wash. Laws, https://lawfilesext.leg.wa.gov/biennium/2011-12/Pdf/Bills/Session%20Laws/Senate/5769-S2.SL.pdf#page=1.

[11] *See* MOA (Dec. 23, 2011), https://ecology.wa.gov/getattachment/858591f6-dd25-47be-ba1d-0f58264ca147/20111223TransAltaMOA.pdf ("D. In exchange for the benefits of entering into an MOA with the State pursuant to RCW 80.80.100, the Company will . . . (5) permanently cease power generation operations of one Boiler in 2020 and the other Boiler in 2025, which dates are prior to the 2035 end of their expected useful lives . . . ."); *see also* First Amendment to MOA (July 13, 2017), https://fortress.wa.gov/ecy/ezshare/AQ/PDFs/TransAltaMOAAmend1-20170713.pdf. As a coal-fired facility, it would be difficult for the Centralia Plant to resume operations once it has been retired. Specifically, any stop and start of operation creates heating and cooling cycles that could cause an immediate failure that could take 30-60 days to repair if a unit comes offline. In addition, other practical issues, such as employment, contracts, and permits may greatly increase the timeline for resumption of operations. Further, if TransAlta were to begin disassembling the plant or other related facilities, the associated challenges would be greatly exacerbated. Thus, continuous operation is required in such cases so long as the Secretary determines a shortage exists and is likely to persist.

[12] *TransAlta Signs Long-Term Agreement for 700 MW at Centralia Facility Enabling Coal to Natural Gas Conversion* (Dec. 9, 2025), https://transalta.com/newsroom/transalta-signs-long-term-agreement-for-700-mw-at-centralia-facility-enabling-coal-to-natural-gas-conversion/.

[13] Executive Order No. 14156, 90 Fed. Reg. 8433 (Jan. 20, 2025) (Declaring a National Energy Emergency), https://www.federalregister.gov/documents/2025/01/29/2025-02003/declaring-a-national-energy-emergency.

[14] *Id.*

[15] Executive Order No. 14262, 90 Fed. Reg. 15521 (Apr. 8, 2025) (Strengthening the Reliability and Security of the United States Electric Grid), https://www.federalregister.gov/documents/2025/04/14/2025-06381/strengthening-the-reliability-and-security-of-the-united-states-electric-grid.

14262. The Department concluded that "[a]bsent decisive intervention, the Nation's power grid will be unable to meet projected demand for manufacturing, re-industrialization, and data centers driving artificial intelligence (AI) innovation."[16]

### ORDER

FPA section 202(c)(1) provides that whenever the Secretary of Energy determines "that an emergency exists by reason of a sudden increase in the demand for electric energy, or a shortage of electric energy or of facilities for the generation or transmission of electric energy," then the Secretary has the authority "to require by order . . . such generation, delivery, interchange, or transmission of electric energy as in its judgment will best meet the emergency and serve the public interest."[17] This statutory language constitutes a specific grant of authority to the Secretary to require the continued operation of Centralia Unit 2 when the Secretary has determined that such continued operation will best meet an emergency caused by a sudden increase in the demand for electric energy or a shortage of generation capacity.

Such is the case here. As described above, the emergency conditions resulting from increasing demand and accelerated retirement of generation facilities will continue in the near term and are also likely to continue in subsequent years. This could lead to the potential loss of power to homes, businesses, and facilities critical to the national defense in the areas that may be affected by curtailments or power outages, presenting a risk to public health and safety.

I have also made the determination that, to best meet the emergency arising from increased demand, determined shortage, and other causes, and serve the public interest under FPA section 202(c), Centralia Unit 2 shall be made available for operation until March 16, 2026.

Based on my determination of an emergency set forth above, I hereby order:

A. From December 16, 2025, TransAlta shall take all measures necessary to ensure that Centralia Unit 2 is available to operate at the direction of either Bonneville Power Administration (BPA) (in its role as Balancing Authority) or the California Independent System Operator Corporation Reliability Coordinator West[18] (in its role as the Reliability Coordinator). Following the conclusion of this Order, sufficient time for orderly ramp down is permitted, consistent with industry practices.

B. To minimize adverse environmental impacts, this Order limits operation of Centralia Unit

---

[16] U.S. Department of Energy, *Resource Adequacy Report: Evaluating the Reliability and Security of the United States Electric Grid*, at 1 (July 2025), https://www.energy.gov/sites/default/files/2025-07/DOE%20Final%20EO%20Report%20%28FINAL%20JULY%207%29.pdf.

[17] Although the text of FPA section 202(c) grants this authority to "the Commission," section 301(b) of the Department of Energy Organization Act transferred this authority to the Secretary of the Department of Energy. *See* 42 U.S.C. § 7151(b).

[18] *See* NERC list of acronyms for Reliability Coordinators at https://www.nerc.com/programs/bulk-power-system-awareness/reliability-coordinators. On the official NERC Compliance Registry, CAISO is listed as the Reliability Coordinator. *See* NERC Compliance Registry at https://view.officeapps.live.com/op/view.aspx?src=https%3A%2F%2Fwww.nerc.com%2Fglobalassets%2Fprograms%2Fregistration%2Fcompliance-registry-files%2Fnerc_compliance_registry_matrix_excel.xlsx&wdOrigin=BROWSELINK.

2 to the times and within the parameters established in paragraph A. TransAlta shall provide a daily notification to the Department (via AskCR@hq.doe.gov) reporting whether Centralia Unit 2 has operated in compliance with this Order.

C. All operations of Centralia Unit 2 must comply with applicable environmental requirements, including but not limited to monitoring, reporting, and recordkeeping requirements, to the maximum extent feasible while operating consistent with the emergency conditions. This Order does not provide relief from any obligation to pay fees or purchase offsets or allowances for emissions that occur during the emergency condition or to use other geographic or temporal flexibilities available to generators.

D. By December 30, 2025, TransAlta is directed to provide the Department of Energy (via AskCR@hq.doe.gov) with information concerning the measures it has taken and is planning to take to ensure the operational availability of Centralia Unit 2 consistent with this Order. TransAlta shall also provide such additional information regarding the environmental and operational impacts of this Order and its compliance with the conditions of this Order, in each case as requested by the Department of Energy from time to time.

E. TransAlta is directed to file with the Federal Energy Regulatory Commission tariff revisions or waivers to effectuate this Order, as needed. Rate recovery is available pursuant to 16 U.S.C. § 824a(c).

F. BPA is directed to facilitate transmission service, as needed, to effectuate this Order.

G. This Order shall not preclude the need for Centralia Unit 2 to comply with applicable state, local, or Federal law or regulations following the expiration of this Order.

H. Because this Order is predicated on the shortage of facilities for generation of electric energy and other causes, Centralia Unit 2 shall not be considered a capacity resource.

I. This Order shall be effective from 11:59 PM Eastern Standard Time (EST) on December 16, 2025, and shall expire at 11:59 PM Eastern Daylight Time (EDT) on March 16, 2026, with the exception of applicable compliance obligations in paragraph D.

Issued in Washington, D.C. at 5:20PM EST on this 16th day of December 2025.


*Chris Wright*

Chris Wright
Secretary of Energy

Exhibit C

## UNITED STATES OF AMERICA
## Department of Energy
Washington, DC 20585

TransAlta Centralia Generation LLC　　　　　　　　　　　　　　Order No. 202-25-11A
Regarding the Centralia Generating Station

## NOTICE OF DENIAL OF REHEARING BY OPERATION OF LAW AND PROVIDING FOR FURTHER CONSIDERATION
(February 19, 2026)

　　　Rehearing has been timely requested of the Department of Energy's order issued on December 16, 2025, in the above-captioned matter.[1] Thirty (30) days having passed from the date on which rehearing requests were filed, the requests for rehearing are deemed denied by operation of law.[2]

　　　As provided in 16 U.S.C. § 825*l*(a) and 16 U.S.C. § 824a(c), the requests for rehearing of the above-cited order may be addressed in a future order.[3]

_____
Chris Wright
Secretary of Energy

---

[1] *TransAlta Centralia Generation LLC*, Order No. 202-25-11 (2025) (regarding the Centralia Generating Station).
[2] 16 U.S.C. § 825*l*(a).
[3] 16 U.S.C. § 825*l*(a) (DOE may modify or set aside its above-cited order, in whole or in part, in such manner as it shall deem proper); 16 U.S.C. § 824a(c) (DOE may issue a supplemental order).

Controlled by: The U.S. Department of Energy, DOECUI@hq.doe.gov

Exhibit D

BEFORE THE UNITED STATES DEPARTMENT OF ENERGY

| | |
|---|---|
| Federal Power Act Section 202(c) Emergency Order: TransAlta Centralia Generation LLC | Order No. 202-25-11 |

Motion to Intervene, Motion for Clarification, and Request for Rehearing and Stay of Sierra Club, NW Energy Coalition, Washington Conservation Action, Climate Solutions, Public Citizen, and Environmental Defense Fund (collectively, "Public Interest Organizations" or "PIOs")

I. INTRODUCTION.................................................................................................. 3

II. STATEMENT OF ISSUES AND SPECIFICATION OF ERROR ................... 6

III. INTERVENORS' INTERESTS ....................................................................... 8

IV. BACKGROUND ............................................................................................... 13

    A. *The Primary Actors in the Electric Industry Already Protect Resource Adequacy Without Intrusion from the Department.*.......................................... 13

        1. The Federal Energy Regulatory Commission Regulates Wholesale Electricity Markets and Mechanisms that Acquire Adequate Resources. 13

        2. NERC Protects Reliability via Standards and Regular Assessments........ 14

        3. Regional Actors Protect Reliability and Resource Adequacy..................... 15

        4. Washington Protects Resource Adequacy Through Integrated Resource Planning and Annual Reviews................................................................... 24

    B. *Centralia Should Retire as Scheduled and as Legally Required Under Washington Law*.................................................................................................. 26

        1. Centralia Is an Old Coal-Fired Power Plant, the Last in Washington State. ............................................................................................................. 26

        2. Centralia's 2025 Retirement is Compelled by a 2011 Washington Law and Environmental Compliance Order.......................................................... 28

V. REQUEST FOR REHEARING .................................................................... 33

    A. *The Order Addresses Circumstances Beyond the Lawful Scope of an Emergency Under Section 202(c), and Fails to Provide Evidence or Reasoned-Decision-Making Substantiating the Existence of an Emergency that Can Come Within Section 202(c).* ......................................................................... 35

        1. Legal Framework: Section 202(c) Empowers the Department to Respond Only to Imminent, Certain, and Unexpected Shortfalls in Electricity Supply. ........................................................................................................ 36

2. The Order's Primary Focus is Long-Term Bulk-System Reliability, Which Is Not a Basis to Mandate Generation Under Section 202(c). ................... 43

3. The Order Does Not, and Could Not, Provide any Valid Evidence or Reasoned Decision-Making to Support Its Stated Near-Term Resource Adequacy Concerns ................................................................................... 49

B. *The Order Is Not Based on Reasoned Decision-Making and Substantial Evidence in Imposing Requirements to "Best Meet the Claimed Emergency and Serve the Public Interest."* ........................................................................ 63

1. Legal Framework: Section 202(c)(1) Authorizes the Department to Require Only Generation that Best Meets the Emergency and Serves the Public Interest. .................................................................................... 63

2. The Department Fails to Consider Alternatives. ................................... 65

3. The Department Fails to Consider Centralia's Shortcomings ................... 66

4. The Department Assigns, Without Explanation, Responsibility to Direct Centralia's Operation to Entities that Do Not Manage the Generator, Creating Reliability Risk. ....................................................................... 69

C. *The Order Exceeds Other Limits on the Department's Authority.* ................... 71

1. The Department Lacks Jurisdiction to Impose the Availability Requirements. ........................................................................................ 71

2. The Department's Capacity Decree Is Not the Product of Reasoned Decision-Making and Beyond the Department's Authority ...................... 73

D. *The Order Fails to Provide the Conditions Required Under Section 202(c) to Lessen Conflicts with Environmental Standards and Minimize Environmental Harm.* .............................................................................. 74

1. Legal Framework: Section 202(c) Further Limits the Department's Authority and Mandates Affirmative Steps to Maximize Environmental Compliance and Minimize Environmental Harm Where the Order "May Result in a Conflict" with a Federal, State, or Local Environmental Law or Regulation. ........................................................................................ 74

2. The Order May Result in a Conflict with a Federal, State, or Local Environmental Law or Regulation. ........................................................ 75

3. The Order Lacks the Conditions Required by Section 202(c). ................... 78

VI. REQUEST FOR STAY ................................................................................ 82

VII. CONCLUSION ......................................................................................... 85

INDEX OF EXHIBITS .................................................................................... 86

I. INTRODUCTION

The Department of Energy ("Department") is unlawfully using Section 202(c) of the Federal Power Act to prevent the retirement of Centralia Unit 2 ("Centralia"). Centralia generates power by burning coal, and the Department is acting pursuant to a new and unprecedented policy to exceed its carefully constrained emergency authority under Section 202(c) in order to prevent coal plant retirements. The policy is unlawful because Section 202(c) applies only to imminent, unexpected shortfalls, not to the Department's preference for specific types of energy generation. In purporting to find an emergency, the Department claims an emergency exists in the Northwest based on the federal agency's misunderstanding or mischaracterization of two third-party studies, a couple executive orders containing no relevant facts, and the Department's own error-riddled and widely panned study.

There is no evidence of an emergency. As further discussed below, the two third-party studies cited by the Department demonstrate the absence of an emergency. *See infra* sec. V.A.3. For instance, the North American Electric Reliability Corporation's ("NERC") assessment of reliability for this winter expressly states that "[o]perating reserve margins are expected to be met after imports in all winter scenarios." Ex. 1-59 at 37 (NERC 2025-26 Winter Assessment). This means that the study on which the Department relies anticipates that the region will be able to meet peak demand *and* maintain the full added buffer of reserves on top.

The Department also bases its emergency finding on a September 2025 presentation from Energy and Environmental Economics ("E3") describing an as-yet unreleased study. Ex. 1-90 at 2, 10 (E3 Resource Adequacy Phase 1 Presentation). But the principal author of the E3 presentation confirms that "[f]or 2026, the risk in the studied region is *slightly elevated* above the target risk." Ex. 67 at 4 (Email Correspondence with E3) (emphasis added) (agreeing further that "[a]ny electric system will have some level of resource adequacy risk" and that the target risk "was calculated to achieve a loss of load expectation of one event-day per decade").

E3 also confirms that it calculated this "slightly elevated" risk without examining the actual conditions this winter; as a planning document, the presentation is based on a historical model and "does not reflect actual weather and hydrological conditions presently existing for this winter." *Id.* As such, the presentation "likely underestimates the actual reliability position in the region" if hydrological forecasts are stronger than the historical average, holding other factors constant. *Id.* at 4–5. The same goes for winter weather forecasts that are milder than the historical average. *Id.* at 5. And in fact, one day before December 16, 2025, the date of the Department's unlawful order, the forecasts depicted relatively strong hydrological conditions during the vast majority of the Order's 90-day duration, including virtually all of January and February 2026. *See* Ex. 1-01 at 20–23 (Expert Report of Current Energy Group); *see also* Ex. 1-67 at 4 (Email Correspondence with E3) ("The study finds that the greatest risk to the system is during low hydro years and the evidence,

3

as of December 31, 2025, does not indicate we are in a low hydro year."). Meanwhile, "[t]he planned resources in utilities' integrated resource plans shown on slide 21 [of the E3 presentation] are enough to meet the shortfalls shown on slide 10 for all years studied." Ex. 1-67 at 4 (Email Correspondence with E3). The lead author of the E3 presentation is clear: the Order "need not be renewed in March 2026 to address the Reliability Positions shown on slide 10 of the presentation." *Id.* at 5.

The absent emergency is even more apparent upon consideration of the multitude of evidence the Department does not examine. A host of studies from state, regional, and private entities undercut the Department's claimed emergency and find that the region has adequate resources this winter. Indeed, the Department itself undercuts the emergency claim; in recent orders, the Department allows electricity exports from the Pacific Northwest to Canada upon "find[ing] that the wholesale energy markets are sufficiently robust to make supplies available to exporters and other market participants serving United States regions along the Canadian and Mexican borders" and recounting the multi-layered and "comprehensive" reliability processes that "ensure[] that bulk-power system owners, operators, and users have a strong incentive both to maintain system resources and to prevent reliability problems that could result from movement of electric supplies through export." Research Power Corp., Order No. EA-365-C at 4–6 (Oct. 21, 2025), https://www.energy.gov/gdo/ea-365-c-research-power-corporation; *see* Dep't of Energy, Export Authorization Library (last visited Jan. 4, 2026), https://www.energy.gov/gdo/export-authorization-library.

State authorities, regional entities, and utilities have been carefully planning for Centralia's retirement for over a decade, securing replacement resources and continuously tailoring plans to evolving supply and demand conditions. And planning efforts continue; Washington state is currently evaluating a plan from TransAlta (announced before issuance of the Order) to convert Centralia to a gas-burning generator. There is every reason to believe the established planning efforts have prevented an emergency now and will continue to provide for resource adequacy and reliability through the end of the decade and beyond.

And whatever needs our modern energy system has, Centralia is not the answer. The plant is an old, dirty, expensive generator that is required to retire under Washington law and state enforcement orders. In order to avoid investing in pollution controls to meet air pollution standards and to obtain a time-limited exemption from the state's greenhouse gas emissions performance standard, TransAlta agreed in 2011 to shut down the Centralia plant fully by December 31, 2025. The shutdown mandate is codified in state law and incorporated in state clean air act enforcement orders. Not only does running Centralia after December 31, 2025, violate state law, but it will plague the region with excessive amounts of harmful air pollution and exacerbate existing toxic contamination of soil, sediment, and groundwater that violates the state's toxic waste law. The plant is estimated to cause upwards of 7 premature deaths each year and to spew pollution into the air that mires national parks in haze, contaminates the ground, and warms our planet. *See* Ex. 1-11 at

4

PDF 4–5 (EPA COBRA Health Effects Estimate); Clean Air Task Force, *Toll from Coal* (last visited Jan. 4, 2025), https://www.tollfromcoal.org; *infra* sec. IV.B.1.

After more than a half-century of burning coal, Centralia is beyond both a typical coal unit's economic design life of 30–40 years and a typical operational lifetime of 40–50 years. Ex. 1-47 at 127 (Palgrave Handbook); Ex. 1-48 at 18 (IEA Report). Given the long-anticipated shutdown and lack of investment in maintenance and upgrades, it is prone to breakdowns and cannot operate efficiently and reliably. It is costly to run and produces energy far more expensive than available from other sources in the region. Costs to comply with the Department's Order will be passed along to ratepayers, unnecessarily saddling them with additional burdens when cheaper and more reliable energy is available.

The Department must abide by the limitations Congress set forth in Section 202(c). This includes limitations on what the Department can require even if the Department substantiated its emergency claim (which it has not). According to the law, the Department "shall ensure" that its order "requires generation . . . only during hours necessary to meet the claimed emergency and serve the public interest." 16 U.S.C. § 824a(c)(2). The Department must therefore clarify that generation from Centralia shall be required only when the loss of power about which the Department (baselessly) warns would occur absent Centralia's operation. *See infra* sec. V.D.3.i (moving the Department for clarification and alternatively requesting rehearing).

The Department must also ensure that the Order is consistent with state environmental laws, to the maximum extent practicable, and must minimize any adverse environmental impacts. The Department does neither. It fails to acknowledge the ways the Order undermines the state's laws governing Centralia's air pollution, toxic waste contamination, and greenhouse gas emissions, while including no measures to ameliorate the virtually certain conflicts with state environmental laws and their implementation with respect to Centralia.

The Department's policy to prevent coal plant retirements is wrongheaded, and not just because it is unlawful. As the Department issues an Order that belies the markets and processes in the Pacific Northwest, putting forward weak arguments that cannot withstand scrutiny, others will bear the costs of investment uncertainty, higher prices, and deadly pollution. Coal plants are retiring because they cannot compete in the modern energy system. The Department cannot centralize control and change facts any more than King Canute could set his throne by the seashore and command the incoming tide to halt. *See King Cnut and the tide*, Wikipedia (last visited Jan. 4, 2025), https://en.wikipedia.org/wiki/King_Cnut_and_the_tide.

Public Interest Organizations thus respectfully request that the Department grant intervention in the proceedings over Order No. 202-25-11 (the "Order"); stay the Order; grant clarification of the Order; grant rehearing of the Order; rescind the Order (and any renewals of the Order); and allow Centralia to retire.

II. STATEMENT OF ISSUES AND SPECIFICATION OF ERROR

The undersigned Public Interest Organizations move to intervene and request clarification, rehearing, and a stay pursuant to Section 313(a) of the Federal Power Act, 16 U.S.C. § 825*l*(a), and the applicable rules of practice and procedure, 18 C.F.R. §§ 385.203, .212, .214, .713; *see* Ex. 1-04 at PDF 2(Cooke Email to Alle-Murphy) (recommending that "a party seeking rehearing can look for procedural guidance to [Federal Energy Regulatory Commission's ("FERC")] Rules of Practice and Procedure, 18 CFR Part 385.").[1] Public Interest Organizations' motion and requests are based upon the following errors and issues:

A. The Department has not demonstrated that an emergency exists in any portion of the WECC Northwest assessment area as required by Section 202(c) of the Federal Power Act; nor has the Department demonstrated that an emergency exists as defined in the implementing regulations for Section 202(c). *See, e.g.*, 16 U.S.C §§ 824(a)–(b), 824a(a)–(c); 10 C.F.R. §§ 205.371–.375; *Emergency Interconnection of Elec. Facilities and the Transfer of Elec. to Alleviate an Emergency Shortage of Elec. Power,* 46 Fed. Reg. 39,984 (Aug. 6, 1981); *Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150 (2016); *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000); *Jarecki v. G.D. Searle & Co.*, 367 U.S. 303 (1961); *Citizens Action Coal. v. FERC*, 125 F.4th 229 (D.C. Cir. 2025); *Conn. Dep't of Pub. Util. Control v. FERC*, 569 F.3d 477 (D.C. Cir. 2009); *Alcoa Inc. v. FERC*, 564 F.3d 1342 (D.C. Cir. 2009); *Cal. Indep. Sys. Op. Corp. v. FERC*, 372 F.3d 395 (D.C. Cir. 2004); *Otter Tail Power Co. v. Federal Power Commission*, 429 F.2d 232 (8th Cir. 1970); *Richmond Power & Light v. FERC*,

---

[1] Until sometime after June 18, 2025, the Department maintained a webpage with procedures for intervention and rehearing requests. U.S. Dep't of Energy, *DOE 202(c) Order Rehearing Procedures* (visited June 18, 2025), https://www.energy.gov/ceser/doe-202c-order-rehearing-procedures (attached as Ex. 1-05) [hereinafter "DOE Rehearing Procedures"]. The Department maintains another website which currently states, "All public comments and requests related to FPA section 202(c) should be sent via email to AskCR@hq.doe.gov. . . . Additional information about 202(c) procedures, if necessary, will be announced on this page. The provision of this process for submission of correspondence or comments on any pending application is for purposes of ensuring the receipt by the appropriate office and personnel within the Department. Establishment of this email address does not establish a "docket," and those submitting correspondence do not constitute parties or intervenors to any proceeding." U.S. Dep't of Energy, *DOE's Use of Federal Power Act Emergency Authority* (last visited Jan. 14, 2026), https://www.energy.gov/ceser/does-use-federal-power-act-emergency-authority (attached as Ex. 1-03) [hereinafter "DOE 202(c) Webpage"]. Public Interest Organizations' instant motion and requests are also pursuant to the DOE 202(c) Webpage and the DOE Rehearing Procedures.

574 F.2d 610, 615 (D.C. Cir. 1978); *Duke Power Co. v. Fed. Power Com.*, 401 F.2d 930, 938 (D.C. Cir. 1968).

B. Even if the emergency described by the Order did exist—it does not—the Department has not demonstrated a reasoned basis for its determination that requiring TransAlta to make Centralia available to operate at the direction of two specified entities "best meet[s] the emergency and serve the public interest." *See, e.g.*, 16 U.S.C. § 824a(c); 10 C.F.R. §§ 205.373, 205.375; *Dep't of Homeland Sec. v. Regents of the Univ. of Calif.*, 591 U.S. 1 (2020); *Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208 (2009); *Allentown Mack Sales & Service, Inc. v. NLRB*, 522 U.S. 359 (1998); *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983); *NAACP v. Fed. Power Comm'n*, 425 U.S. 662 (1976); *Gulf States Utils. Co. v. Fed. Power Comm'n*, 411 U.S. 747 (1973); *Otter Tail Power Co. v. United States*, 410 U.S. 366 (1973); *California v. Fed. Power Comm'n*, 369 U.S. 482 (1962); *Pa. Water & Power Co. v. Fed. Power Comm'n*, 343 U.S. 414 (1952); *Nat'l Shooting Sports Found., Inc. v. Jones*, 716 F.3d 200 (D.C. Cir. 2013); *Chamber of Com. of the U.S. v. Secs. & Exch. Comm'n*, 412 F.3d 133 (D.C. Cir. 2005); *Sierra Club v. Env't. Prot. Agency*, 353 F.3d 976, 980 (D.C. Cir. 2004); *Wabash Valley Power Ass'n, Inc. v. FERC*, 268 F.3d 1105 (D.C. Cir. 2001).

C. The Order exceeds the Department's authority in its availability requirement and its decree concerning whether Centralia shall be considered a capacity resource. *See, e.g.*, 16 U.S.C. §§ 824(a)–(b), 824a(b)–(c); *Gallardo v. Marstiller*, 596 U.S. 420 (2022); *Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150 (2016); *FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260 (2016); *Gomez-Perez v. Potter*, 553 U.S. 474 (2008); *Allentown Mack Sales & Service, Inc. v. NLRB*, 522 U.S. 359 (1998); *Fed. Power Comm'n v. Fla. Power & Light Co.*, 404 U.S. 453 (1972); *Conn. Light & Power v. Fed. Power Comm'n*, 324 U.S. 515 (1945); *Conn. Dep't of Pub. Util. Control v. FERC*, 569 F.3d 477 (D.C. Cir. 2009).

D. The Department has unlawfully failed to ensure that the Order requires generation of electric energy only during hours necessary to meet the emergency and serve the public interest, that operations are consistent with any applicable environmental laws and regulations to the maximum extent practicable, and that any adverse environmental impacts are minimized. *See, e.g.*, 16 U.S.C. § 824a(c)(2); *Kingdomware Techs., Inc. v. United States*, 579 U.S. 162 (2016); Ex. 1-13 (DOE Order No. 202-22-4); Ex. 1-14 (DOE Order No. 202-17-4 Summary of Findings); Ex. 1-21 (DOE Order No. 202-24-1).

7

III. INTERVENORS' INTERESTS

As further discussed below, each of the Public Interest Organizations has interests that may be directly and substantially affected by the outcome of this proceeding. Each party may therefore intervene in this proceeding. 18 C.F.R. § 385.214; *see* Ex. 1-03 (DOE 202(c) Webpage); Ex. 1-04 (Cooke Email to Alle-Murphy); Ex. 1-05 (DOE Rehearing Procedures).

Each of the Public Interest Organizations also demonstrates a concrete injury arising from the Order that is redressable by a favorable outcome. Each organization is therefore aggrieved by the Department's Order and may properly apply for rehearing. *See* Federal Power Act, § 313(a), 16 U.S.C. § 825*l*(a); *Wabash Valley Power Ass'n, Inc. v. FERC*, 268 F.3d 1105, 1112 (D.C. Cir. 2001); 18 C.F.R. §§ 385.203, 385.713; Ex. 1-03 (DOE 202(c) Webpage); Ex. 1-04 (Cooke Email to Alle-Murphy); Ex. 1-05 (DOE Rehearing Procedures).

*A. Sierra Club*

Sierra Club has a demonstrated organizational commitment to reducing pollution and harm from coal-fired power plants, including Centralia. Sierra Club's Beyond Coal Campaign seeks to reduce the pollution currently being produced by coal-fired power plants such as Centralia, and to reduce energy bills by ensuring that ratepayers do not fund the cost of continuing to operate uneconomic coal plants like Centralia. To those ends, Sierra Club has long engaged in advocacy and litigation relating to the Centralia Plant and coal transport through the Pacific Northwest. Starting in 2009, Sierra Club engaged in community organizing and legal efforts to bring attention to the significant air pollution coming from the Centralia plant. With partners, Sierra Club appealed an air permit issued to Centralia, arguing that the permit failed to adequately control for toxic mercury, haze-forming pollutants, and greenhouse gases. *See, e.g.,* Ex. 1-117 (Sierra Club Comments on TransAlta-Ecology Proposed BART Settlement (Nov. 2009)). Sierra Club then actively lobbied in favor of Washington's Clean Energy Transition Act that included the closure of Centralia by the end of 2025. Sierra Club participated in the negotiations that led to the agreement between TransAlta and the State of Washington to shut down the Centralia plant. Sierra Club is a signatory to the memorandum of understanding with TransAlta supporting the shutdown agreement. Ex. 1-107 (Shutdown Memorandum of Understanding). Sierra Club supported the settlement agreement because it would advance the organization's and its members' interests in reducing pollution and energy bills. By denying these and other benefits of the Centralia Plant's retirement, the Order harms Sierra Club and its members.

As of December 2025, over 24,000 Sierra Club members reside in Washington State; several of those members reside within just five miles of the Centralia Plant and hundreds more live nearby. Sierra Club members are harmed by pollution produced by operating the Centralia Plant. The Order to operate the plant beyond its

8

planned retirement date will subject Sierra Club members to additional air and water pollution in the areas where they live and recreate. Sierra Club members also hear coal trains delivering coal to the plant and are exposed to dust from trains delivering coal to the plant. In addition, Sierra Club members include ratepayers who may be subject to higher energy bills as a result of the Department's Order.

Sierra Club has also advocated for the passage of legislation in Washington State to reduce reliance on fossil fuels and shift to clean energy, including Washington's Clean Energy Transformation Act, the Climate Commitment Act, and Emissions Performance Standards. Sierra Club joined a diverse coalition of labor unions, environmental justice groups, businesses, medical professionals, faith leaders and conservation groups to support the successful passage of these laws. Additionally, Sierra Club volunteers and members collected evidence of coal dust and debris polluting waterways as it was transported by rail through the Northwest, including to Centralia. Then in 2013, Sierra Club and other partners filed a lawsuit against BNSF Railway Company for its unpermitted release of coal dust and other pollutants into navigable waters, ultimately resulting in a consent decree requiring BNSF to invest in mitigation and clean-up efforts. Ex. 1-136 (*Sierra Club v. BNSF Ry. Co.* Consent Decree).

### B. NW Energy Coalition

The NW Energy Coalition (NWEC) brings together a broad alliance of people and organizations to promote the development of renewable energy, energy conservation, and affordable energy services in the Northwest. NWEC includes hundreds of individual members and approximately 100 environmental, civic, and human service organizations, electric utilities, and businesses working toward clean and affordable energy.

NWEC was created in 1981 specifically to help fulfill the clean energy and consumer protection promises enshrined in the Northwest Power Act, passed the year prior, and to ensure the Bonneville Power Administration meets its obligations to the region by considering the environmental costs of energy resources and prioritizing conservation, renewable resources, and fish and wildlife recovery. NWEC is committed to reducing reliance on fossil fuels as soon as possible, while ensuring our electric grid is reliable, efficient, and affordable for customers.

Toward that end, NWEC played a leadership role in the TransAlta shutdown negotiations. Ex. 1-02 at 2 (Declaration of Nancy Hirsh). NWEC is a signatory to the memorandum of understanding with TransAlta. Ex. 1-107 (Shutdown Memorandum of Understanding). NWEC worked with the Governor's office to ensure the just transition funds would be devoted, as intended, to energy efficiency and weatherization, including for low- and moderate-income residents within Lewis and south Thurston Counties, to community and economic development in the affected communities, and to clean energy technologies in the state. Ex. 1-02 at 5–6

(Declaration of Nancy Hirsh). NWEC has served on the boards administering the just transition funds. *Id.* at 6.

NWEC has advocated for and defended Washington's signature climate laws, including the Climate Commitment Act and the Clean Energy Transformation Act. Each of these laws contained exemptions for Centralia provided it met the shutdown dates incorporated into the Energy Transition Act. NWEC agreed to the exemptions because Centralia was on track and, in fact, did close Unit 1 as scheduled and was on track to close Unit 2 by the December 31, 2025, shutdown date.

NWEC participates in Washington Utilities and Transportation Commission proceedings reviewing the integrated resource plans of major utilities throughout the Pacific Northwest, as well as in regional planning done by the Northwest Power and Conservation Council. NWEC supported the approval of TransAlta's coal transition power purchase agreement, which ended on December 31, 2025, and has supported the development of clean energy resources in the region to replace the power from Centralia at the end of the contract term.

Besides the impact on NWEC's mission and core activities, NWEC members will be exposed to pollution from Centralia's coal-burning operations. NWEC members will face increased energy costs due to the 202(c) Order, saddling ratepayers with the costs of operating Centralia as a coal-burning power plant. The 202(c) order will have a direct and significant financial impact on the hundreds of thousands of electric power customers who are represented by our member organizations, and on several hundred individual NWEC members.

### C. Washington Conservation Action

Washington Conservation Action Education Fund (WCA), formerly known as Washington Environmental Council, is a statewide environmental advocacy organization that promotes conservation and environmental justice in Washington State. For over 50 years, WCA has championed and defended the laws and policies that make the State of Washington an environmental leader.

WCA's mission is to "champion policies that center the expertise and resilience of overburdened communities for environmental progress and justice in the Pacific Northwest." Coal plants are significant sources of air, water, and toxic waste pollution that harms these communities. Retiring them is a primary strategy for fulfilling WCA's mission to protect these communities.

WCA has a 14-year history with the Centralia plant, having been a negotiator of the agreement to shut down the plant and a signatory to the 2012 Memorandum of Understanding with TransAlta. Ex. 1-107 (Shutdown Memorandum of Understanding). The organization was instrumental in securing the $55 million just transition fund, with $30 million going toward economic development, the plant's workforce, weatherization and energy efficiency in the impacted community, and $25

million going toward energy technologies that create energy, economic development, pollution reduction and environmental benefits. Ex. 1-02 at 3, 5 (Declaration of Nancy Hirsh).

WCA is an active member of the Northwest Energy Coalition (NWEC), which engages closely with the integrated resource plans of major utilities throughout the Pacific Northwest, as well as regional planning done by the Northwest Power and Conservation Council. As a member, WCA attends meetings to receive updates and share perspectives on matters related to energy resource planning.

WCA successfully advocated for and defended Washington's signature climate laws, including the Climate Commitment Act and the Clean Energy Transformation Act. It has also engaged in rulemaking processes at the state level to ensure effective implementation of each law.

WCA's members are impacted by the Centralia coal plant in several ways. WCA has members who live in close proximity to the plant and are directly exposed to pollution from the plant's coal-burning operations. The plant is also the primary source of haze pollution in Mount Rainier and Olympic National Parks and wilderness areas, where WCA members recreate. In addition, as ratepayers, WCA members will be harmed by having to pay the "onerous costs" of the DOE Order.

WCA can contribute its knowledge regarding the intent and framework of the agreement to shut down the coal plant and the measures taken through the Just Transition Fund and regional planning to invest in the social welfare of workers and the local community and ensure the orderly transition to other sources of power. WCA can also offer technical expertise as to how the Order may result in conflicts with state-mandated carbon reduction goals and greenhouse gas emissions performance standard and it can serve as a bridge between high-level policy and the lived experiences of members who are directly impacted by the plant's pollution and the financial burden of "onerous costs" passed down to ratepayers.

*D. Climate Solutions*

Climate Solutions is a regional non-profit organization that advocates for a thriving, equitable Northwest, powered by clean energy, inspiring the transition to sustainable prosperity across the nation and beyond. It is headquartered in Seattle, Washington, with satellite offices in Olympia, Washington and Portland, Oregon. Its mission is to accelerate clean energy solutions to the climate crisis. As a Northwest-based clean energy economy nonprofit, Climate Solutions works to: (1) champion transformational policies and market-based innovations; (2) catalyze powerful partnerships and a diverse movement for action and accountability; and (3) communicate a bold vision for solutions at scale required by climate science.

Climate Solutions participated in the negotiations that led to the 2011 deal to shut down Centralia Unit 1 by the end of 2020 and Unit 2 by the end of 2025. Climate

11

Solutions is a signatory to the 2012 TransAlta Memorandum of Understanding in which it committed to support the shutdown compromise with respect to air pollution controls before the Environmental Protection Agency and the purchase power agreement before the Washington Utilities and Transportation Commission. Ex. 1-107 at § 3(a) (Shutdown Memorandum of Understanding).

Building on the shutdown deal, Climate Solutions has advocated for Washington laws that move the state toward a clean energy future, including the Climate Commitment Act (CCA) and the Clean Energy Transformation Act (CETA).

Climate Solutions represents the interests of people who are adversely affected by pollution from Centralia's coal-burning operations. Climate Solutions also represents the interests of ratepayers who may be forced to bear the cost of keeping Centralia open and burning coal past its retirement date.

### E. Public Citizen

Established in 1971, Public Citizen is a national research and advocacy organization representing the interests of household consumers. Public Citizen has members and supporters in every state, including those who pay electric utility bills in Washington State and the Pacific Northwest. Public Citizen is active before the Federal Energy Regulatory Commission promoting just and reasonable rates, and in supporting efforts for utilities to be accountable to the public. Financial details about the organization are on its website. Public Citizen, *Annual Reports*, www.citizen.org/about/annualreport/.

### F. Environmental Defense Fund

The Environmental Defense Fund ("EDF") is a nonprofit membership organization with hundreds of thousands of members nationwide, including more than 20,000 members who live in Washington State and the Pacific Northwest, who pay for and consume electricity in those areas, and who are harmed by pollution from Centralia's coal-burning operations. EDF's mission is to build a vital Earth for everyone by preserving the natural systems on which all life depends. Guided by expertise in science, economics, law, and business partnerships, EDF seeks practical and lasting solutions to address environmental problems and protect human health, including in particular by addressing pollution from the power sector. On behalf of its members, EDF works with partners across the private and public sectors to engage in utility regulatory forums at the federal level and throughout the United States to advocate for policies that will create an affordable, reliable, and low pollution energy system. Centralia's retirement would help create an affordable, reliable, and low pollution energy system. Because the Order denies these and other benefits of the plant's retirement, the Order harms EDF members.

12

IV. BACKGROUND

> A. *The Primary Actors in the Electric Industry Already Protect Resource Adequacy Without Intrusion from the Department.*

Multiple entities across the Pacific Northwest have consistently maintained resource adequacy in the region, through a combination of resource adequacy assessments and long-term planning. Resource adequacy is "the situation where an electric system has enough capacity available to meet customer demand, plus a reserve margin on top, in most hours under most conditions based on a chosen standard." Ex. 1-01 at 5 (Expert Report of Current Energy Group) (defining resource adequacy and including perspective from National Laboratory of the Rockies). The electric industry uses a variety of metrics to assess resource adequacy, though all get to the same concept: whether there are sufficient resources available to both meet forecasted demand and provide an additional buffer. *See id.* at 5–7. But however defined or measured, the entities and processes discussed below have for decades maintained an interconnected planning web that has sustained, and continues to sustain, resource adequacy across the region. That includes, of course, accounting for declared retirements, including Centralia's long-planned retirement.

> 1. *The Federal Energy Regulatory Commission Regulates Wholesale Electricity Markets and Mechanisms that Acquire Adequate Resources.*

FERC regulates wholesale sales and transmissions of electric energy in interstate commerce. 16 U.S.C. § 824(b)(1). Federal authority over the electric grid dates back at least to 1935, when the Federal Power Act became law and the Federal Power Commission administered the Act.

The Federal Power Act did not give the federal agency plenary authority over the electric grid. Instead, Congress provided that federal regulation shall "extend only to those matters which are not subject to regulation by the States" and provided that "[t]he Commission" does not have jurisdiction, "except as specifically provided in [the Federal Power Act], over facilities used for the generation of electric energy." *Id.* at § 824(a)–(b)(1). As such, authority over generation facilities belongs to the states. *See id.*

In 1977, through the Department of Energy Organization Act, Congress reorganized the agencies that administer the Federal Power Act. Congress created the Department of Energy and FERC. 42 U.S.C. §§ 7131, 7171(a). Congress also transferred certain functions of "the Commission" in the Federal Power Act to the Department and other functions to FERC, thereby abolishing the Federal Power Commission. *See id.* §§ 7151(b), 7172(a)(1). FERC retained authority over rates and charges for the transmission or sale of electric energy, and the non-emergency interconnection of facilities for the generation, transmission, and sale of electric energy. *Id.* § 7172(a)(1)(B). The Department's authority over functions of "the

13

Commission" in the Federal Power Act include functions under some subsections of Section 202 of the Act. *See id.* § 7151(b). The 1977 reorganization did not expand the role of the "the Commission" at the expense of state authority or shrink states' authority over generation facilities. *See, e.g.*, *id.* § 7113 ("Nothing in this chapter shall affect the authority of any State over matters exclusively within its jurisdiction.").

In many parts of the country, FERC has promoted the role of nonprofit entities, known as Independent System Operators or Regional Transmission Organizations (collectively, "RTOs"), in ensuring the grid operates reliably in a defined geographic area. *See FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 267 (2016); *Regional Transm. Orgs.*, Order No. 2000, 65 Fed. Reg. 810, 811 (Jan. 6, 2000); *Promoting Wholesale Competition Through Open Access Non-Discriminatory Transm. Servs. by Pub. Utils. and Recovery of Stranded Costs by Pub. Utils. and Transm. Utils.*, Order No. 888, 61 Fed. Reg. 21,540, 21,542 (May 10, 1996). There are no RTOs in the Pacific Northwest, but as discussed further below there are entities that have taken on some of the regional coordination roles and responsibilities that RTOs provide in other parts of the country.

### 2. *NERC Protects Reliability via Standards and Regular Assessments.*

NERC is the "Electric Reliability Organization" under section 215 of the Federal Power Act. *N. Am. Elec. Reliab. Corp.*, 116 FERC ¶ 61,062, at P 3, *order on reh'g & compliance*, 117 FERC ¶ 61,126 (2006); *see* 16 U.S.C. § 824o(a)(2). This role dates back to 2005, after Congress added Section 215 to the Act and FERC certified NERC as the Electric Reliability Organization. Energy Policy Act of 2005, Pub. L. No 109-58, Title XII, Subtitle A, section 1211(a), 119 Stat. 594, 941 (2005), 16 U.S.C. 824o (2000 & Supp. V 2005); 116 FERC ¶ 61,062, at P 3.

As the Electric Reliability Organization, NERC is responsible for establishing and enforcing reliability standards for the bulk power system. 16 U.S.C. § 824o(a)(2); 18 C.F.R.§ 39.1. NERC's reliability standards are subject to FERC's review and approval. 16 U.S.C. § 824o(d).

The NERC-developed and FERC-approved reliability standards apply to all users, owners, and operators of the bulk power system within the continental United States. *Id.* § 824o(b)(1); 18 C.F.R. §§ 39.2, 40.1(a), 40.2(a); *see id.* § 39.1 (defining "Bulk–Power System"). Each reliability standard identifies the types of entities that must comply with the standard, like generator owners, transmission owners, or transmission operators. *Reliability Standard Compliance and Enforcement in Regions with Regional Transm. Orgs. or Indep. Sys. Ops.*, 122 FERC ¶ 61,247, at P 4 (2008); *e.g.*, Ex. 1-98 at EOP-011-4 (NERC Emergency Operations) (stating requirements applicable to, *inter alia*, balancing authorities, reliability coordinators, and transmission operators for the purpose of "address[ing] the effects of operating Emergencies by ensuring each Transmission Operator and Balancing Authority has developed plan(s) to mitigate operating Emergencies and that those plans are

14

implemented and coordinated within the Reliability Coordinator Area as specified within the requirements").

NERC performs other functions in addition to development and enforcement of reliability standards. For instance, NERC annually assesses seasonal and long-term reliability of the bulk power system and monitors system performance. *See* 18 C.F.R. § 39.11. Since it began providing standardized "risk" assessments by region in the summer of 2021, NERC has adhered to a three-tiered assessment of risk: areas facing the least risk are "low" or "normal" risk regions, areas facing the most risk are "high" risk regions, and areas in between are "elevated" risk regions. *See* Ex. 1-28 at PDF 75, 124, 170, 218 (2019–24 NERC Summer Reliability Assessments). NERC's determination of "elevated" risk generally indicates that there is a "[p]otential for insufficient operating reserves in above-normal conditions." Ex. 1-27 at 6 (NERC 2025 Summer Reliability Assessment). An elevated risk does not constitute an emergency declaration because it does not indicate the possibility of imminent shortfalls; indeed, it is only the second of three risk levels offered by NERC. NERC typically provides specific context and details associated with its determination.

NERC also delegates certain authorities to six Regional Entities that make up the Electric Reliability Organization (ERO) Enterprise. Ex. 1-81 at 1 ("About WECC" Webpage). The largest of these, the Western Electricity Coordinating Council ("WECC") is one of the key regional actors described below working to ensure that the power grid remains reliable.

*3. Regional Actors Protect Reliability and Resource Adequacy.*

Within the Northwest region, there are at least three principal entities whose responsibilities include analyzing resource adequacy and reliability, as well as proactively working to ensure that the region meets energy demand with sufficient generating resources.

1. The Northwest Power & Conservation Council ("Power Council") develops a regional power plan, which directs how Bonneville Power Administration ("Bonneville") markets federal hydropower and other electricity resources to utilities and other customers primarily within the Northwest and also to other buyers in the Western Interconnection.

2. The Western Power Pool provides a mechanism for load-serving entities to share resources and work together to minimize the risk of service interruptions during emergency events and has for years been developing regional resource adequacy coordination.

3. And as discussed above, WECC is the regional entity (under authority delegated by NERC) responsible for generating regional reliability standards, enforcing the standards, and assessing regional resource adequacy.

15

In addition to these three regional planning entities, Bonneville itself is responsible for ensuring the stability of its own system. Bonneville is a Power Marketing Administrator within the Department of Energy that markets power from hydroelectric and other generators with a service territory in Washington, Oregon, Idaho, and parts of Nevada, Montana, and Wyoming. *See* Ex. 1-72 at 5 (FERC Western Energy Markets Explainer). Bonneville's planning guides multiple load-serving entities across the region in their efforts to plan for resource adequacy and ensure their system's stability. Between these entities' processes, which are further described below, there is no shortage of planning that goes into ensuring that the Northwest has sufficient energy to service customers.

### i. *Northwest Power & Conservation Council Develops a Regional Power Plan, Including a Resource Adequacy Analysis.*

One distinguishing feature of the Pacific Northwest electric grid is the Northwest Power and Conservation Council, which provides much of the regional coordination and joint planning that RTOs provide in other regions of the country. The Power Council was created pursuant to the Northwest Power Act, 16 U.S.C. § 839, which authorizes Idaho, Montana, Oregon, and Washington to form an interstate compact to develop a regional power plan and a fish and wildlife program that balances the Northwest's environment and energy needs. The Power Council is comprised of two members appointed by each member state. The Northwest Power Act specifically requires that the plan includes an energy demand forecast of at least twenty years, developed in consultation with Bonneville, state ratemaking agencies, utilities, and the public. 16 U.S.C. § 839b(e)(3)(D). This forecast must include regional reliability and reserve requirements, as well as resource acquisition recommendations issued to Bonneville to comply with the reliability and reserve requirements. *Id.* § 839b(e)(3)(D). And the law directs planners in the region to "give priority to resources which the Council determines to be cost-effective. Priority shall be given: first, to conservation; second, to renewable resources; third, to generating resources utilizing waste heat or generating resources of high fuel conversion efficiency; and fourth, to all other resources." *Id.* § 839b(e)(1).

As the organization resulting from this mandate, the Power Council is tasked with developing the regional power plan. Ex. 1-69 at 3 (Power Council Overview). Bonneville funds the Power Council's work. 16 U.S.C. § 839b(c)(10)(A). Bonneville must follow the regional power plan developed by the Power Council when acquiring resources. *Id.* § 839b(d)(2). As required, the Power Council's power plan looks forward 20 years, with revisions every five years; the most recent iteration was the Eighth Power plan of 2021. Ex. 1-70 (Power Council 2021 Power Plan). The Power Council is slated to release the Ninth Power Plan in mid-2026 and to adopt it by the end of the year. Ex. 1-69 at 2 (Power Council Overview).

Beginning in fiscal year 2023, the Power Council's staff adopted a new, more sophisticated way to test whether the region's power grid has adequate resources by

16

using multiple metrics.[2] Ex. 1-22 at 1 (Overview of Power Council's Resource Adequacy Approach). The Power Council's multi-metric approach allows it to understand the probability, shape, and size of adequacy issues. *Id.* The Power Council also continues to update it approach to load forecasting. *See* Ex. 1-23 at 1 (Overview of Power Council's Approach to Load Forecasting).

In 2024, the Power Council published a power supply adequacy assessment that looked forward to 2029 and explored how the Council's 2021 Power Plan supported the regional system in an adequate manner. Ex. 1-71 at 6 (Power Council 2029 Power Supply Adequacy Assessment). The Council used an adequacy model called GENESYS to simulate the regional power system to detect potential shortfalls each year from 2024 through 2029. *Id.* The analysis was based on a number of resource acquisition scenarios and load demands, including scenarios reflecting a rapid uptick in the number of data centers sited in the region. *Id.* at 7. The outcomes of each model were then scored against a set of metrics, including the frequency, duration, and magnitude of shortfall events. *Id.* at 6-7. This methodology has allowed the Power Council to comprehensively assess the system's resource adequacy. *Id.* at 9-10.

>   *ii. Bonneville Forecasts Regional Demand and Supply on an Annual Basis.*

Bonneville is one of the two Western Power Marketing Administrators within the Department of Energy, the other being the Western Area Power Administration. Ex. 1-72 at 5 (FERC Western Energy Markets Explainer). Bonneville's service territory includes Washington, Oregon, Idaho, and parts of Nevada, Montana, and Wyoming, *id.* at 5, as shown below in Figure 1.

---

[2] Current Energy Group's report describes and distinguishes between Loss of Load Expectation (LOLE), which measures loss-of-load events per year; Loss of Load Probability (LOLP), which measures loss-of-load events per grid-straining event; Demand-at-Risk Hours (DARH), which measures the number of hours during which load loss is possible; and other metrics. *See* Ex. 1-01 at 5–8 (Expert Report of Current Energy Group); *see also* WECC, *Western Assessment of Resource Adequacy: 2024* (last visited Jan. 12, 2025), https://feature.wecc.org/wara/ (explaining that the Western Electricity Coordinating Council uses a DARH-based methodology); Ex. 1-97 at *passim* (WECC Explainer) (discussing probabilistic assessments and the one-day-in-ten-years standard); *see generally* Ex. 1-25 at 3–5, 23–24, 55 (MISO LOLE Presentation) (discussing loss of load expectation calculations).

17

*Figure 1: Boundary Areas of*
*Power Marketing Administrations*

Source: Ex. 1-72 at 5 (FERC Western Energy Markets Explainer).

Bonneville markets about one-third of the power generated in the Pacific Northwest from a series of federally owned hydroelectric dams in the Columbia Basin and a nuclear power plant in Southeast Washington. Ex. 1-73 at 1 (Bonneville 2024 Fact Sheet). It also owns, operates and maintains more than 15,000 circuit miles of the Northwest's high voltage transmission grid. *Id.* It sells the bulk of this power to public power utilities, federal agencies, and Tribal utilities in the region, which are Bonneville's "preference" customers. *Id.; see* 16 U.S.C. § 832c(a). It also sells power to investor-owned utilities like PacifiCorp and Portland General Electric, and to certain industrial customers. Ex. 1-73 at 1 (Bonneville 2024 Fact Sheet); *see* 16 U.S.C. § 839c(b)(1). In addition, Bonneville currently engages in bilateral trading within and outside its service area as needed to balance its load and meet demand. Ex. 1-93 at 7 (Bonneville Day-Ahead Market Policy).

Bonneville must exercise its responsibilities "in accordance with the provisions of the [Northwest Power Act]." 16 U.S.C. § 839b(a)(2)(A). These responsibilities include (1) "to assure the Pacific Northwest of an adequate, efficient, economical, and reliable power supply;" (2) to encourage "the development of renewable resources within the Pacific Northwest;" (3) "to protect, mitigate and enhance the fish and wildlife . . . of the Columbia River and its tributaries[;]" and to (4) "provid[e] environmental quality[.]" *Id.* § 839.

Every year, Bonneville publishes a 10-year "Loads and Resources Study"—which it calls the "White Book"—for the Pacific Northwest region. *E.g.*, Ex. 1-119 (2023 Bonneville "White Book"); Ex. 1-120 (2024 Bonneville "White Book"); Ex. 1-121 (2025

18

Bonneville "White Book"). Bonneville's forecasting includes analysis of the effects of varying water conditions over the 10-year period. *See, e.g.*, Ex. 1-121 at 9 (2025 Bonneville "White Book"). Every other year, Bonneville uses its latest forecast to conduct a comprehensive resource assessment in which load needs and market resource availability are analyzed to inform Bonneville's own resource portfolio. *E.g.*, Ex. 1-75 at *passim* (Bonneville Resource Plan (compiled 2022 & 2024)). Although these are not necessarily formal resource adequacy projections, these forecasts help guide planning across the region and are a critical piece of the regional coordination that maintains grid reliability. *See* Ex. 1-94 at PDF 1 (Power Council 2024 Resource Program Results).

Bonneville also performs other functions. As a Balancing Authority, Bonneville ensures that supply and demand are balanced in real time. *See* Ex. 1-65 (EIA Explainer on Balancing Authorities).[3] Bonneville also acts as a transmission provider in the region. *See Seminole Elec. Coop., Inc. v. FERC*, 861 F.3d 230, 237 (D.C. Cir. 2017).

### iii. *The Western Power Pool Is Implementing a Western Resource Adequacy Program and Forecasts Regional Resource Adequacy on an Annual Basis.*

The Western Power Pool is a grouping of utilities and partners that coordinate and share resources in the Western Interconnection. Ex. 1-72 at 10 (FERC Western Energy Markets Explainer). The Western Power Pool's territory stretches from British Columbia and Alberta through all or parts of 11 different states, including Washington, Oregon, Idaho, and Montana, *id*. at 9–10, as shown below in Figure 2.

---

[3] Although Bonneville has not served as the Balancing Authority for the Centralia Plant leading up to the Order, *see infra* sec. V.B.4, its scope of operations in the region makes it an important player in the Northwest energy space. As such, understanding the resource adequacy of the Northwest more broadly benefits from an understanding of Bonneville's resource adequacy projections.

*Figure 2: Boundary Area of*
*Western Power Pool*



Source: Ex. 1-72 at 9 (FERC Western
Energy Markets Explainer).

The Western Power Pool organizes multiple programs to ensure that participants are protected against emergency events that would otherwise disrupt service, leading to blackouts. For instance, it operates a reserve sharing program, in which participating Balancing Authorities share contingency reserves to ensure that participants have access to sufficient power during emergencies. *See* Ex. 1-76 (Western Pool Reserve Sharing Program). The Western Power Pool also organizes more rapid-response grid stability coordination, including a frequency response sharing group in which participating entities work together to secure adequate ancillary services to maintain minute-to-minute grid stability. Ex. 1-77 (Western Frequency Response Sharing Group).

Of particular note to the question of resource adequacy oversight, in February 2023 the Western Power Pool secured approval from FERC to create a more comprehensive resource adequacy coordination regime, the Western Resource Adequacy Program. *Northwest Power Pool*, 182 FERC ¶ 61063 (2023). The Western Resource Adequacy Program was designed initially as a voluntary resource adequacy planning and compliance program for utilities in the West and is intended to supplement the resource planning and projections undertaken by utilities, states, and provinces. *Id.* at ¶ 5. As FERC identified in its order approving the Western Resource Adequacy Program, the operational program serves as "a resource of last resort—not

a resource of first resort"—and participants are maintaining their own processes to plan ahead and ensure their own resource adequacy. *Id.* at ¶ 98. This makes the coordination offered by the Western Resource Adequacy Program entirely additional and complementary to the other planning processes discussed in this section. *Id.* at ¶ 5.

The Western Resource Adequacy Program has two distinct operational components: a forward-showing process and operational follow-through. Under the forward-showing component, participants in the program demonstrate seven months in advance of each summer season and each winter season that they have secured their proportional share of regional capacity, which includes a required planning reserve margin that is designed to meet a loss-of-load expectation ("LOLE") standard of 1-event-in-10-years. *Id.* at ¶¶ 6, 53. To avoid a charge, participants must also show that they have reserved at least 75% of the transmission necessary to deliver energy at the time of their forward showing filings, and all of the necessary transmission during the activation period of the operating program. Ex. 1-78 at § 13.2 (WRAP Tariff). This transmission reservation must be at the highest level of reliability (NERC Priority 6 or Priority 7 firm point-to-point or network integration transmission service). *Northwest Power Pool*, 182 FERC ¶ 61063, at ¶¶ 54, 78.

Each participant's forward projection is then tested against a nearer-term forecast (week ahead or day ahead) in the operational phase of the Western Resource Adequacy Program process. Based on the results of the comparison, participants with surpluses may be required to hold back capacity for the benefit of other participants with a deficit, with fines levied for nonperformance of this obligation to hold back. *Id.* at ¶¶ 7, 94–95. In this way, the Western Resource Adequacy Program ensures that each balancing authority in the region is able to rely on imports from neighbors, thereby approximating one of the key benefits load-serving entities gain via participation in RTOs in other parts of the country. *See generally* 89 FERC ¶ 61,285.

As of October 13, 2025, 16 utilities committed to the Program's initial binding operational season, in Winter 2027/28. Ex. 1-79 (WRAP Notice). Even in its voluntary form, the Western Resource Adequacy Program has added to the tapestry of regional cooperation that has helped ensure the Pacific Northwest continues to receive power reliably.

### iv. WECC Assesses Resource Adequacy in the Region on an Annual Basis and Enforces Federal Standards.

WECC is the largest of the six Regional Entities that make up NERC's Electric Reliability Organization Enterprise. Ex. 1-81 at 1–2 ("About WECC" Webpage). Its service territory encompasses two Canadian provinces (Alberta and British Columbia), the northern portion of Baja California, Mexico, and all or parts of 14 Western states (including Washington, Oregon, Idaho, Montana, and California) *id.*, as shown below in Figure 3.

21

*Figure 3: Boundary Areas of*
*WECC Subregions*



Source: Ex. 1-124 at PDF 5 (WECC's 2025–26 Winter Reliability Assessment Western Overview).[4]

---

[4] The Order claims an emergency exists "within the Western Electricity Coordinating Council (WECC) Northwest assessment area." Order at 1. The Order employs only one regional definition of WECC Northwest. *Id.* ("In its 2025–2026 Winter Reliability Assessment, NERC finds that the WECC Northwest region, which includes Montana, Oregon, Washington, and parts of northern California and northern Idaho . . . ."). A map of the NERC-defined region is in Exhibit 1-59 at 6 (NERC 2025-26 Winter Reliability Assessment). The map in Figure 3 depicts the WECC subregions revised in 2025. Ex. 1-124 at PDF 5 (WECC's 2025–26 Winter Reliability Assessment Western Overview) (explaining that, in 2025, "WECC adopted new subregional boundaries that more accurately reflect operational and planning realities, as well as the footprints of various entities."). WECC's revised subregion boundaries were used in NERC's 2025-2026 Winter Reliability Assessment. *Id.*

22

Under its NERC-delegated authority, WECC is responsible for setting regional reliability standards, monitoring compliance with those standards, enforcing standards, and overseeing reliability assessment and performance analysis within WECC's footprint. Ex. 1-81 at 1 ("About WECC" Webpage); Ex. 1-82 at § 401 (NERC Rules of Procedure); *see N. Am. Elec. Reliab. Corp.*, 153 FERC ¶ 61,134, at PP 55–56 (2015). This work includes ensuring that regional contingency reserve standards are aligned with national standards and performing risk assessments of bulk power system users, owners, and operators on the reliability of the Western Interconnection. Ex. 1-83 at 13–14 (WECC Contingency Reserve Whitepaper) (finding that by reducing minimum contingency reserve amounts, prior sequestered resources will be made available to match the less predictable response of variable generation resources and more development of variable generation sources may be encouraged); Ex. 1-84 (WECC Risk Factor Criteria).

WECC also performs a yearly assessment of resource adequacy in its footprint, which is a useful resource for system planners. *E.g.*, WECC, *Western Assessment of Resource Adequacy: 2024* (last visited Jan. 14, 2026), https://feature.wecc.org/wara/ [hereinafter "WECC 2024 Resource Adequacy Assessment, https://feature.wecc.org/wara/"]. The yearly resource adequacy assessment performed by WECC is "an energy-based probabilistic" assessment, which evaluates resource adequacy under a variety of conditions. *Id.* It divides WECC's larger footprint into smaller subregions and provides detailed analysis of regional demand forecasts and planned resource additions for the next 10 years. *Id.* The scenarios modeled in the assessment include increased demand and slower buildout of generating resources. *Id.* These analyses provide information that helps inform NERC's reliability assessments of the entire country's energy system. Ex. 1-86 at 1 (WECC Reliability Assessment Webpage). Additionally, WECC contributes to NERC's assessments. *See* Ex. 1-59 at 4 (NERC 2025-26 Winter Assessment).

---

Before 2025, NERC and WECC used different definitions of a Northwest region. For instance, in the 2024 Western Assessment of Resource Adequacy, WECC includes a map of "NW Northwest" that includes British Columbia. WECC, *Western Assessment of Resource Adequacy: 2024* (last visited Jan. 12, 2025), https://feature.wecc.org/wara/. A much broader conception of "WECC-NW" is depicted in NERC's 2024 Long Term Resource Adequacy assessment. Ex. 1-123 at 6, 127 (NERC 2024 Long-Term Reliability Assessment). Other regional assessments use their own definition of the Northwest region. *See generally* Ex. 1-01 (Expert Report of Current Energy Group) (collecting regional assessments).

*4. Washington Protects Resource Adequacy Through Integrated Resource Planning and Annual Reviews.*

In addition to the regional processes described above, individual states have multiple regulatory frameworks to ensure the adequacy of resources in their territories. There are multiple states located within the WECC Northwest assessment area that forms the scope of the Department's stated emergency, each of which has its own set of policies and procedures to ensure grid reliability.

*i. The Washington Department of Commerce and Utilities and Transportation Commission Convene Annual Resource Adequacy Meetings and Report to the Legislature Annually.*

Since 2006, the Washington Department of Commerce has reviewed the integrated resource plans of both consumer- and investor-owned utilities in the state, as well as other state, regional, and national sources, and prepared a biennial report to the legislature on resource adequacy in the region. WASH. REV. CODE § 19.280.060; *see, e.g.*, Ex. 1-88 (Wash. Commerce Util. Res. Planning Report (compiled 2022 & 2024)). Through legislative developments like the Clean Energy Transformation Act (CETA), WASH. REV. CODE § 19.405, the legislature recognized the need for regulatory bodies in the state to work more closely together to ensure that there was sufficient resource adequacy to serve a growing electric demand. To that end, the legislature required the Washington Department of Commerce and the Washington Utilities and Transportation Commission (Washington Utilities Commission, and together with Washington Department of Commerce, the Washington Agencies) to

> jointly convene a meeting of representatives of the investor-owned utilities and consumer-owned utilities, regional planning organizations, transmission operators, energy analytics experts at Pacific Northwest national laboratory, and other stakeholders to discuss the current, short-term, and long-term adequacy of energy resources to serve the state's electric needs, and address specific steps the utilities can take to coordinate planning in light of the significant changes to the Northwest's power system including, but not limited to, technological developments*, retirements of legacy baseload power generation resources*, and changes in laws and regulations affecting power supply options.

*Id.* § 19.280.065(1) (emphasis added). The statute was updated in 2023 to explicitly "focus discussion on the extent to which proposed laws and regulations may require new state policy for resource adequacy." *Id.* § 19.280.065(2).

In 2025, the Washington Agencies hosted three separate meetings focusing on resource adequacy in Washington state: a June 5th meeting focused on summer readiness, a September 22nd meeting focused on long-term resource adequacy, and a

24

November 4th meeting focused on winter readiness. See Ex. 1-89 (Washington Agencies Resource Adequacy Meeting Summaries (Compiled)). These meetings involved detailed reports from a mix of utilities, regional planning organizations, transmission operators, and regional energy experts. *Id.*

### ii. Individual Utilities Are Required to Develop Resource Plans that Account for Resource Adequacy.

Electric utilities serving customers within Washington State are required to develop their own Integrated Resource Plans (IRPs) to plan for how the individual utility will meet future customer energy needs in both a cost-effective and reliable manner. WASH. ADMIN. CODE § 480-100-620. These plans must be updated every two years. *Id.* § 480-100-625. IRPs include resource adequacy analysis to ensure that, looking forward, the utility will be able to consistently meet varying load demands. *Id.* § 480-100-620(8). IRPs also provide a utility the opportunity to "show its work" regarding the conclusions the utility makes around resource acquisition needs. *Id.* § 480-100-620(11). IRPs are reviewed by the Washington Utilities Commission and are subject to public comment. *Id.* § 480-100-620(17) (requiring utilities to summarize and respond to public comments received on draft IRPs); *id.* § 480-100-625 (requiring utilities to file work plans, draft IRPs, and progress reports to the Washington Utilities Commission); *id.* § 480-100-630 (requiring utilities to demonstrate how advisory group input informed the final IRP). The Washington Department of Commerce summarizes the utilities' IRPs and reports to the state legislature. *E.g.*, Ex. 1-26 at 4 (Wash. Dep't of Commerce Summary of Utilities' 2024 IRPs (Dec. 1, 2025)).

Beyond IRPs, utilities must also develop Clean Energy Action Plans and Clean Energy Implementation Plans to identify how the utility will meet the statutory requirements of the Clean Energy Transformation Act. WASH. REV. CODE § 19.280.030 (Clean Energy Action Plans); *id.* § 19.405.060(1)-(2) (Clean Energy Implementation Plans). Clean Energy Action Plans are 10-year plans for how a utility will meet resource emission standards under CETA, while still accounting for resource adequacy. *Id.* § 19.280.030(1)(l), (2). Within the Clean Energy Action Plan, a utility must establish a resource adequacy requirement that will guide its resource planning and compliance. *Id.* § 19.280.030(2)(b). Clean Energy Implementation Plans are focused on shorter-term planning, where a utility sets forward specific actions it will meet in the next four years to ensure that it is on track to meet the statutory requirements of CETA. *Id.* § 19.405.060. This includes analysis of resource adequacy. *Id.* § 19.405.060(2)(a)(iv).

Utilities in the region also commissioned a consultancy, Energy and Environmental Economics ("E3"), to study resource adequacy in the Pacific Northwest. *See* Ex. 1-90 at 2 (E3 Resource Adequacy Phase 1 Presentation). E3 presented to the Washington Agencies at the agencies' Fall 2025 Resource Adequacy meeting focused on long-term resource adequacy in Washington State. *See id.* at 1.

25

*B. Centralia Should Retire as Scheduled and as Legally Required Under Washington Law.*

   *1. Centralia Is an Old Coal-Fired Power Plant, the Last in Washington State.*

The Centralia coal plant is located east of Centralia in Lewis County, Washington. It is located about 40–50 miles from Mount Rainier seen in Figure 4 below.

*Figure 4: Centralia Plant
and Mount Rainier*



Source: Ex. 1-100 at 1
(Seattle Times Article).

Centralia is a coal-fired power plant that went online more than fifty years ago in 1971. Ex. 1-113 at 3 (Ecology-TransAlta Agreed Order on Centralia Cleanup). Originally, the plant had two units, each producing 670 MW. Ex. 1-87 at PDF 2 (TransAlta Form EIA-860). While originally owned by investor-owned utilities, TransAlta, a Canadian energy corporation, purchased the plant in 2000. Ex. 1-113 at 3 (Ecology-TransAlta Agreed Order on Centralia Cleanup). The purchase turned Centralia into a merchant plant that enters into contracts for the sale of energy produced at the plant; TransAlta is not regulated by the Washington Utilities and Transportation Commission and cannot pass along costs to ratepayers. Ex. 1-101 at 24, 29 (TransAlta Annual Information Form for Year Ended Dec. 31, 2024).

The plant long obtained coal from a mine on site, but TransAlta discontinued operating the mine in November 2006 and began remediation of the mine site, which remains ongoing. Ex. 1-101 at 23–24 (TransAlta Annual Information Form for Year Ended Dec. 31, 2024). After 2006, the Centralia facility sourced coal from the Powder River Basin in Montana and Wyoming. *Id.* at 23.

Centralia is and has been a significant source of pollution. Centralia is the largest single source greenhouse gas emitter in Washington State. Ex. 1-111 at PDF 1 (2023 GHG Washington Reporting Data). In each year between 2021 through 2024, Centralia emitted thousands of tons of air pollutants such as nitrogen oxides and millions of tons of carbon dioxides annually. Ex. 1-58 at PDF 1 (EPA CEMS Data

2021-2025). In 2024 alone, Centralia emitted over six billion pounds of carbon dioxide and about six million pounds of nitrogen oxides. *Id.*

Centralia is also prone to emissions of other air pollutants that violate its air permit. In December 2025, the Southwest Clean Air Agency issued two notices of violation to TransAlta. The first violation notice was for particulate matter emissions from the fly ash unloading baghouse; the electrostatic precipitators that control its coal fly ash particulate matter emissions failed to keep opacity levels within the permit's limits. Ex. 1-130 at 24, 27, 29 (Southwest Clean Air Agency Compliance Evaluation On-Site Inspection Report (Dec. 12, 2025)); Ex. 1-134 at PDF 3 (Southwest Clean Air Agency Notice of Violation No. 10642) (on-site inspection found significant visible emissions in violation of opacity standard). The second violation notice was due to not fully engaging pollution control equipment until after firing coal as part of starting up the plant. Ex. 1-130 at 38, 86 (Southwest Clean Air Agency Compliance Evaluation On-Site Inspection Report) (coal firing began before the wet scrubber was operational during all four startups in the first half of 2025); Ex. 1-135 at PDF 3 (Southwest Clean Air Agency Notice of Violation No. 10643).

Centralia has also been cited multiple times for exceeding the mercury limits in its air operating permit. Ex. 1-131 at 68 (Southwest Clean Air Agency Basis Statement for TransAlta 2021 Title V Air Operating Permit). Because of atmospheric deposition of mercury, including from coal-fired power plants and in remote locations, both the U.S. Geological Survey and National Park Service have monitored mercury levels in fish at western national parks. Mercury concentrations in fish in Hoh Lake in Olympic National Park were among the highest found, approaching or exceeding the Environmental Protection Agency's human health limit and its benchmark for reproductive impairment in birds. Ex. 1-132 at 22 (Mercury in Fishes in National Parks Report). The National Park Service has attributed the mercury levels in the Olympic National Park to Centralia. Ex. 1-133 at 2–3 (High Levels of Mercury in Fish at Hoh Lake Article).

Centralia's air pollution harms its neighbors. It has consistently been the largest emitter of nitrogen oxide in the state, and it emits large quantities of sulfur dioxide. Ex. 1-09 at 75-77, 171 (Ecology 2018-2028 Regional Haze Plan). When nitrogen oxide and sulfur dioxide are emitted into the air, they can irritate the lungs and harm respiratory systems. Ex. 1-127 at 1 (EPA Basic Information about NO2); Ex. 1-128 at 2 (EPA Sulfur Dioxide Basics). Nitrogen oxide is also a precursor to ozone formation, and sulfur dioxide contributes to the formation of acid rain. Ex. 1-127 at 2 (EPA Basic Information about NO2); Ex. 1-128 at 2 (EPA Sulfur Dioxide Basics). Centralia also emits particulate matter, which can cause serious health problems when inhaled, and can also contribute to haze that impacts visibility. Ex. 1-09 at 70-71, 76 (Ecology 2018-2028 Regional Haze Plan); Ex. 1-129 at 2 (EPA Particulate Matter (PM) Basics).

Centralia also has a long legacy, spanning four decades, of releasing hazardous substances into soils, sediments, and groundwater. Ex. 1-113 at 4-6 (Ecology-

TransAlta Agreed Order on Centralia Cleanup). Burning coal at Centralia creates toxic coal ash. A landfill adjacent to the plant holds roughly over 850,000 cubic yards of coal ash. Ex. 1-10 at PDF 3 (Landfill Inspection Report (Jan. 2025)). In 2024, groundwater monitoring near this landfill showed levels of boron exceeding compliance limits. Ex. 1-06 at §§ 3-1, 4.3 (Groundwater Report (Jan. 2025)). And recent remedial investigations compelled under the 2011 Shutdown Memorandum of Agreement revealed contaminants of concern in soil, sediment, and groundwater above cleanup levels. Ex. 1-113 at 6 (Ecology-TransAlta Agreed Order on Centralia Cleanup); Ex. 1-07 at 1 (Cleanup Site Details (Oct. 2025)).

Of note, Centralia discharges significant amounts of contaminated wastewater back into the Central Packwood Lake and Hanaford Creek, a salmon stream supporting Endangered Species Act-listed salmon populations. Ex. 1-80 at 8 (Fisheries Report); 50 C.F.R. § 226.212 (Lewis County designated as critical habitat for salmon and steelhead populations listed under the Endangered Species Act); Ex. 1-125 at 3 (ECHO Pollutant Loading Report (DMR)). Recent effluent data shows exceedances of the permitted levels of chromium, a toxic substance discharged from Centralia. Ex. 1-126 at PDF 2 (ECHO Effluent Charts).

All these harms could be avoided by retiring the Centralia plant. Nearly 15 years ago, TransAlta, Washington, and conservation groups negotiated a carefully crafted plan to retire Centralia with funding and time to transition workers, the community, and the state's electricity sources to cleaner sources of energy.

### 2. Centralia's 2025 Retirement is Compelled by a 2011 Washington Law and Environmental Compliance Order.

By 2006, TransAlta's Centralia plant was the only coal-fired power plant in Washington State and the state's largest single source of carbon dioxide and nitrogen oxide (NOx) emissions. Ex. 1-02 at 2 (Declaration of Nancy Hirsh). Nitrogen oxide puts fine particles into the air and causes smog, which poses risks to human health, such as decreased lung function and aggravated asthma, and impairs visibility in national parks and wilderness areas. Ex. 1-127 at 1–2 (EPA Basic Information about NO2).

The Clean Air Act establishes special protections for Class I areas, which include national parks and wilderness areas, with the goal of preventing future and remedying existing visual impairment of air quality in these areas. 42 U.S.C. § 7491. The National Park Service plays a statutorily assigned role in identifying impaired areas and ways to remediate the impairment caused by haze pollution. 42 U.S.C. §§ 7491(d), 7492.

Based on monitoring and modeling, the National Park Service identified the Centralia plant as the cause of haze pollution adversely affecting air quality at Mount Rainier and Olympic National Parks and numerous wilderness areas in the state,

including Alpine Lakes and Goat Rocks. Ex. 1-102 at 2 (Park Service Comments on BART Proposals (Nov. 2009)); Ex. 1-103 at 7 (Park Service June 2010 Comments on Proposed Haze State Implementation Plan). At the time, the Centralia plant was among the top 10% of worst nitrogen oxide polluters in the nation in 2007. Ex. 1-117 at 2 n.3 (Sierra Club Comments on TransAlta-Ecology Proposed BART Settlement (Nov. 2009)). To reduce Centralia's air emissions, the Washington Department of Ecology ("Ecology") proposed a settlement with TransAlta and an order purporting to require that Centralia employ "Best Available Retrofit Technology" (BART). Ex. 1-02 at 1 (Declaration of Nancy Hirsh). In comments on Ecology's BART proposals and its draft haze state implementation plan, the Park Service provided detailed evidence showing that Selective Catalytic Reduction (SCR) technology would be technically feasible for reducing nitrogen oxide pollution from the Centralia coal plant to meet the Clean Air Act's haze requirements. Ex. 1-102 at 2 (Park Service Comments on BART Proposals (Nov. 2009)); Ex. 1-103 at 7 (Park Service Comments on Proposed Haze State Implementation Plan (June 2010)); Ex. 1-116 at 1 (Nat'l Park Serv. Testimony at BART Hearing re Centralia (2009)).

In 2009, Ecology proposed and, in 2010, it issued a BART order requiring that Centralia install some pollution controls for nitrogen oxide and ammonia, but not Selective Catalytic Reduction technology, which was being required elsewhere to reduce haze pollution from other coal plants. *See* Ex. 1-104 at 2–7 (BART Order No. 6426 (June 18, 2010)). The Sierra Club and others filed comments, petitions, and lawsuits seeking to compel Ecology and the U.S. Environmental Protection Agency to require Selective Catalytic Reduction technology at the Centralia plant. *See, e.g.*, Ex. 1-105 at 6–21 (Sierra Club Comments on Proposed Haze State Implementation Plan); Ex. 1-02 at 1 (Declaration of Nancy Hirsh).

Meanwhile, then-Governor Christine Gregoire issued an Executive Order directing the Department of Ecology to work to obtain TransAlta's commitment to have the Centralia plant meet the State's greenhouse gas emissions performance standard set out in WASH. REV. CODE § 80.80.040(1) by the end of 2025. Ex. 1-114 at PDF 3 (Wash. Exec. Order 09-05 (May 2009)). This would, in practice, require closure of the plant. Ex. 1-02 at 1–2 (Declaration of Nancy Hirsh).

It is against the backdrop of these contentious legal battles that then-Governor Gregoire brought together TransAlta, state regulators, and conservation groups—the Sierra Club, Washington Environmental Council (now Washington Conservation Action), NW Energy Coalition, and Climate Solutions—for intensive negotiations that produced an agreement to shut down the Centralia plant. *Id.* at 2–3. At the core of the negotiations, TransAlta sought to avoid the hefty costs of installing Selective Catalytic Reduction technology and, in return, agreed to shut down Unit 1 by the end of 2020 and Unit 2 by the end of 2025. *Id.* at 3.

The TransAlta Energy Transition Bill, SB 5769, signed by the Governor on April 29, 2011, codified this agreement. Ex. 1-118 at 1 (Energy Transition Bill, SB 5769).

It amended a 2007 law that established a greenhouse gas emissions performance standard for all baseload electric generation for which electric utilities enter into long-term financial commitments. WASH. REV. CODE § 80.80.40(1); *see* Ex. 1-112 at 4 (Energy Facility Site Evaluation Council 2007 Adjudicative Order) (application for new coal-fired power plant without carbon sequestration fails to meet the emissions performance standard). The Energy Transition Act provides:

> A coal-fired baseload electric generation facility in Washington that emitted more than one million tons of greenhouse gases in any calendar year prior to 2008 must comply with the lower of the following greenhouse gas emissions performance standard such that one generating boiler is in compliance by December 31, 2020, and any other generating boiler is in compliance by December 31, 2025.

WASH. REV. CODE § 80.80.040(3)(C)(i). The Energy Transition Act further provides that the performance standard will not apply to Centralia if Ecology determines that federal or state law requires installation of Selective Catalytic Reduction technology on either of the boilers. *Id.* § 80.80.040(3)(C)(ii).

Subsequently, on December 23, 2011, the State and TransAlta entered into a Memorandum of Agreement required by the Energy Transition Act, memorializing and expanding on some of the emissions reductions, pollution control, and financial assistance requirements of the shutdown deal. Ex. 1-106 at 1 (Shutdown Memorandum of Agreement). For their part, conservation groups entered into a Memorandum of Understanding with TransAlta, pledging their support for the shutdown deal before EPA with respect to air pollution controls and before the Washington Utilities and Transportation Commission with respect to a coal transition purchase agreement. Ex. 1-107 (Shutdown Memorandum of Understanding).

The 2011 Energy Transition Act and a subsequent Department of Ecology order require that Centralia utilize various pollution control technologies to reduce nitrogen oxide and ammonia emissions, but do not require use of Selective Catalytic Reduction technology. WASH. REV. CODE § 80.80.100(2)(b); Ex. 1-49 at 4–6 (2011 BART Order). In 2020, Ecology revised its prior BART Order to require Unit 2 to meet a slightly lower nitrogen oxide emissions limit through various potential controls, but still not including Selective Catalytic Reduction technology. Ex. 1-50 at 2–3 (2020 BART Order).

The BART Orders incorporate the requirement to shut down Unit 1 by December 31, 2020, and Unit 2 by December 31, 2025; they explain that the 2011 Energy Transition Act made the state's greenhouse gas performance standard applicable to Unit 1 at the end of 2020 and Unit 2 at the end of 2025, unless Ecology determines Selective Catalytic Reduction technology is required for nitrogen oxides control. *Id.* at 2. The Order's Schedule for Compliance provides that that one of the Centralia

30

units "will permanently case coal-fired power generation operations . . . no later than December 31, 2020," and "[t]he other unit must cease no later than December 31, 2025." *Id.* at 3.

Because Washington law prohibited an electrical company from entering into a long-term contract for power that is not in compliance with the state greenhouse gas performance standard, the 2011 Energy Transition Act created an exemption for coal transition power purchased from Centralia through the mandatory shutdown dates. WASH. REV. CODE § 80.80.040(3)(c)(i). That law further authorized an electric company to seek and the Washington Utilities and Transportation Commission to approve a power purchase agreement for 500 MW of coal transition power from Centralia, subject to the conditions in the shutdown law, through December 31, 2025. *Id.* §§ 80.80.060(9), 80.80.070(7). The statute provided that the utility would be able recover an equity return in addition to the costs of the power. Ch. 180, Wash. Laws of 2011 § 304(4), (6).

Pursuant to this authority, the Washington Utilities and Transportation Commission approved a Puget Sound Energy–TransAlta power purchase agreement for coal transition power on January 9, 2013. Ex. 1-108 at 1, 45–47 (Order Approving Puget-TransAlta Power Purchase Agreement). Under the approved agreement, Puget Sound Energy acquired an average of 346 MW of firm, base-load coal transition power starting in December 2014. *Id.* at 1, 7. From December 2016 to December 2024, the contract was for 380 MW, and the volume dropped to 300 MW in the last year of the agreement. *Id.* at 7. The Commission determined that the Energy Transition Act authorized the recovery not only of the costs of the power, but also an "equity return in the amount of $1.49 per MWh for all deliveries of power under the contract. This 'equity adder,' a unique contract incentive provided by statute exclusively for the purchase of coal transition power, will result in PSE receiving $44.12 million in nominal return on equity, having a net present value of $34.15 million over the full term of the contract." *Id.* at 1, 22–24, 44, 46. TransAlta reports that it also sold electricity from Centralia into the Western Electricity Coordinating Council Western Interconnection and, in particular, in the Pacific Northwest energy market. Ex. 1-101 at 24 (TransAlta Annual Information Form for Year Ended Dec. 31, 2024).

A key part of the shutdown deal is TransAlta's commitment to invest in the community and in cleaner sources of energy on the condition that Centralia remain exempt from the state's retail sales and use taxes on coal, which is codified in the Energy Transition Act and incorporated in the Shutdown Memorandum of Agreement. Ch. 180, Wash. Laws of 2011 § 106(3)(c) (making funding obligations conditioned on continuation of the sales and use tax exemptions provided under WASH. REV. CODE §§ 82.08.811 and 82.12.811); Ex. 1-106 at 8 (Shutdown Memorandum of Agreement) (allowing TransAlta to terminate the Memorandum of Agreement if any of the coal tax exemptions are repealed). Specifically, TransAlta agreed to provide $55 million in financial assistance over ten years for economic and community development, worker training, energy efficiency, and the development of

31

energy technologies throughout the state with less harmful health and environmental impacts. Ex. 1-106 at 14 (Shutdown Memorandum of Agreement). Twenty million of that amount is dedicated to education, retraining, economic development and community enhancement for those impacted by the closure of the plant. WASH. REV. CODE § 80.80.100. TransAlta and the state committed to establishing grant review boards to approve grants for weatherization, economic and community development, and clean energy technology. Ex. 1-106 at 4–7 (Shutdown Memorandum of Agreement). The oversight boards have disbursed nearly all the amounts TransAlta contributed to these funds. Ex. 1-02 at 6 (Declaration of Nancy Hirsh). In addition to decommissioning the two units, TransAlta is obligated to clean up hazardous substances and reclaim the site to meet applicable state and federal cleanup standards. Ex. 1-118 at § 201(1) (Energy Transition Bill, SB 5769).

TransAlta retired Unit 1 at the end of 2020, as required by state law, reducing the plant's total capacity to 670 MW (the capacity of Unit 2). Ex. 1-101 at 23–24, 26 (TransAlta Annual Information Form for Year Ended Dec. 31, 2024). Unit 2 has been winding down production and preparing to shut down at the end of 2025, as required by state law. Ex. 1-115 at 3 (TransAlta 2024 Annual Integrated Report). The Centralia facility's coal contracts expired at the end of 2025, and its current contract with Puget Sound Energy expired and cannot be renewed under state law after December 31, 2025. Ex. 1-101 at 23 (TransAlta Annual Information Form for Year Ended Dec. 31, 2024); WASH. REV. CODE § 19.405.030(1).

TransAlta has been developing alternative plans for the Centralia site. On December 9, 2025, TransAlta announced that it has signed an agreement with Puget Sound Energy to convert Centralia to a natural gas power plant. Under the agreement, the conversion will deliver 700 megawatts of power under a 16-year contract that runs through Dec. 31, 2044. TransAlta anticipates obtaining regulatory approvals in early 2027 and commencing operations in late 2028. TransAlta claims the conversion will reduce the emission intensity of the facility by approximately 50%. Ex. 1-109 at PDF 2–3 (Centralia Conversion Announcement); Ex. 1-110 at 1–2 (Centralia Conversion Reporting).

V. REQUEST FOR REHEARING

The Order is a manifestation of the Department's overarching policy to systematically misapply Section 202(c) of the Federal Power Act to preserve fossil-fueled power plants, including coal-fired plants, that otherwise would be retired. That policy aims to bolster the fossil energy industry, irrespective of need, expense, and harm. In its zeal to implement its policy through issuance of the Order, (1) the Department has exceeded the authority Congress gave it, using its "emergency" powers in the absence of any imminent shortfall to impose federal control over basic generation and supply decisions; and (2) the Department has done so without reasoned decision-making and on the basis of purported "facts" that are not supported by credible evidence. *See Michigan v. EPA*, 268 F.3d 1075, 1081 (D.C. Cir. 2001) (explaining that, absent statutory authorization, an agency's action is contrary to law); *Allentown Mack Sales & Serv., Inc. v. Nat'l Labor Rel. Bd.*, 522 U.S. 359, 374 (1998) (explaining agency obligation to undertake reasoned-decision-making); *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 429 U.S. 29, 43 (1983) (same); *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962) ("The agency must make findings that support its decision, and those findings must be supported by substantial evidence."); *Butte Cnty. v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010) ("[A]n agency cannot ignore evidence contradicting its position."). Numerous examples of the Department's unreasoned and unlawful decision-making are described throughout this section V. The only plausible explanation for these repeated legal errors is that the Department has prioritized implementing its policy over compliance with law.

Congress never conferred on the Department the broad authority over the country's mix of power generation resources that the Department seeks to wield under the pretense of responding to claimed "emergencies." To the contrary, Congress explicitly reserved authority over resource adequacy and grid reliability to the states, which operate independently and through an interstate compact known as the Northwest Power and Conservation Council; to FERC; and to NERC. *See, e.g.*, 16 U.S.C. §§ 824(a)–(b), 824o; *Pac. Gas & Elec.*, 461 U. S. at 205. Both the agency's new policy and the Order exceed the Department's authority and are therefore contrary to law.

Before tackling the Order's legal faults and issues, *see infra* secs. V.A through V.D, it is useful to understand the broader context of the Department's policy. The Department acknowledges that its Order is based on a government-wide policy—dictated by Executive Order—of promoting fossil-based energy through the use of any emergency powers executive departments and agencies could try to invoke. Order at 2. The Order relies upon the Energy Emergency Executive Order, 90 Fed. Reg. 8,433, which directs the heads of all executive departments and agencies to use "emergency authorities" and "other lawful authorities" to facilitate the production, extraction, creation, and generation of coal and other fossil fuels. Order at 2 (relying on Ex. 1-36 (Energy Emergency EO)).

33

The Order also relies on another executive order, the Grid EO. *Id.* (relying on Ex. 1-37 (Grid EO)). The Grid EO was issued at the same time as three other executive actions aimed at giving a lifeline to the coal industry, and was announced at a White House political event focused on promoting coal. Ex. 1-38 (NY Times Coal Article). In essence, the Grid EO calls on the Department to assume the authority for resource adequacy and grid reliability decision-making that the Federal Power Act reserves to others, and to "systemize" the issuance of Section 202(c) orders for that improper purpose. *See* Ex. 1-37, 90 Fed. Reg. at 15521–22 (Grid EO) (directing the Department to "streamline, systemize and expedite" the issuance of Section 202(c) orders; to develop a "uniform methodology" for assessing reserve margins and a protocol to retain generators the Secretary deems critical to system reliability; and to prevent certain generators from leaving the bulk power system or converting to a different fuel source).

The Department's words and actions following issuance of the Grid EO reveal its efforts to unlawfully arrogate to itself others' lawful authority through systematic misapplication of Section 202(c) to prop up coal-burning power plants. The Department's initial steps included issuing a Section 202(c) order to prevent the well-planned retirement of the J.H. Campbell coal plant. *See* Order No. 202-25-3 at *passim*. The Department's order was clear on one point—Campbell cannot be allowed to retire—but left vague and unclear almost everything else. *See, e.g.*, *Consumers Energy Co. v. Midcontinent Indep. Sys. Op., Inc.*, 192 FERC ¶ 61,158, at PP 39–40 (2025) (recognizing the variety of interpretations of the Campbell order and settling on "the most reasonable reading of the DOE Order's intended scope"). The Campbell order failed to make clear even where the grid supposedly needed energy from Campbell, selectively quoted sources without examining their context and core findings, and flouted Congress' explicit limitations on the Department's Section 202(c) powers. *See* Motion to Intervene and Request for Rehearing and Stay of Sierra Club et al. at *passim* (June 18, 2025), https://www.energy.gov/sites/default/files/2025-07/PIO%20Request%20for%20Rehearing%20of%20Order%20No.%20202-25-3.pdf.

After preventing Campbell's retirement, the Department has continued to implement its policy. In addition to the Order to TransAlta, the Department has issued Section 202(c) orders to prevent fossil-burning plant retirements in Pennsylvania, Order Nos. 202-25-4, 202-25-8, & 202-25-10, in Indiana, Order Nos. 202-25-12 & 202-25-13, and in Colorado, Order No. 202-25-14.

Additionally, on July 7, 2025, the Department published the "methodology" required by the Grid EO, which the Department explained will "guide reliability interventions," including the use of Section 202(c) orders. Ex. 1-35 at vi (July Resource Adequacy Report); *see also* Ex. 1-39 at 3–4 (DOE July 7 Press Release) ("The methodology also informs the potential use of DOE's emergency authority under Section 202(c) of the Federal Power Act."). The report identifies no present or

34

imminent emergency; at most, using deeply flawed methodology, it identifies a theoretical shortfall of generation in 2030.

Taken together, the Energy Emergency EO, Grid EO, July Resource Adequacy Report, and the Department's Section 202(c) orders reflect a policy to promote the long-term preservation of fossil-fueled electric generation, including coal-fired generation, by using the Department's emergency authority under Section 202(c). To the extent these actions left any room for doubt that the Department has such a policy, Energy Secretary Wright's own words have removed it. In his statement to the press when the Centralia Order issued, Secretary Wright emphasized, "The Trump administration will continue taking action to keep America's coal plants running." Ex. 1-60 (Department Press Release on Centralia Order); *see also* Ex. 1-34 (Secretary Wright's West Virginia Remarks) (reporting Secretary Wright's stated intention to stop the closure of coal plants and claiming authority to do so).

The Department has further reinforced this policy by applying it to TransAlta's Centralia plant.

*A. The Order Addresses Circumstances Beyond the Lawful Scope of an Emergency Under Section 202(c), and Fails to Provide Evidence or Reasoned-Decision-Making Substantiating the Existence of an Emergency that Can Come Within Section 202(c).*

The Order claims an emergency exists within the WECC Northwest assessment area. Order at 1. The Order explains that "the WECC Northwest region . . . includes Montana, Oregon, Washington, and parts of northern California and northern Idaho." *Id.* According to the Order, "the emergency conditions . . . will continue in the near term and are also likely to continue in subsequent years. *Id.* at 3. The Order then identifies the supposed emergency: "the potential loss of power to homes, businesses, and facilities critical to the national defense in the areas that may be affected by curtailments or power outages, presenting a risk to public health and safety." *Id.*

As discussed below, the Order's determination of an emergency in the WECC Northwest assessment area (*i.e.*, in Montana, Oregon, Washington, and parts of northern California and northern Idaho) exceeds statutory authority and is both unreasoned and without substantial evidence.[5]

---

[5] To the extent the Department claims an emergency in some region distinct from the WECC Northwest assessment area defined in the Order, the Department's emergency declaration still exceeds statutory authority and is both unreasoned and without substantial evidence, including (but not limited to) because the Order describes no such region, presents no reasoning associated with any such region,

1. *Legal Framework: Section 202(c) Empowers the Department to Respond Only to Imminent, Certain, and Unexpected Shortfalls in Electricity Supply.*

The Order invokes Section 202(c) of the Federal Power Act, which provides:

> During the continuance of any war in which the United States is engaged, or whenever the Commission determines that an emergency exists by reason of a sudden increase in the demand for electric energy, or a shortage of electric energy or of facilities for the generation of transmission of electric energy . . . the Commission shall have authority . . . with or without notice, hearing, or report, to require by order such temporary connections of facilities and such generation, deliver, interchange, or transmission of electric energy as in its judgment will best meet the emergency and serve the public interest.

16 U.S.C. § 824a(c)(1). That authority was transferred to the Department by the Department of Energy Organization Act. *See* 42 U.S.C. § 7151(b).

Section 202(c)'s text and context establish that an "emergency" enabling the Department to over-ride state and private decision-making must be an event that is imminent, certain, and unexpected. 16 U.S.C. § 824a(c). The constrained scope of Section 202(c)'s emergency authority is confirmed by the broader statutory context—in particular, the separate regime delineating federal authority over bulk-system reliability in Section 215 of the Federal Power Act, *id.* § 824o—as well the Department's regulations, caselaw applying Section 202(c), and the Department's consistent past practice.

i. *The Text and Context of Section 202(c) Confine an Emergency to Imminent, Certain, and Unexpected Events*

Section 202(c)'s text empowers the Department to require generation only in an "emergency." *Id.* § 824a(c). Both the ordinary meaning of the term (which the statute does not expressly define) and statutory context limit the Department's emergency authority to imminent, unexpected, and certain events. At the time Congress enacted Section 202(c), Webster's New International Dictionary of the English Language (1930) defined "emergency" as, with emphasis added here, a "*sudden* or *unexpected* appearance or occurrence... An *unforeseen* occurrence or combination of circumstances which calls for *immediate* action or remedy; *pressing* necessity; exigency." Contemporary dictionaries similarly define "emergency" as demanding

---

offers no credible evidence demonstrating an emergency in such region, and fails to examine the evidence detracting from an emergency determination in such region. Moreover, the Order is unreasoned and not based on substantial evidence in imposing requirements to best meet such an emergency and serve the public interest.

36

imminence: an emergency is "an *unforeseen* combination of circumstances or the resulting state that calls for *immediate* action." Merriam Webster's Dictionary 407 (11th ed. 2009) (emphasis added); *see* 3 Oxford English Dictionary 119 (1st ed. 1913) (defining emergency similarly as "a state of things *unexpectedly* arising, and urgently demanding *immediate* action" (emphasis added)); *see also* Benjamin Rolsma, *The New Reliability Override*, 57 Conn. L. Rev. 789, 812 n.147 (2025) (noting that dictionaries have given the term "emergency" the "same meaning for many years").

The remainder of Section 202(c) underscores the exigency inherent in the governing term "emergency." The authority granted by Section 202(c) is, in the first instance, a war-time power. 16 U.S.C. § 824a(c) (beginning with "[d]uring the continuance of any war in which the United States is engaged"); *see Jarecki v. G.D. Searle & Co.*, 367 U.S. 303, 307 (1961) (noting that statutory terms should be interpreted in the context of nearby parallel terms "in order to avoid the giving of unintended breadth to the Acts of Congress"). An "emergency" under the statute is limited to circumstances of similar urgency: "a *sudden* increase in the demand for electric energy," for example. 16 U.S.C. § 824a(c) (emphasis added); *see Richmond Power & Light v. FERC*, 574 F.2d 610, 615 (D.C. Cir. 1978) (holding that Section 202(c) "speaks of 'temporary' emergencies, epitomized by wartime disturbances"); S. Rep. No. 74-621, at 49 (1935) (explaining that Section 202(c) provides "temporary power designed to avoid a repetition of the conditions during the last war, when a serious power shortage arose").

The text's use of the present tense accentuates its focus on imminent and certain shortfalls: It empowers the Department to act only where "an emergency *exists*." 16 U.S.C. § 824a(c) (emphasis added). The Section's title and text both emphasize that it provides a "temporary" authority, further emphasizing that its emphasis on immediate—not distant—needs. *Id.* § 824a(c), (c)(1); *see Dubin v. United States*, 599 U.S. 110, 120–21 (2023) (cleaned up) ("The title of a statute and the heading of a section are tools available" to resolve "the meaning of a statute," and "a title is especially valuable where it reinforces what the text's nouns and verbs independently suggest."). That near-term focus precludes use of Section 202(c) to pursue broader or long-term energy-policy goals, such as a "fear of overdependence" on foreign oil supplies, *Richmond Power & Light*, 574 F.2d at 617, or "energy independence," Ex. 1-35 at 1 (July Resource Adequacy Report); *see also Richmond Power & Light*, 574 F.2d at 614 (Section 202(c) "speaks of 'temporary' emergencies, epitomized by wartime disturbances, and is aimed at situations in which demand for electricity exceeds supply and not those in which supply is adequate but a means of fueling its production is in disfavor.").

Section 202's overall structure further highlights Section 202(c)'s emphasis on imminent, near-term concerns. The preceding subsections (202(a) and (b)) together define and limit the tools by which the federal government may pursue "abundant" energy supplies in the normal course. 16 U.S.C. § 824a(a) (seeking "abundant supply of electric energy" by directing the federal government to "divide the country into

regional districts for the voluntary interconnection and coordination of facilities for the generation, transmission, and sale of electric energy"); *id.* § 824a(b) (allowing federal government to order "physical connection . . . to sell energy to or exchange energy" upon application, and after an opportunity for hearing). The resulting statutory "machinery for the promotion of the coordination of electric facilities" comprises the following: in subsection (a), an instruction to establish a general framework meant to facilitate "coordination by voluntary action;" in subsection (b), "limited authority to compel interstate utilities to connect their lines and sell or exchange energy," subject to defined procedural and substantive requirements, when "interconnection cannot be secured by voluntary action;" and in subsection (c), "much broader" but "temporary" authority "to compel the connection of facilities and the generation, delivery, or interchange of energy during times of war or other emergency." S. Rep. No. 74-651 at 49 (1935).

That tiered structure—placing primary emphasis on voluntary resource adequacy planning, 16 U.S.C. § 824a(a), specifying limited authority where that voluntary system fails, *id.* § 824a(b), and allowing for "temporary" central command-and-control only in case of an "emergency," *id.* § 824a(c)—requires that Section 202(c) remain narrowly confined to instances of an immediate and unavoidable "break-down in electric supply," S. Rep. No. 74-651 at 49 (1935), rather than a mere desire for more abundant supply in the future, *cf.* Order at 3 (emphasis added) (pointing to conditions that "will continue in the near term and are also *likely* to continue in *subsequent years*" that "*could* lead to the *potential* loss of power . . . in the areas that *may* be affected by curtailments or power outages, presenting a *risk* to public health and safety"). The tiered structure authorizes increasingly intrusive federal intervention, but under increasingly narrow circumstances. Interpreting Section 202(c)'s "emergency" powers to permit the Department to compel generation based on nothing more than the generalized challenges of operating a reliable bulk electric system in a transforming energy landscape, or concerns over longer-term resource adequacy, *see* Order at 1–3, would unwind the careful balance of voluntary, market-driven action and federal power set out in Sections 202(a) and 202(b). Such an interpretation cannot be squared with the statutory text and structure. *See Otter Tail Power Co. v. Fed. Power Comm'n*, 429 F.2d 232, 233–34 (8th Cir. 1970) (holding that Section 202(c) "enables the Commission to react to a war or national disaster," while Section 202(b) "applies to a crisis which is likely to develop in the foreseeable future").

> ii. *Congress' Enactment of a Specific, Cabined Scheme to Address Reliability Concerns Confirms That Generalized or Long-Term Bulk Power System Reliability Concerns Are Not an "Emergency" Under Section 202(c).*

That the Department's Section 202(c) emergency powers do not extend to general supervision of bulk power-system reliability is confirmed by Section 215 of the Federal Power Act—which specifically and directly delineates the scope of federal authority to enforce mandatory reliability requirements for the bulk power system. 16 U.S.C. § 824o. Congress added Section 215 to the Federal Power Act in 2005

precisely because the Act as it then existed—including Section 202—did not give the federal government the power to enforce measures designed to ensure bulk-system reliability. *See Rules Concerning Certification of the Elec. Reliab. Org.; and Procedures for the Establishment, Approval, and Enforcement of Elec. Reliab. Standards*, 70 Fed. Reg. 53,117, 53,118 (Sept. 7, 2005) ("In 2001, President Bush proposed making electric Reliability Standards mandatory and enforceable," leading to enactment of Section 215 in 2005); Ex. 1-99 at page 7-6 (2001 National Energy Policy) (noting that "[r]egional shortages of generating capacity and transmission constraints combine to reduce the overall reliability of electric supply in the country" and that "one factor limiting reliability is the lack of enforceable reliability standards" because "the reliability of the U.S. transmission grid has depended entirely on *voluntary* compliance," and then recommending "legislation providing for enforcement" of reliability standards (emphasis added)); S. Rep. No. 109-78 at 48 (2005) (stating that Section 215 "changes our current voluntary rules system" for bulk-system reliability "to a mandatory rules system"); *see also Alcoa, Inc. v. FERC*, 564 F.3d 1342, 1344 (D.C. Cir. 2009) (noting that prior to the Energy Policy Act of 2005, "the reliability of the nation's bulk-power system depended on participants' voluntary compliance with industry standards").

By enacting Section 215, Congress provided a comprehensive and carefully circumscribed scheme to empower the federal government to enforce bulk-system reliability requirements. That statutory scheme strikes a careful balance between state and federal authority, and between private, market-driven decisions and top-down control. Reliability standards are devised by NERC independent "of the users and owners and operators of the bulk-power system" but with "fair stakeholder representation." 16 U.S.C. § 824o(c)–(d); *see also id.* § 824o(a)(3) (defining reliability standards as "a requirement . . . to provide for reliable operation of the bulk-power system"). FERC may approve or remand those standards (but not replace them with its own) and is required to "give due weight" to NERC's "technical expertise" while independently assessing effects on "competition." *Id.* § 824o(d)(2)–(4). Section 215 provides specified enforcement mechanisms and procedures for reliability standards—which mechanisms conspicuously exclude the power to command specific generation resources to remain operational. *Id.* § 824o(e). And Section 215 carefully preserves state authority over "the construction of additional generation" and in-state resource adequacy, establishing regional advisory boards to ensure appropriate state input on the administration of reliability standards. *Id.* § 824o(i)–(j).

Interpreting Section 202(c) to permit the Department to mandate generation based on its own unfettered assessment of bulk-system reliability needs would effectively allow the Department to bypass Section 215's procedural safeguards, constraints on federal authority, and protection of state power. Such a bypass would impermissibly "contradict Congress' clear intent as expressed in its more recent," reliability-specific legislation, enacted "with the clear understanding" that the Department had "no authority" to address long-term reliability through Section 202(c). *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 142 &

149 (2000); s*ee also Cal. Indep. Sys. Operator Corp. v. FERC*, 372 F.3d 395, 401–02 (D.C. Cir. 2004) ("Congress's specific and limited enumeration of [agency] power" over a particular matter in one Section of the Federal Power Act "is strong evidence that [a separate Section] confers no such authority on [agency]."). Congress has, in Section 215, directly established the mechanisms (and limitations) by which the federal government may compel action to ensure the reliability of bulk power electric system. In so doing, it has confirmed that the Department may not, through Section 202(c) "emergency" orders, use those reliability concerns to mandate the generation it views as required to address broad resource adequacy problems; the Department's emergency authority is confined to specific and imminent supply shortfalls requiring immediate response.

### iii. *The Department's Regulations Similarly Establish that Section 202(c) Emergency Authority Can Only Be Invoked to Address Imminent, Certain Supply Shortfalls Requiring Immediate Response.*

The Department's regulations demonstrate its own long-standing understanding that Section 202(c)'s emergency authority is confined to imminent, certain, and otherwise unavoidable resource shortages, and does not provide a mechanism to address broad, long-term concerns as to the reliability of the bulk power system. The regulations recognize that an emergency under Section 202(c) requires, first, "a *specific* inadequate power supply situation." 10 C.F.R. § 205.371 (emphasis added). The Department's non-specific dissatisfaction with regional power planning does not, consequently, empower the Department to override that planning by emergency order. The need for both specificity and certainty is repeated in the Department's regulations defining an inadequate energy supply: "A system may be considered to have" inadequate supply when "the projected energy deficiency . . . *will* cause the applicant [for a 202(c) Order] to be unable to meet its normal peak load requirements based upon use of all of its otherwise available resources so that it *is* unable to supply adequate electric service to its customers." 10 C.F.R. § 205.375 (emphasis added). The same provision suggests that an emergency will generally exist only when "the projected energy deficiency . . . without emergency action by the [Department], will equal or exceed 10 percent of the applicant's then normal daily net energy for load." *Id.*

The regulations further recognize that Section 202(c) does not provide a means of planning against months-off expectations or risks. They define an emergency as "an *unexpected* inadequate supply of electric energy which may result from the *unexpected* outage or breakdown" of generating, transmission, or distribution facilities—not a tool to ensure future energy abundance, or override state and private planning that the Department deems inadequate. 10 C.F.R. § 205.371 (emphasis added). Emergencies are characterized by shortages produced by "weather conditions, acts of God, or unforeseen occurrences not reasonably within the power of the affected 'entity' to prevent." *Id.* Where the culprit is increased demand, it must be "a *sudden*

40

increase in customer demand," *id.* (emphasis added), rather than demand projections producing non-immediate reliability concerns.

And while the regulations suggest that "inadequate planning or the failure to construct necessary facilities can result in an emergency," they recognize that the Department may not utilize a "continuing emergency order" to mandate long-term system planning. *Id.* The regulations also recognize that "where a shortage of electricity is projected due solely to the failure of parties to agree to terms, conditions, or other economic factors" there is no emergency "unless the inability to supply electric service is *imminent.*" *Id.* (emphasis added). An emergency may exist where past planning failures produce an immediate, present-tense shortfall (that is where, a shortfall *results* from insufficient planning); the Department has no authority to commandeer bulk-system reliability planning merely because it deems current plans inadequate. *See* 10 C.F.R. § 205.375 (requiring present inability to meet demand to demonstrate inadequate energy supply). As the Department stated when it promulgated those regulations, the statute allows the Department to provide "assistance [to a utility] during a period of unexpected inadequate supply of electricity," but does not empower it to "solve long-term problems." *Emergency Interconnection of Elec. Facilities and the Transfer of Elec. to Alleviate an Emergency Shortage of Elec. Power,* 46 Fed. Reg. 39,984, 39,985–86 (Aug. 6, 1981).

### iv. Courts Have Uniformly Held that Section 202(c) Can Be Invoked Only in Immediate Crises.

Caselaw applying Section 202(c) further supports the narrow circumstances under which it permits the Department to seize command of the power system. *Richmond Power and Light* arose out of the 1973 oil embargo. The Federal Power Commission responded to the embargo by calling for voluntary transfer of electricity from non-oil power plants to areas of the country that relied heavily on oil, such as New England. 574 F.2d at 613. The New England Power Pool was not convinced that the voluntary program would work and petitioned the Commission for a 202(c) order. *Id.* Rather than issue such an order, the Commission facilitated an agreement between state commissions and supplying utilities, which satisfied the New England Power Pool, leading it to withdraw its petition. *Id.* A dissatisfied utility sought judicial review of the Commission's decision to allow the withdrawal of the Section 202(c) petition. *Id.* at 614.

The court easily upheld the Commission's decision not to invoke Section 202(c). *Id.* Though the oil embargo had ended, the utility argued that the "high cost and uncertain supply of imported oil" justified an emergency order. *Id.* The Commission countered that the voluntary program had worked, the New England Power Pool never interrupted service, and there was no need for a Section 202(c) order. *Id.* at 615. The D.C. Circuit agreed. *Id.* The utility alternatively argued that "dependence on imported oil leaves this country with a *continuing* emergency." *Id.* (emphasis added). The court observed that Section 202(c) "speaks of 'temporary' emergencies,

41

epitomized by wartime disturbances." *Id.* Interpreting this statutory language, the court upheld the Commission's view that Section 202(c) cannot be used when "supply is adequate but a means of fueling its production is in disfavor." *Id.*

*Richmond Power and Light* thus teaches that Section 202(c) is not an appropriate means to implement long-term national policy to switch fuels. The provision allows only a temporary fix for a temporary problem.

The Eighth Circuit has similarly held that Section 202(c) can only be used to respond to immediate crises. In *Otter Tail Power*, a utility insisted that the only way for the Federal Power Commission to properly order the utility to connect to a municipal power provider was to issue a Section 202(c) order. 429 F.2d at 234. Demand for electricity in the city had increased, and the peak load of the municipal power provider was getting to be so high that both of its two generators would likely need to be used simultaneously in the near future, "causing a possible loss of service should one malfunction during a peak period." *Id.* at 233–34. To avoid this possible loss of service, the Federal Power Commission issued a Section 202(b) order, requiring the utility to connect to the municipal power provider. *Id.* The utility argued that the Federal Power Commission used the wrong provision and should have used Section 202(c) instead. *See id.*

The court explained that Section 202(c) "enables the Commission to react to a war or national disaster" by ordering "immediate" interconnection during an "emergency." *Id.* at 234. For non-emergency situations, "[o]n the other hand, Section 202(b) applies," including when there is a "crisis which is likely to develop in the foreseeable future but which does not necessitate immediate action on the part of the Commission." *Id.* The court upheld the Commission's use of Section 202(b) instead of Section 202(c) because there was no immediate emergency. *See id.* The case law thus uniformly supports that Section 202(c) can only be used in short-term, urgent emergencies.

> *v. The Department's Prior Orders Recognize that Section 202(c) Does Not Confer Plenary Authority Over Bulk-System Resource Adequacy.*

The Department's consistent application of Section 202(c) prior to 2025 further corroborates the urgency of the emergency conditions that are the necessary predicate for any Department intervention under that Section 202(c). *See Fed. Trade Comm'n v. Bunte Bros., Inc.*, 312 U.S. 349, 352 (1941) ("[J]ust as established practice may shed light on the extent of power conveyed by general statutory language, so the want of assertion of power by those who presumably would be alert to exercise it is equally significant in determining whether such power was actually conferred."). Since obtaining authority under Section 202(c) in the 1970s and prior to 2025, the Department has consistently used Section 202(c) to address specific, imminent, and unexpected shortages—not to address longer-term reliability concerns or demand forecasts. *See, e.g.*, Ex. 1-13 at 1 (DOE Order No. 202-22-4) (responding to ongoing

42

severe winter storm producing immediate and "unusually high peak load" between Christmas Eve and Boxing Day); Ex. 1-16 at 1–2 (DOE Order No. 202-20-2) (responding to shortages produced by ongoing extreme heat and wildfires); Ex. 1-20 at 1 (DOE Order No. 202-08-1) (ordering temporary connection of facilities in response to "massive devastation caused by Hurricane Ike," leaving "large portions" of Texas "without electricity"); *see also* Rolsma, 57 Conn. L. Rev. at 803–04 (describing "sparing[]" use of Section 202(c) outside of war-time shortages during the twentieth century).[6] Public Interest Organizations are not aware of any instance in which, before 2025, the Department utilized Section 202(c) to mandate generation the Department viewed as necessary to ensure long-term resource sufficiency, or in response to generalized regional risks that had not produced any particular, defined generation shortfall, and for good reason: Any such use would exceed the Department's statutory authority.

2. *The Order's Primary Focus is Long-Term Bulk-System Reliability, Which Is Not a Basis to Mandate Generation Under Section 202(c).*

The Department's determination that an emergency exists rests on its assertion that "increasing demand and accelerated retirement of generation facilities . . . could lead to the potential loss of power to homes, businesses, and facilities critical to the national defense." Order at 3. This determination focuses primarily on long-term concerns, noting that such conditions are "likely to continue in subsequent years" in concluding that an emergency designation is appropriate. *Id.* Those concerns—even if fully substantiated—would not be a basis to mandate Centralia's continued operation. And they are not substantiated. Regional coordinating entities and state and local regulatory authorities (collectively, "Regional Planners"), as well as utilities and other local entities, have taken and are continuing to take steps to address longer-term concerns to ensure no resource shortfall arises.

---

[6] The Department has also narrowly tailored the remedies in Section 202(c) orders to ensure that the orders only address the stated emergency, to limit the order to the minimum period necessary, and to mitigate violations of environmental requirements and impacts to the environment. *See, e.g.*, Ex. 1-13 at 4–7 (DOE Order No. 202-22-4) (limiting order to the 3 days of peak load, directing PJM to exhaust all available resources beforehand, requiring detailed environmental reporting, notice to affected communities, and calculation of net revenue associated with actions violating environmental laws); Ex. 1-16 at 3–4 (DOE Order No. 202-20-2) (limiting order to the 7 days of peak load, directing CAISO to exhaust all available resources beforehand, requiring detailed environmental reporting).

i. *Even Assuming* Arguendo *Evidentiary Support, the Department's 2027-Onwards Concerns Are Not an "Emergency" Within the Meaning of 202(c).*

As an initial matter, even if the Order's claimed emergency conditions were established (they are not), reliability concerns arising beyond "the near term . . . in subsequent years," Order at 3, do not qualify as an emergency under Section 202(c). Such concerns are neither imminent nor unexpected. The Department's stated concerns cannot plausibly be characterized as a "*sudden* increase in the demand for electric energy" or a "shortage" in electric energy, generation, or transmission" constituting an emergency. 16 U.S.C. § 824a(c)(1) (emphasis added).

At most, the Order describes long-term trends that may affect the reliability of the bulk power system in the future if left unaddressed. The Order's longer-term concerns are based on projections of demand increases, changes in the mix of power supply resources, challenges in resource development (including challenges "due to . . . federal policy headwinds"), and the Administration's view of foreign actors. *See* Order at 1–3 (quoting Ex. 1-90 at 2 (E3 Resource Adequacy Phase 1 Presentation)).

While many of the Order's stated concerns are the province of state, regional, and private entities, Congress has provided certain mechanisms for the federal government to address the reliability concerns raised in the Order. The emergency provision in Section 202(c), along with the Department's claimed power to seize command-and-control authority over generating resources like Centralia, are not among those mechanisms.

The congressionally provided mechanisms to the federal government include Section 202(a), which allows the federal government to pursue "an abundant supply of electric energy" but only by facilitating "*voluntary* interconnection and coordination of facilities for the generation, transmission, and sale of electric energy" 16 U.S.C. § 824a(a) (emphasis added). Additionally, under certain circumstances, Section 202(b) allows the federal government to require utilities to sell or exchange energy with other facilities, but only upon application and with "no authority to compel the enlargement of generating facilities for such purposes." *Id.* § 824a(b).

Another mechanism, Section 215, provides for mandatory, nationwide reliability standards developed and enforced by a federally certified but independent entity. 16 U.S.C. § 824o(d), (e). "These standards," the Department explains, "ensure that all owners, operators, and users of the bulk-power system have an obligation to maintain system security and reliability." Ex. 1-62 at 7 (Department Export Authorization EA-365-C (Oct. 21, 2025)). The standards cannot be enforced by ordering generation facilities to operate, and Section 215 specifically disallows requiring the "construction of additional generation" or "enforc[ing] compliance" with "adequacy" standards. 16 U.S.C. § 824o(e), (i)(2).

Additionally, the Department of Defense has the authority to plan and provide for the energy reliability and resilience of "critical missions" of the Defense Department. 10 U.S.C. § 2920. Such planning "shall . . . favor the use of full-time, installed energy sources rather than emergency generation" and "shall promote the use of multiple and diverse sources of energy, with an emphasis favoring energy resources originating on the [military] installation." 10 U.S.C. § 2920(b)(2).

The Order purports to mandate generation based upon the Department's assessment of the bulk power system's long-term reliability needs, a power Congress chose not to provide *any* federal agency. *See* 16 U.S.C. § 824o(e) (specifying enforcement mechanisms for federal reliability standards). And what authority Congress has authorized to implement mandatory reliability standards it provided to FERC—not the Department. *Alcoa,* 564 F.3d at 1344. Reliability concerns in future years simply do not constitute an emergency within the meaning of Section 202(c).

Section 202(c) provides an explicitly "temporary" authority, 16 U.S.C. § 824a(c), preventing any interpretation of its terms that might encompass a potential longer term resource adequacy emergency in "subsequent years." Order at 3. The expansive interpretation of Section 202(c) implicit in the Order, stretching the meaning of "emergency" to cover resource planning concerns over "years" subsequent to the near term, is further precluded by the Federal Power Act's express background principles of permitting "Federal regulation" only of "matters which are not subject to regulation by the States," and disavowing "jurisdiction, except as specifically provided" over "facilities used for the generation of electric energy." 16 U.S.C. § 824(a), (b)(1); *see Duke Power Co. v. Fed. Power Comm'n,* 401 F.2d 930, 938 (D.C. Cir. 1968) (explaining that the Federal Power Act's policy declarations are "relevant and entitled to respect as a guide in resolving any ambiguity or indefiniteness in the specific provisions which purport to carry out its intent"). The Department knows that "resource adequacy planning and capacity requirements . . . have traditionally been the domain of state regulatory commissions, NERC-certified Regional Entities, and RTOs/ISOs," *i.e.*, not the Department. Ex. 1-62 at 5 n.4 (Department Export Authorization EA-365-C (Oct. 21, 2025)).

Through the Order, the Department expressly seeks to override the decisions of Regional Planners and utilities pursuant to the procedures established by Congress to ensure abundant electricity supplies and the reliability of the bulk-electric system. Section 202(c) does not permit that effort to transform the statutory scheme from one driven primarily by market- and state-based decision-making to one consolidating centralized command-and-control in the Department. And it especially does not permit that transformation in service of the Department's desire to dictate "how much coal-based generation there should be over the coming decades"—a power that the Supreme Court has found Congress "highly unlikely" to have left to agency discretion. *West Virginia v. EPA*, 597 U.S. 697, 729 (2022).

45

> ### ii. The Order Does Not Demonstrate Any Long-Term Resource Adequacy Concerns that Are Not Already Being Addressed Through the Appropriate Processes Under the Federal-State Balance of Responsibilities.

In addition to being an invalid basis for Department action under Section 202(c), the Order's discussion of long-term concerns is unreasoned and without substantial evidence, including because the Order both overestimates the potential of a shortfall and underestimates the ability of existing processes to address any projected shortfall. The Order discusses two sources touching on long-term planning, neither of which presents circumstances anywhere near an emergency in the region. And many other sources the Department fails to consider further undermine the Department's claim.

The E3 presentation identifies resource gaps in the studied region extending to 2030 *based on the assumptions and inputs embodied in that presentation.* For example, the resource gaps in the presentation do not include the planned resources already in utilities' integrated resource plans. Ex. 1-67 at 3 (Email Correspondence with E3); *see* Ex. 1-90 at 10 (E3 Resource Adequacy Phase 1 Presentation). The planned resources in utilities' integrated resource plans are sufficient to fill the identified resource gaps for all years that E3 studied. Ex. 1-67 at 4 (Email Correspondence with E3); Ex. 1-90 at 10, 21 (E3 Resource Adequacy Phase 1 Presentation). As such, the E3 presentation demonstrates the role that traditional actors are playing to secure resource adequacy. Moreover, as also discussed *infra* sec. V.A.3.ii, the E3 presentation assumes a static level of imports across all years that is below the studied region's demonstrated import capability. The level of imports "is not intended to represent the maximum import capability of the region E3 studied." Ex. 1-67 at 3 (Email Correspondence with E3).

The E3 presentation's long-term projections are also subject to significant uncertainty. According to an independent evaluation of the E3 Presentation, "[t]he scale and nature of the winter resource adequacy challenge in the Pacific Northwest depends strongly on future load growth, which remains highly uncertain due to both data center demand and electrification trends," while "[l]arge load flexibility could mitigate most or all near-term winter resource adequacy needs under most load scenarios." Ex. 1-24 at 12–13 (Sylvan & GridLab Independent Evaluation of E3 Presentation). In fact, even assuming that only resources already in development come online by 2030, Sylvan and GridLab conclude that in 2030 "large load management could reduce average outages among other customers during critical winter weather conditions from 19 hours to 0.1 hours." *Id.* at 16, 41.

The Order also cites the Department's July Resource Adequacy Report as evidence of a potential emergency years down the road. Order at 2–3 (citing Ex. 1-35 at 1 (July Resource Adequacy Report)). But there is no reason to believe the July 2025 Report actually informs the emergency determination; the Order's discussion of the July 2025 Report is strictly limited to (1) mentioning that the report was issued pursuant

to presidential directive and (2) inserting a conclusory quotation regarding "the Nation's power grid" found on page 1 of the report. *Id.*

Moreover, even granting for argument's sake that the July 2025 Report does not contain the myriad inaccurate assumptions and methodological flaws discussed below, the report undercuts the Order's emergency determination. The July 2025 Report depicts the "Washington Region" and the "Oregon Region" as having some of the lowest risk in 2030 of the entire country. *See* Ex. 1-35 at 6, 37 (July Resource Adequacy Report). And the normalized unserved energy in 2030 in the "West Non-CAISO" region,[7] according to the report, is lower than any other region of the country. *See* Ex. 1-01 at 35 (Expert Report of Current Energy Group).

The lack of evidence for a long-term emergency is underscored by the fact that the Department's own analysis premises a resource adequacy shortfall on a type of demand increase (large load buildout), Ex. 1-35 at 2–3, 15–17 (July Resource Adequacy Report), that the report goes on to admit would likely never actually be allowed to destabilize the grid. Specifically, the report notes that its analysis "is not an indication that reliability coordinators would allow this level of load growth to jeopardize the reliability of the system." *Id.* at 14. In other words, even taking the report at face value, it does not identify a shortfall of a type and nature that could justify invocation of the Department's Section 202(c) emergency authority. At best, the report highlights that data centers cannot be built at projected rates unless new generation is built, which is far from the type of emergency situation that could provide the basis for a Section 202(c) order.

The July 2025 Report does not credibly project conditions in 2030 because of its many inaccurate assumptions and methodological errors. The Department is on notice of these flaws. *See, e.g.*, Ex. 1-40 at *passim* (PIOs' RFR of July Resource Adequacy Report); Ex. 1-40a at 2 (Department's Response to PIOs' RFR of July Resource Adequacy Report). Yet the Order cites the July 2025 Report without providing a reasoned explanation of how it could credibly rely on the report in light of the identified flaws.

Most glaringly, the Department's July 2025 Report overestimates demand growth and expected facility retirements while underestimating the likelihood of new entry. This biases the entire report in the direction of over-identifying resource adequacy concerns. Ex. 1-41 at 21–25 (Inst. Pol'y Integrity Report); Ex. 1-42 at 2–4 (GridLab Report). Ex. 40 at 34–35 (PIOs' RFR of July Resource Adequacy Report) (citing

---

[7] The "West Non-CAISO" region is roughly, according to the report's delineations, the Western continental United States excluding the California Independent System Operator and nearby areas. *See* Ex. 1-35 at 6, 35, 37 (July Resource Adequacy Report).

47

multiple expert reports and initiatives demonstrating the potential for flexibility of large data center loads, including Ex. 1-43 (Duke University Rethinking Load Growth Study)).

The Report also "departs from best [modeling] practices by using a deterministic modeling rather than a probabilistic approach," and thereby fails to account for necessary uncertainties. Ex. 1-41 at 19 (Inst. Pol'y Integrity Report). And in many places the Department simply does not explain its own methodology. The report states that its model is derived from NERC's Interregional Transfer Capability Study, which is focused on the ability of the transmission system to transfer power between regions. Ex. 1-35 at 2 (July Resource Adequacy Report). However, the report inexplicably excludes new transmission projects from its analysis, ignoring that transmission improvements can be the most cost-effective way to improve grid reliability. The Department's July 2025 Report also departs from sound statistical reasoning by, for instance, calling out PJM for failing loss-of-load criteria under one realization of a possible weather year that would include Winter Storm Elliott, without considering that a system's loss-of-load expectation is averaged across all simulated weather years. Ex. 1-41 at 19 (Inst. Pol'y Integrity Report); Ex. 1-35 at 7, 9, 27 (July Resource Adequacy Report). The Department also added more "perfect capacity" (in megawatts) within its modeling than actually needed to bring regions to its targeted Normalized Unserved Energy level. Ex. 1-41 at 26 (Inst. Pol'y Integrity Report); Ex. 1-35 at 19, 27, 30, 32, 40 (July Resource Adequacy Report). These analytical failings in and of themselves disqualify the report as a viable source of evidence for an emergency finding.

Finally, on its opening page, the report acknowledges that its analysis is general in nature, looking at the country as a whole, and that the various "entities responsible for the maintenance and operation of the grid" have information "that could further enhance the robustness of reliability decisions" in the sections of the grid they administer. *Id.* at i. This type of generalized analysis based on incomplete information is simply insufficient to justify a Section 202(c) emergency finding for the WECC Northwest assessment area or any other specific region.

Additionally, the Order fails to consider many other facts and processes that undercut its emergency claim. NERC's annual Long-Term Reliability Assessments examine each region over a period of 10 years. *See* Ex. 1-123 at 6 (NERC 2024 Long-Term Reliability Assessment). NERC's most recent assessment finds that, even with the planned retirements of multiple coal and natural gas units in the region and the potential for increased demand, the WECC Northwest assessment area is within a larger region that has sufficient resources to exceed a reference margin level through 2031. *Id.* at 127–28. When Tier 2 resources are considered, the large region surpasses NERC's reference margin level through the timeline considered in the study. *Id.*

Other planning documents and processes that the Order fails to consider include those of Washington State, the Power Council, the Western Power Pool, WECC,

48

Bonneville, and Puget. *See* Ex. 1-01 at 25–33 (Expert Report of Current Energy Group) (collecting and examining studies). For instance, on November 19, 2025, the Washington Agencies reported to Governor Bob Ferguson that recent "[r]eliability assessments . . . indicated that the Northwest's electrical grid meets national resource adequacy criteria over the near and medium terms under a broad range of operating conditions." Ex. 1-89 at PDF 2 (Washington Agencies Resource Adequacy Meeting Summaries (Compiled)). The Department fails to even reconcile the Order with its finding that "NERC's FERC-approved comprehensive enforcement mechanism ensures that bulk-power system owners, operators, and users have a strong incentive both to maintain system resources and to prevent reliability problems that could result from movement of electric supplies through export." Ex. 1-62 at 6 (Department Export Authorization EA-365-C (Oct. 21, 2025)).

To engage in reasoned decision-making based on a planning study necessitates following important basic principles. Falling below a specific resource adequacy goal that is based on a 1-in-10 LOLE standard does not by itself create a loss of load event. Instead, it indicates conditions in which system planners might expect more than one shortfall per decade. *See* Ex. 1-01 at 11 (Expert Report of Current Energy Group). Importantly, a small deviation below the resource adequacy goal will be associated with a small increase in this likelihood (and vice versa). This fact is relevant in the context of system planning because the tradeoff between grid reliability and energy costs is a core part of system planning: no system is ever 100% reliable, and ratepayers do not want to spend too much of their income on energy bills. *See id.* at 5; Ex. 1-67 at 4 (Email Correspondence with E3) ("Any electric system will have some level of resource adequacy risk."). Indeed, for this reason both MISO and PJM have explicit conditions in their tariff that allow for each grid operator to fall below the 1-in-10 LOLE threshold as part of their response to potential higher capacity prices. Thus, treating a potential short- to medium-term dip in the size of the planning reserve margin as an emergency belies both industry practice that explicitly allows for such dips, and basic system planning principles.

3. *The Order Does Not, and Could Not, Provide any Valid Evidence or Reasoned Decision-Making to Support Its Stated Near-Term Resource Adequacy Concerns.*

The Order relies on four principal pieces of evidence to support its emergency declaration: 1) NERC's 2025-2026 Winter Reliability Assessment; 2) a consultant's presentation on resource adequacy; 3) executive orders; and 4) the Department's July 2025 Resource Adequacy Report. Order at 1–3. But none of these sources establishes factual circumstances that come close to meeting the definition of "emergency" that permits Departmental action under Section 202(c). 16 U.S.C. § 824a(c)(1). Moreover, the Department fails to consider many other authoritative and germane analyses (including the Department's own analysis) that undercut its emergency claim. As a result, the Department's emergency determination is unjustified, unreasoned, and not based on substantial evidence.

49

As the following sections explain, the Order is unreasoned and not based on substantial evidence. The Department has misunderstood or misrepresented the few sources on which it relies. It relies on these sources in a vacuum, ignoring two fundamental realities about the current situation in the region: (i) utilities and other load-responsible entities in the WECC Northwest assessment area have prepared diligently for the retirement of Centralia for well over a decade such that its long-planned retirement is not remotely likely to impact the region's resource adequacy; and (ii) Regional Planners in the WECC Northwest assessment area have already determined that the regional grid will be secure this winter with Centralia's retirement. Thus, there is no factual or legal basis for the Department's emergency declaration.

> i. *NERC's 2025-2026 Winter Reliability Assessment Does Not Support the Order's Emergency Finding.*

The Department's first basis for finding an emergency in the WECC Northwest assessment area is its reliance on NERC's 2025-2026 Winter Reliability Assessment. Order at 1 (discussing Ex. 1-59 at 6 (NERC 2025-26 Winter Assessment). Specifically, the Department emphasizes NERC's conclusion that WECC Northwest faces an "elevated risk during periods of extreme weather." *Id.* The Department also recounts NERC's statements that "[Balancing Authorities] are likely to require external assistance during extreme winter weather" and "[e]xternal assistance may not be available during region-wide extreme winter conditions." *Id.* (quoting Ex. 1-59 at 6 (NERC 2025-26 Winter Assessment)). But this reliance on NERC's Assessment is based on a misunderstanding or mischaracterization of the Assessment's nature, purpose, and conclusions.

Fundamentally, the NERC Assessment does not serve the purpose the Department seems to suggest. The purpose of the NERC Assessment is to identify and point out to grid operators the constraints that might arise and implicate grid reliability if not mitigated appropriately. Ex. 1-59 at 4 (NERC 2025-26 Winter Assessment) (stating that the report "is intended to inform industry leaders, planners, operators, and regulatory bodies so that they are better prepared to ensure [bulk power system] reliability"). This means the circumstances flagged by NERC are not necessarily grid emergencies; they are periods of time in which grid operators might need to take certain mitigation measures to maintain grid security.

Crucially, the types of mitigation measures NERC endorses are readily available to grid operators; they do not come close to the extreme measures the Order demands. NERC recommends that reliability coordinators, balancing authorities, and transmission operators "review seasonal operating plans and the protocols for communicating and resolving potential supply shortfalls," including "potentially high generator outages and extreme demand levels," and "review NERC's Resources on Cold Weather Preparations." *Id.* at 7. This list of interventions focuses on operational preparedness rather than resource manipulation as the most viable pathway to

50

ensuring grid stability even in extreme scenarios. Notably absent from this list of recommendations is an invitation or suggestion to interfere with previously established resource management decisions.

The Department also misconstrues NERC's three-tiered risk designations. An "elevated risk" designation does not constitute an emergency because it does not indicate the possibility of imminent shortfalls; indeed, it is only the second of three risk levels used by NERC. Since NERC began providing standardized "risk" assessments by region in the winter of 2023-2024, NERC has adhered to a three-tiered assessment of risk: areas facing the least risk are "low" or "normal" risk regions, areas facing the most risk are "high" risk regions, and areas in between are "elevated" risk regions. *See* Ex. 1-91 at PDF 49 (NERC Winter Assessments 2022-24 (Compiled)). NERC's designations of risk in the 2025-26 Winter Reliability Assessment are shown in Figure 5 below.

*Figure 5: NERC's Winter Reliability Risk Area Summary*



Source: Ex. 1-59 at 6 (NERC 2025-26 Winter Assessment).

NERC's determination of "elevated" risk in WECC Northwest indicates only that, in certain extreme circumstances, the area needs to use imports to maintain reserve requirements. *See* Ex. 1-59 at 37 (NERC 2025-26 Winter Assessment). These extreme circumstances, moreover, require a confluence of two extra-ordinary occurrences: "[a]bove-normal peak demand combined with high generator outages in extreme conditions." *Id.* In other words, even if the region faces a double whammy of unusual circumstances, the region can use imports, which are regularly available in the Pacific Northwest, to meet peak demand and maintain the added reserve margin buffer.

NERC's statement that "[e]xternal assistance may not be available during region-wide extreme winter conditions," *id.* at 6, does not support the Department's emergency determination. NERC expressly states that, in WECC Northwest, "[o]perating reserve margins are expected to be met after imports *in all winter scenarios.*" *Id.* at 37 (NERC 2025-26 Winter Assessment) (emphasis added). The entity to which NERC has delegated authority in the Western United States, WECC, explains that "[t]he Northwest is expected to be able to sufficiently meet demand through imports" even in "[e]xtreme winter conditions extending over a wide area." Ex. 1-124 at PDF 4 (WECC's 2025–26 Winter Reliability Assessment Western Overview). NERC also determined that almost all other geographically bordering regions are (1) not winter-peaking regions, and (2) are sufficiently resourced such that they can meet operating reserve margins before importing energy. *See* Ex. 1-59 at 32–38 (NERC 2025-26 Winter Assessment). Moreover, as the Department explains, "Reliability oversight is designed through coordinated efforts amongst Reliability Coordinators to preserve the benefits of interconnected operations and ensure that operations in one area will not adversely impact other areas." Ex. 1-62 at 5 (Department Export Authorization EA-365-C (Oct. 21, 2025)).

Consistent with its foundational purpose, NERC's Assessment treats energy imports from neighbors as mitigations available to grid operators rather than as "anticipated" resources when designating the risk levels of different regions. *See, e.g.*, Ex. 1-59 at 37. This underscores the Department's misunderstanding when it cites to NERC's classification scheme without acknowledging that "risks" identified by NERC can be "mitigated" by this crucial category of resources. In other words, the "elevated risk" identified in NERC's assessment is *not* one of a grid emergency; it is instead a risk of an event that grid operators can mitigate by accessing imports of power from neighboring regions to keep the grid operating smoothly. There is thus no basis to conclude that NERC's Assessment supports the proposition that WECC Northwest has an inadequate energy supply capability or supports the Department's emergency determination. *See* 10 C.F.R. § 205.373(f) (providing that, in determining whether an emergency exists and whether to issue an order under Section 202(c), the Department shall consider whether "adequate electric service to firm customers cannot be maintained without additional power transfers"); *id.* § 205.375 (emphasis added) ("A system may be considered to have an inadequate ... energy supply capability when ... it is unable to meet its normal peak load requirements based upon use of *all of its otherwise available resources ....*").

Additionally, NERC specifically explains why retirements do not create a reliability risk this winter. As NERC says, "[a]n increase in firm imports is seen in the model, 6.1 GW, absorbing the reduction in existing certain capacity of 4 GW." Ex. 1-59 at 37 (NERC 2025-26 Winter Assessment).

The Department cites the Assessment, without delving into its core findings, and fails to explain how it supports the Department's claimed emergency determination. Instead, the Department simply pastes into its Order a quote and a paraphrase from

52

the high-level summary at the front of the document. Order at 1. The Order does not assess the true meaning of NERC's "elevated risk" designation and does not examine the portion of NERC's Winter Reliability Assessment that specifically addresses WECC Northwest. *Compare* Order at 1 (discussing only page 6 of the Assessment), *with* Ex. 1-59 at 37 (NERC 2025-26 Winter Assessment) (specifically addressing WECC Northwest). The Department never independently assesses *any* facts bearing on the Assessment. The Department exceeds its authority by declaring a Section 202(c) emergency based on conditions that are remediable through available resources and that could transpire only during historically extreme weather and a confluence of two unusual circumstances, as well as by using Section 202(c) to prevent the retirement of a generation resource based on a policy preference for coal-fired power.

### ii. The E3 Presentation Does Not Support the Order's Emergency Finding.

The Department's second basis for finding an emergency in the WECC Northwest assessment area is a presentation from E3, a consultancy group. Order at 1 (discussing Ex. 1-90 at 2, 10 (E3 Resources Adequacy Phase 1 Presentation)). The Department notes E3's finding of a resource gap in 2026. *Id.* The Department also points to broader, longer-term considerations addressed in the presentation. *See id.*

The E3 presentation does not support the Department's claimed emergency. The Department's reliance on the E3 presentation for its determination is not reasoned. There are at least four reasons.

First, and perhaps most importantly, the actual and forecasted conditions this winter are at odds with the assumptions in the E3 presentation. The actual and forecasted conditions show that the model likely underestimates the studied region's reliability position.

The E3 presentation uses a model that depends on 30 years of past hydrological conditions and 44 years of past temperatures. Ex. 1-67 at 4 (Email Correspondence with E3). The model "does not reflect actual weather and hydrological conditions presently existing for this winter, such as La Niña" and "[s]imilarly, the model does not reflect weather and hydrological forecasts for this winter." *Id.* To gauge the extent to which the model represents current conditions, weather forecasts and hydrological conditions are among the key factors. *Id.*; *see also* Ex. 1-19 at 63 (FERC Energy Primer) (explaining certain conditions under which hydroelectric power is abundant in the Northwest region, and indicating that the region may increase reliance on coal- and gas-burning generators "[w]hen less water is available"). "Thus, for instance, if prevailing and forecasted hydrological conditions are stronger than the average conditions observed in the 30-year dataset used for the model, and holding constant other factors, the 'Reliability Position' shown on slide 10 [in the E3 presentation] likely underestimates the actual reliability position in the region." Ex. 1-67 at 4–5 (Email Correspondence with E3). The same goes for a winter weather forecast that is

53

milder than the average weather observed in the historical dataset used for the model. *Id.*

The actual and forecasted conditions this winter—both those currently existing and those available to the Department on December 16, 2025—show stronger hydrological conditions than the average conditions in the model's 30-year dataset. The National Oceanic and Atmospheric Administration's December 15 hydrological forecast projects inflows at or above median historical levels for much of the January–February period, and inflows generally tracking (*i.e.,* sometimes slightly below and sometimes slightly above) the median in March and April 2026. *See* Ex. 1-01 at 20–23 (Expert Report of Current Energy Group). "As a result, the hydrologic conditions reflected in these forecasts reduce the likelihood of the most constraining near-term scenarios identified by E3, particularly during winter peak months when cold-weather events can drive elevated demand." *Id.* at 23.

As such, there is strong evidence that the E3 presentation underestimates the studied region's current reliability position. The Department does not reconcile its reliance on the E3 presentation with actual and forecasted conditions this winter. *See* Order at *passim*. The Department does not even evaluate the actual and forecasted conditions. *See id.*

Second, the resource gaps in the E3 presentation are not predictions of the shortage of capacity needed to meet demand. Rather, again consistent with its planning purpose, the E3 presentation calculates the amount of resources needed to meet demand *plus* maintain a planning reserve margin selected by E3 *plus* serve treaty obligations. Ex. 1-90 at 10 (E3 Resource Adequacy Phase 1 Presentation). E3 calculates the planning reserve margin using its own model to achieve a loss of load expectation of one event-day per decade (*i.e.*, the 1-in-10 LOLE standard). Ex. 1-67 at 3 (Email Correspondence with E3); *see* Ex. 1-90 at 10–11 (E3 Resource Adequacy Phase 1 Presentation). Thus, the "Surplus" or "Shortfall" shows whether the region has more or fewer resources needed to achieve, in E3's model, the target risk threshold of a loss of load expectation of one event-day in ten years. Ex. 1-67 at 3–4 (Email Correspondence with E3); *see* Ex. 1-90 at 10–11 (E3 Resource Adequacy Phase 1 Presentation).

For 2026 (and notwithstanding the earlier point about actual and forecasted conditions), the E3 presentation calculates a risk in the studied region that is "slightly elevated" above the target risk. Ex. 1-67 (Email Correspondence with E3); *see* Ex. 1-90 at 10 (E3 Resource Adequacy Phase 1 Presentation). The E3 presentation first calculates a shortfall of 1,321 MW. Ex. 1-90 at 10–11 (E3 Resource Adequacy Phase 1 Presentation). But "in-development" resources reduce that calculated shortfall by 941 MW, from 1,321 MW to 380 MW. Ex. 1-67 at 3 (Email Correspondence with E3); *see* Ex. 1-90 at 10 (E3 Resource Adequacy Phase 1 Presentation); *see also* Ex. 1-29 at 27–29 (FERC Staff Winter Reliability Assessment) (explaining that in the WECC region, 14.1 GW of nameplate capacity additions are completed or expected from

54

March 2025 through February 2026, including roughly 7 GW of additions expected between October 2025 and February 2026). According to E3, this 380 MW shortfall equates to a loss-of-load expectation for 2026 of 0.15, Ex. 1-67a at 4 (E3's Attachment to Email Correspondence with E3); Ex. 1-67b (E3's Attachment to Email Correspondence with E3 (as transmitted in Excel form)), or 0.05 above the 0.1 loss-of-load expectation target.

That slightly elevated risk in 2026 is not a basis on which to declare an imminent shortfall or an emergency. It is a planning signal to guide medium- and long-term state and regional planning. The Department does not evaluate the meaning of the resource gaps identified in the E3 presentation or explain how the slightly elevated risk in 2026 could support the claimed emergency. *See* Order at *passim*.

Third, E3's calculated reliability position for the studied region is further strengthened by the amount of imports likely available to the studied region. The E3 presentation is "intentionally conservative" in assuming 3,750 MW of "firm imports" available to the studied region. Ex. 1-67 at 3 (Email Correspondence with E3); *see* Ex. 1-90 at 10 (E3 Resource Adequacy Phase 1 Presentation). "The 3,750 MW figure is not intended to represent the maximum import capability of the region E3 studied." Ex. 1-67 at 3 (Email Correspondence with E3).

The amount of imports that are likely available this winter to the studied region exceeds E3's assumption by around 1,000 MW, and there is good reason to believe the import capability is even higher. During a January 2024 winter storm known as the "Big Freeze," the Northwest region imported an average of 4,745 MW during peak times and an average of 5,241 MW across all hours, mostly from the Southwest and Rockies. Ex. 1-59 at 52 (NERC 2025-26 Winter Assessment). An independent evaluation of the E3 Presentation recognizes the import capability demonstrated during the Big Freeze, and goes on to assume that the Pacific Northwest can import 5,000 MW, explaining that "[t]he 3,750 MW limit [in the E3 Presentation] aligns well with imports from California during the event, but may neglect additional import capability from Canada and the rest of the West." Ex. 1-24 at 22–23 (Sylvan & GridLab Independent Evaluation of E3 Presentation).

The Department does not evaluate the actual import capability of the WECC Northwest assessment area or explain how, in light of the studied region's likely import capability, the E3 presentation supports the claimed emergency. The Department's failure to consider this relevant factor is unreasoned and means the emergency determination is not based on substantial evidence. *See, e.g.*, 10 C.F.R. § 205.373(f) (providing that, in determining whether an emergency exists and whether to issue an order under Section 202(c), the Department shall consider whether "adequate electric service to firm customers cannot be maintained without additional power transfers"); *id.* § 205.375 (emphasis added) ("A system may be considered to have an inadequate . . . energy supply capability when . . . it is unable

to meet its normal peak load requirements based upon use of *all of its otherwise available resources . . . .*").

Fourth, the E3 presentation evaluates resource adequacy in a different region than the area in which the Department claims an emergency. The area in which the Department claims an emergency is both overinclusive and underinclusive as compared to E3's studied region. Compare Order at 1 (defining region in which claimed emergency exists), with Ex. 1-67 at 2 (Email Correspondence with E3) (defining studied region), and Ex. 1-24 at 22 (Sylvan & GridLab Independent Evaluation of E3 Presentation) (same). While there is a large amount of overlap between the two domains, the Department does not explain whether the 2026 reliability position discussed in the E3 presentation applies to the WECC Northwest assessment area.

Additionally, there are other reasons to think the near-term reliability position in WECC Northwest may be stronger than appears in the E3 Presentation. For instance, the E3 Presentation may undervalue the potential of the hydro system to support resource adequacy. Ex. 1-24 at 25 (Sylvan & GridLab Independent Evaluation of E3 Presentation).

Current Energy Group's evaluation of the E3 presentation demonstrates that, even where that study identifies possible deviations below resource adequacy goals (using conservative assumptions), the actual risk of real-world load loss does not increase significantly. *See* Ex. 1-01 at 17–20, 27–28 (Expert Report of Current Energy Group) ("[A] small modeled resource shortfall does not necessarily indicate a qualitatively different reliability outcome, but rather that the modeled system slightly exceeds the selected risk threshold"). While system planners reasonably strive to achieve the 1-in-10 LOLE threshold (or similar standards), time-limited deviations from that threshold do not offer any insight into the actual loss of load risk in any particular year: actual near-term weather and resource projections are vastly more useful inputs to answer that question. *See id.* at 20. This is particularly true in the WECC Northwest assessment area the Department has identified as the emergency area in the Order, because hydrological conditions are a key variable in any given water season; E3's presentation focuses on water years for that exact reason. *Id.* To gauge the extent to which the model underlying the E3 presentation represents current conditions, hydrological conditions and weather forecasts are among the key factors. Ex. 1-67 at 4 (Email Correspondence with E3) (noting also that the model underlying the E3 presentation reflects neither actual nor forecasted hydrological and weather conditions this winter). It is not reasoned decision-making to simply rip a number in a planning study from its context and reach a conclusion that is at odds with the study's methodology, assumptions and findings.

### iii. The Executive Orders Do Not Provide a Valid Basis to Declare an Emergency Under Section 202(c).

The Department also cites to the Energy Emergency EO and the Grid EO claiming that there is an energy emergency and that the grid is being stressed by unprecedented demand. Order at 2. In the quoted passages from the Energy Emergency EO, the President offered his perspective on issues relating to the nexus between energy usage and "our Nation's economy, national security, and foreign policy." Ex. 1-36 at 90 Fed. Reg. at 8433–34 (Energy Emergency EO). In the Grid EO, the President added his view on the nature and drivers of electricity demand in the country. Ex. 1-37 at 90 Fed. Reg. at 15521 (Grid EO).

Neither executive order supplies valid evidence of an actual energy emergency under Section 202(c) (this winter or anytime). An emergency under Section 202(c) must be a specific inadequate power supply situation. *See supra* sec. V.A.1; *e.g.*, 10 C.F.R. § 205.371.Yet the executive orders provide no factual evidence applicable to the WECC Northwest assessment area for this winter or beyond. *See* Ex. 1-36 at *passim* (Energy Emergency EO); Ex. 1-37 at *passim* (Grid EO). The executive orders thus do not constitute useful evidence, much less substantial evidence. *See, e.g.*, *Chritton v. Nat'l Transp. Safety Bd.*, 888 F.2d 854, 856 (D.C. Cir. 1989) (defining substantial evidence). And reliance on the executive orders' unsupported, generalized conclusions is unreasoned. *Sinclair Wyo. Ref. Co. LLC v. EPA*, 114 F.4th 693, 714 (D.C. Cir. 2024).

Even if the declared national energy emergency were legitimate, a presidential declaration of an emergency does not unlock unlimited agency powers. *See Biden v. Nebraska*, 600 U.S. 477, 500–01 (2023) (presidential declaration of national emergency does not change the limitations on agency's emergency authority as written into statute). The Energy Emergency EO was issued pursuant to authority from the National Emergencies Act.[8] Congress explained that the National Emergencies Act "is not intended to enlarge or add to Executive power. Rather, the statute is an effort by Congress to establish clear procedures and safeguards for the exercise by the President of emergency powers conferred on him by other statutes." S. Rep. No. 94-1168, 3 (1976) (emphasis added). And Section 202(c)'s authority is not triggered by a Presidential emergency declaration; the statute requires that "the

---

[8] Under the National Emergencies Act, no emergency powers unlocked by a Presidential declaration of a national emergency "shall be exercised unless and until the President specifies the provisions of law under which he proposes that he, or other officers will act." 50 U.S.C. § 1631 (emphasis added). The Energy Emergency EO does not adhere to this requirement. Ex. 1-36, 90 Fed. Reg. at 8,434 (Energy Emergency EO) (generically directing agencies to "identify and exercise any lawful emergency authorities available to them, as well as all other lawful authorities they may possess, to facilitate the . . . generation of domestic energy resources.").

Commission determine[] that an emergency exists." 16 U.S.C. § 824a (emphasis added).[9] Thus, the burden is on the Department (which stands in the shoes of the "Commission") to demonstrate that there is an emergency within the narrow terms of Section 202(c); simply pointing to the Energy Emergency EO or the Grid Reliability EO without providing actual evidence that an emergency exists cannot provide the substantial evidence needed to sustain the Order.

### iv. The Department's July 2025 Report Does Not Provide a Valid Basis to Declare an Emergency Under Section 202(c).

The Order's final citation is a brief reference to the Department's July 2025 Report. Order at 2–3. That report includes inaccurate assumption and methodological errors, and there is no reason to believe the July 2025 Report actually informed the emergency determination. *See supra* sec. V.A.2.ii. Moreover, the July 2025 Report merely identifies potential shortfalls years down the road; it offers no actual evidence of any near-term shortfall. Thus, the report provides no evidence to support a near-term emergency, and any reliance on the report to find a near-term emergency is unreasoned.

### v. The Department Fails to Consider the Many Other Resource Adequacy and Reliability Assessments that Undercut the Claimed Emergency.

In addition to misinterpreting and improperly relying on the sources discussed above to make its emergency finding, the Department also ignores several resource adequacy studies, reliability analyses, and planning documents that undercut the Department's emergency determination—including one determination that the Department *itself* made. The Department's failure to consider this cornucopia of conflicting and highly relevant evidence represents a textbook example of unreasoned decision making that is not based on substantial evidence.

The first set of sources undercutting the claimed emergency comes from the Department. The Department has continued to grant entities the authority to export power from WECC Northwest (and other areas) into Canada. *See* Ex. 1-61 (Department Export Authorizations Library); *e.g.*, Ex. 1-62 at 11 (Department Export Authorization EA-365-C (Oct. 21, 2025)) (authorizing exports from multiple interconnection points in Washington State owned by Bonneville).

Under Section 202(e), the Department shall approve an authorization to export power "unless, after opportunity for hearing, it finds that the proposed transmission would impair the sufficiency of electric supply within the United States or would impede or tend to impede the coordination in the public interest of facilities subject

---

[9] The Department has exercised certain powers under Section 202(c) since the DOE Organization Act of 1977. *See* 42 U.S.C. § 7151(b).

to the jurisdiction of the Commission." 16 U.S.C. § 824a(e). The Department interprets the "sufficiency" prong of Section 202(e) "to mean that sufficient generating capacity and electric energy must exist such that the export could be made without compromising the energy needs of the exporting region, including serving all load obligations in the region while maintaining appropriate reserve levels." Ex. 1-62 at 3–4 (Department Export Authorization EA-365-C (Oct. 21, 2025)). To address this prong, the Department "examines whether existing electric supply is available via market mechanisms, and whether potential reliability issues linked to supply problems are mitigated by reliability enforcement mechanisms." *Id.* at 4. The Department interprets the "coordination" prong of Section 202(e) "primarily as an issue of the operational reliability of the domestic electric transmission system" and, "[a]ccordingly, the export must not compromise transmission system security and reliability." *Id.*

The Department's authorizations to export power from WECC Northwest (and other areas) to Canada demonstrate the false basis of the Order's emergency determination. For instance, in its recent export authorization issued less than two months before the Order, the Department explains why allowing exports from WECC Northwest will not impair the sufficiency of domestic electric supply. "From an economic perspective," which the Department explains regards "the supply available to wholesale market participants," the Department "finds that the wholesale energy markets are sufficiently robust to make supplies available to exporters and other market participants serving United States regions along the Canadian and Mexican borders." *Id.* at 4. And from a reliability perspective, through which the Department "focuses on preventing problems that could result from inadequate supplies," the Department says nothing about possible inadequate supplies. *Id.* Instead, the Department recounts the multi-layered and "comprehensive" reliability processes that "ensure[] that bulk-power system owners, operators, and users have a strong incentive both to maintain system resources and to prevent reliability problems that could result from movement of electric supplies through export." *Id.* at 5–6; *see also id.* at 7–8 (explaining further some authorities of balancing authorities and reliability coordinators).

The Order does not reconcile the Order's emergency determination with the export authorizations' findings that markets are sufficiently robust to make supplies available in WECC Northwest and that multi-layered and comprehensive reliability processes incentivize maintenance of system resources. This alone is a sufficient (but not exclusive) reason the Order is unreasoned and not based on substantial evidence.

In addition to departing from the Department's own contemporaneous conclusions, the Order steadfastly fails to address several other studies concluding that there is no reason for alarm in the Pacific Northwest. *See* Ex. 1-01 at *passim* (Expert Report of Current Energy Group). An even-handed assessment of all of the available studies in the region leads to the conclusion that "WECC-Northwest does not face a near-term reliability crisis." *Id.* at 3. And, although some studies project

59

possible shortfalls if things go awry in the medium term, their conclusions are fully addressable through the regular resource adequacy planning process. *Id.* at 4-5. The reports' conclusions complement and support the discussion above demonstrating that there is no basis for an emergency declaration in WECC Northwest. *See supra* sec. V.A.3.i–.iv. And notably, each of these studies reached their conclusions even after factoring in Centralia's scheduled retirement. Ex. 1-01 at 2 (Expert Report of Current Energy Group).

One study the Department improperly fails to address is the WECC 2024 Resource Adequacy Assessment, https://feature.wecc.org/wara/. WECC's 2024 assessment of resource adequacy uses the measure of "demand-at-risk hours." Ex.1-85 at 3 (WECC 2024 Western Assessment of Resource Adequacy Appendix). This measure begins with the one-day-in-ten-year standard. *Id.* To translate that standard into a more granular, hourly level, WECC sets a threshold that, for each hour, there is a 99.98% probability that resources are adequate to serve demand. See *id.* "If the probability of the resource availability falling below demand is greater than a certain threshold— in this case more than 0.02% for one of the hours—WECC notes there is a reliability shortfall in that area for that hour." Ex. 1-97 at 2 (WECC Explainer). As WECC emphasizes and those probabilities make clear, "[d]emand-at-risk-hours are not a prediction that demand will be lost." WECC 2024 Resource Adequacy Assessment, https://feature.wecc.org/wara/. Rather, an hour flagged as "at-risk" is an hour in which the risk is greater than 0.02% that resource availability will be less than demand. *See id.* Demand-at-risk hours constitute a planning signal that must be understood in context:

> [A] finding of demand at risk hours is not necessarily unusual nor a finding of an emergency. Planners take into account both the magnitude of the finding and the trend when making planning decisions, using both to identify the amount and type of measures needed. While any potential shortfall warrants attention, both the magnitude of any identified shortfalls and the rate of increase in 2026 and 2027 do not indicate a resource adequacy shortfall. For example, as shown in Figure 3 above, the 2024 Western Assessment of Resource Adequacy identifies demand-at-risk hours in 2025 under certain scenarios. However, actual system operations during 2025 did not result in supply shortfalls. Modest quantities of modeled demand-at-risk hours are not unusual and should be interpreted as early planning signals rather than evidence of an imminent resource adequacy shortfall.

Ex. 1-01 at 15–16 (Expert Report of Current Energy Group).

WECC goes on to examine the demand-at-risk hours in four scenarios distinguished by the percentage of planned resources that are assumed to actually be built. In each of the first three scenarios—in which 85%, 95%, and 100% of the planned resources are built on time—WECC finds the "NW-Northwest" subregion

faces 0 demand-at-risk hours in 2026 and less than 10 demand-at-risk hours in 2027. Ex. 1-92 at 2–4 (WECC 2024 Western Assessment of Resource Adequacy Demand at Risk Analysis). These results lead WECC to conclude that even the scenario in which only 85% of planned resources are timely built finds "minimal impact in the short-term" in NW-Northwest. WECC 2024 Resource Adequacy Assessment, https://feature.wecc.org/wara/; *see also* Ex. 1-01 at 14 (Expert Report of Current Energy Group) (explaining that the approximately 7 demand-at-risk hours in 2027 under the 85% build scenario is "a minor number").

WECC also examines a fourth, worst-case scenario in which only 55% of resources are timely built. In this scenario, WECC finds the NW-Northwest subregion faces a greater number of demand-at-risk hours in 2026 (approximately 25 such hours). *See* Ex. 1-92 at 7 (WECC 2024 Western Assessment of Resource Adequacy Demand at Risk Analysis). There is good reason to believe, though, that WECC's worst-case scenario is unlikely to materialize in the near term. Between 2018 and 2023, an average of 76% of planned resources in the WECC region came online as scheduled, over 20% more than the rate in WECC's worst-case scenario. WECC 2024 Resource Adequacy Assessment, https://feature.wecc.org/wara/. Moreover, recent data from the Department's Energy Information Administration indicates that a substantial part of WECC Northwest actually built *more* resources in 2025 than were planned. Ex. 1-01 at 14–15 (Expert Report of Current Energy Group) ("Based on Energy Information Administration 860M reports, Washington, Oregon, Idaho, and Montana added more than 1.6GW in 2025, slightly beating the 1.53GW of additions planned for 2025 and the ~1GW of additions in 2024."). Furthermore, Washington has signaled through recent legislation that more efficient and effective permitting of clean energy sources is a priority for the state. Act Relating to Clean Energy Siting, ch. 230, § 1, 2023 Wash. Sess. Laws 1 (identifying intent of the 2023 Legislature to support efficient and effective siting of clean energy projects). Oregon has similarly recently indicated a desire to develop pathways to quickly build out new sources of energy, storage, and transmission projects. Office of the Governor, State of Oregon, Executive Order No. 25-29, Executive Order on Reducing Greenhouse Gas Emissions and Advancing Oregon's Clean Energy Future (Nov. 18, 2025). Additionally, "project development assumptions are generally more certain and less speculative closer to the present." Ex. 1-01 at 14 (Expert Report of Current Energy Group). WECC's resource adequacy assessment thus provides good reason to believe there is no near-term resource adequacy shortfall.

The Western Assessment of Resource Adequacy also notes that policymaking "introduces significant risks to reliability." WECC 2024 Resource Adequacy Assessment, https://feature.wecc.org/wara/. Federal policy interference with regional planning—especially federal policy interference that is unrequested, unneeded, and unsubstantiated—heightens reliability risks. *Cf.* Ex. 1-01 at 34 (Expert Report of Current Energy Group) ("Continued investments to strengthen the Pacific Northwest's reliability position – while accounting for Centralia's retirement – have been planned for over many years. This activity is expected to continue and can be

further aided through policy certainty (and avoidance of unneeded extraordinary interventions) at the federal level.").

Additionally, on November 4, 2025, the Washington Agencies held their 2025 winter preparedness resource adequacy meeting. The meeting notice, agenda, presentations, and video have been publicly available online since well before the Order issued on December 16, 2025. *See* Ex. 1-12 at 1 (Washington Agencies Winter Readiness Meeting Materials Website as of November 9, 2025); UTC Resource Adequacy Meeting 11-04-2025, YouTube (last visited Jan. 11, 2026) (containing a recording of the Washington Agencies' November 4, 2025 meeting and showing that the recording was posted on December 4, 2025); *see also* Resource Adequacy in Washington State, Wash. Utils. & Transp. Comm'n, https://www.utc.wa.gov/regulated-industries/utilities/energy/resource-adequacy-washington-state (last visited Jan. 11, 2026) (collecting materials). As the Washington Agencies explained in a letter to Governor Bob Ferguson, "[w]inter reliability assessments, presented by regional resource adequacy experts, [NERC] and [WECC], indicate the Northwest's electric grid meets national resource adequacy criteria under normal conditions this winter." Ex. 1-89 at PDF 17 (Washington Agencies Resource Adequacy Meeting Summaries (Compiled)). Moreover, the agencies explain that an elevated risk of short-duration outages in extreme weather occurs "absent additional measures, such as utilities following their emergency policies and procedures or firing up their backup generators." *Id.* In plain language, the Washington Agencies suggest that key actors do not believe an emergency exists: "The Bonneville Power Administration and Washington utilities do not forecast outages this winter." *Id.* The Department's failure to address the November 4, 2025 meeting and associated materials is another reason its Order is unreasoned and not based on substantial evidence.

The Washington Department of Commerce also reported to the state legislature on utilities' 2024 Integrated Resource Plans. Ex. 1-26 at 4 (Wash. Dep't of Commerce Summary of Utilities' 2024 IRPs (Dec. 1, 2025)). That report, released two weeks before the Order, explains that "[a]ssessments of resource adequacy from regional experts conclude the Northwest has adequate resources to meet current demand for electricity and does not face a significant risk of outages in the near term." *Id.* at 5.

The Department also fails to address Bonneville's resource adequacy assessment in its "White Book," Ex. 1-121 (2025 Bonneville "White Book"), despite the Order instructing TransAlta to ensure Centralia is available to operate at Bonneville's direction, Order at 3. Bonneville projects that the Pacific Northwest has an energy surplus from August 1, 2025, through July 31, 2027, assuming the availability of market purchases and resources from independent power producers. Ex. 1-121 at 32 (2025 Bonneville "White Book"); *see* Ex. 1-01 at 24 (Expert Report of Current Energy Group). In fact, Bonneville projected (based on a netting of its generating resources and power supply obligations) an energy surplus for the Pacific Northwest region in both 2026 and 2027 even under assumptions that water supplies for hydro facilities

are in the bottom 10% of conditions (which is not reflective of actual expectations in 2026), and that wind power performs at its lowest historical level every year. Ex. 1-121 at 7–8, 31 (2025 Bonneville "White Book"). And under median operating conditions, Bonneville projected surpluses through the end of 2032. *Id.* In short, Bonneville has not provided any reason in its recent assessments to be concerned about the adequacy of the region's supply in the near term.

### B. The Order Is Not Based on Reasoned Decision-Making and Substantial Evidence in Imposing Requirements to "Best Meet the Claimed Emergency and Serve the Public Interest."

The Order determines that, to best meet the claimed emergency and serve the public interest, "TransAlta shall take all measures necessary to ensure that Centralia Unit 2 is available to operate at the direction of either Bonneville (in its role as Balancing Authority) or the California Independent System Operator Corporation Reliability Coordinator West (in its role as the Reliability Coordinator)." Order at 3. But the Order provides no rational basis for that determination. There are at least three types of problems, summarized as the Department's (1) failure to consider alternatives, (2) failure to grapple with Centralia's shortcomings, and (3) unexplained assignment to direct Centralia's operations to entities that have not managed the generator leading up to the Order. As a result, the Order is unreasoned and is not based on substantial evidence.

### 1. Legal Framework: Section 202(c)(1) Authorizes the Department to Require Only Generation that Best Meets the Emergency and Serves the Public Interest.

Section 202(c)(1) authorizes the Department to impose only those requirements that (i) "best" (ii) "meet the emergency and" (iii) "serve the public interest." 16 U.S.C. § 824a(c)(1).

The term "best" demands a comparative judgment that there are no better alternatives. The word "best" is inherently a comparative term and means "that which is 'most advantageous.'" *Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 218 (2009) (*quoting* Webster's New International Dictionary 258 (2d ed.1953)); *cf. Sierra Club v. Env't. Prot. Agency*, 353 F.3d 976, 980, 983–84 (D.C. Cir. 2004) (explaining that statutory "best available control technology" requirement demands sources in a category clean up emissions to the level that peers have shown can be achieved). Consequently, the Department must, at minimum, consider alternatives and evaluate whether and to what extent a given alternative addresses the emergency

and serves the public interest, including deficiencies associated with the alternative.[10]

The Department's obligation to exercise reasoned decision-making further requires consideration of alternatives. The Department need not consider every conceivable alternative, but it must consider alternatives within the ambit of the regulatory context as well as alternatives which are significant and viable or obvious. *See Dep't of Homeland Sec. v. Regents of the Univ. of Calif.*, 591 U.S. 1, 30 (2020); *Motor Vehicle Manufs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 51 (1983); *Nat'l Shooting Sports Found., Inc. v. Jones*, 716 F.3d 200, 215 (D.C. Cir. 2013). Intervenors and the public may also introduce information that requires the Department to evaluate alternatives and reconsider its decision to impose or maintain a requirement. *See, e.g.*, *Chamber of Com. of the U.S. v. Secs. & Exch. Comm'n*, 412 F.3d 133, 144 (D.C. Cir. 2005) (evaluating agency failure to consider alternative raised by dissenting Commissioners and introduced by commenters); *cf.* 10 C.F.R. § 205.370 (stating ability to cancel, modify, or otherwise change an order).

The Department's regulations and practice identify relevant alternatives for its consideration. The regulations specify information the Department shall consider in deciding to issue an order under Section 202(c), and require an applicant for a 202(c) order to provide the information. 10 C.F.R. § 205.373. The specified information includes "conservation or load reduction actions," "efforts . . . to obtain additional power through voluntary means," and "available imports, demand response, and identified behind-the-meter generation resources selected to minimize an increase in emissions." *Id*. § 205.373(f)–(h); Ex. 5 at 4 (DOE Order No. 202-22-4).

The Department may then choose only the best alternative. The best alternative is the one which is most advantageous for meeting the stated emergency and serving the public interest.

The statutory command to take only measures that serve the public interest, including with respect to environmental considerations, further constrains the Department's authority. The public interest element demands that the Department advance, or at least consider, the various policies of the Federal Power Act. *Cf. Wabash Valley Power Ass'n*, 268 F.3d at 1115 (interpreting the "consistent with the public interest" standard in Section 203 of the Federal Power Act); *see Gulf States Utils. Co. v. Fed. Power Comm'n*, 411 U.S. 747, 759 (1973); *California v. Fed. Power Comm'n*, 369 U.S. 482, 484–86, 488 (1962). Primary policies of the Federal Power Act include protecting consumers against excessive prices; maintaining competition to

---

[10] To be sure, the nature and extent to which the Department must consider alternatives depends on the emergency. An emergency that truly requires the Department to act within hours, for instance, permits a more abbreviated consideration than an emergency for which the Department has days to decide.

the maximum extent possible consistent with the public interest; and encouraging the orderly development of plentiful supplies of electricity at reasonable prices. *NAACP v. Fed. Power Comm'n*, 425 U.S. 662, 670 (1976) (orderly development); *Otter Tail Power Co. v. United States*, 410 U.S. 366, 374 (1973) (maintaining competition); *Pa. Water & Power Co. v. Fed. Power Comm'n*, 343 U.S. 414, 418 (1952) (excessive prices). And because Section 202(c) expressly protects environmental considerations, these are part of the public interest element too. See *NAACP*, 425 U.S. at 669 ("[T]he words 'public interest' . . . . take meaning from the purposes of the regulatory legislation.").

### 2. *The Department Fails to Consider Alternatives.*

The Order fails to address imports to the WECC Northwest assessment area as an alternative to Centralia to meet the purported emergency. Yet Section 202(c) specifically identifies "delivery, interchange, or transmission of electric energy" as among the alternatives available to meet a claimed emergency. 16 U.S.C. § 824a(c)(1). And the Department's regulations provide for consideration of available resources, including power transfers. 10 C.F.R. §§ 205.373(f), § 205.375.

Among the few sources on which the Department relies for its claimed emergency, one specifically identifies imports as a solution, and another provides the factual basis for identifying imports as the solution. NERC's 2025-2026 Winter Reliability Assessment expressly states that, in WECC Northwest, "[o]perating reserve margins are expected to be met after imports *in all winter scenarios*." Ex. 1-59 at 37 (NERC 2025-26 Winter Assessment) (emphasis added).

The E3 presentation assumes an import capability of 3,750 MW, an "intentionally conservative" figure that is "not intended to represent the maximum import capability of the region E3 studied" and is below the demonstrated import capability of the Pacific Northwest. Ex. 1-90 at 10 (E3 Resource Adequacy Phase 1 Presentation); Ex. 1-67 at 3 (Email Correspondence with E3). As explained in greater detail above, *see supra* sec. V.A.3.ii, the Northwest region imports averaged 4,745 MW during peak demand periods of a January 2024 winter storm, and average a higher number across all hours. Ex. 1-59 at 52 (NERC 2025-26 Winter Assessment).

The Department has long recognized that power pools and utility coordination "are a basic element in resolving electric energy shortages." *Emergency Interconnection of Elec. Facilities and the Transfer of Elec. to Alleviate an Emergency Shortage of Elec. Power*, 46 Fed. Reg. at 39,985–86. And recent history bears out the important role of transmission connectivity along with imports and exports. *See, e.g.*, Ex. 1-30 at 64 (Winter Storm Elliott System Operations Inquiry) ("Despite tightening conditions on the MISO system . . . MISO maintained steadily increasing exports to TVA throughout the day."); Ex. 1-31 at 43, 83–84 (PJM Elliott Report) (describing PJM exports); *see also* Ex. 1-15 at PDF 2 (DOE Order No. 202-02-1) (providing for usage of interregional transmission).

The Department's failure to consider power transfers via imports, an alternative specifically contemplated by statute and regulation, constitutes unreasoned decision-making. That failure is remarkable in light of the express and implicit support for imports in the studies the Department cites.

The Order also fails to consider limiting exports to Canada from WECC Northwest as another alternative to meet the claimed emergency. The Department has authorized many entities to export energy from the Northwest region, including new authorizations in the last year. *See* Ex. 1-61 (Department Export Authorizations Library); Ex. 1-62 at 11 (Department Export Authorization EA-365-C (Oct. 21, 2025)); Ex. 1-74 at 15 (Department Export Authorization EA-479-A (July 11, 2025)). In addition to the Department's Section 202(c) authority, Section 202(e) of the Federal Power Act authorizes the Department to supplement or modify its export orders if necessary or appropriate. 16 U.S.C. § 824a(e). The Department could modify its export authorization to halt or limit exports from the Northwest Region if the power is needed to avert a true emergency. However, nothing in the Order points to this as a considered alternative.

The Department must also incorporate demand-side resources as a condition precedent to, or an alternative to, circumstances calling for generation by a polluting resource like Centralia (and in determining whether an emergency exists), a requirement consistent with Departmental practice. See 16 U.S.C. § 824a(c)(1)–(2); 10 C.F.R. § 205.375; *e.g.*, Ex. 1-16 at 3 (DOE Order No. 202-20-2); Ex. 1-17 at 4–5 (DOE Order No. 202-22-2); Ex. 1-18 at 2–3 (DOE Order No. 202-21-1).

### 3. *The Department Fails to Consider Centralia's Shortcomings.*

Furthermore, the Order does not evaluate the reasons why Centralia is a poor fit to meet the claimed emergency. The Department recognizes—without offering any evidence—significant shortcomings and weaknesses of "coal-fired facilit[ies]." Order at 2 n.11.[11] But the Department stops short, failing to engage in reasoned decision-making regarding how, given these shortcomings and weaknesses, the Department views Centralia to be the best means to meet the claimed emergency.

What's more, the weaknesses and dangers of coal-burning facilities like Centralia are worse than the Department acknowledges. Coal-burning facilities cannot meet modern energy demands and actually pose reliability risks themselves.

------

[11] To be sure, the Order does not offer any evidence for the premises in footnote 11. The footnote's conclusion—continuous operation is required so long as the Secretary determines a shortage exists and is likely to persist—is unreasoned and is not based on any substantial evidence in the footnote or the Order.

> Cold snaps, heat waves, and storms have all exposed coal's fragility during grid stress events. Reliability is not just about being dispatchable, it's about delivering performance under stress. Coal plants struggle to do that consistently. For coal plants to truly meet the constant demands of data centers, they would need to run at high-capacity factors and avoid major outages, all of which fly in the face of current performance trends. If a large coal plant trips offline while supporting a cluster of data centers, the sudden loss of supply could lead to cascading failures across the grid. This is because generation must equal load at all times, datacenter or no datacenter. As a result, relying on coal plants to support these high-density digital loads doesn't enhance reliability, it endangers it. And it's not a matter of *if* the coal plant will fail, but *when*.

Ex. 1-44 at PDF 2–3 (RMI Analysis of Coal Plants' Threats to Reliability). The Department avers that it is concerned with reliability yet puts forward no analysis to address the likelihood that it is actually creating the (otherwise unproven) problem it is supposedly trying to address. This ostrich-like approach to record evidence and public evidence is not reasoned decision-making. *Butte Cnty.*, 613 F.3d at 194; *cf. Ky. Mun. Energy Agency v. FERC*, 45 F.4th 162, 177 (D.C. Cir. 2022) (rejecting "ostrich-like approach" to agency decision-making).

The Order points to projections of demand growth, including from "the expansion of artificial intelligence data centers." Order at 2 (quoting Ex. 1-37 (Grid EO)). Even assuming *arguendo* the Department has authority under Section 202(c) to address that claimed circumstance (it does not), coal plants' "always-on nature" and "rigidity" are "a poor match for the dynamic and often unpredictable nature of data center demand." Ex. 1-44 at PDF 3 (RMI Analysis of Coal Plants' Threats to Reliability); *see also* Ex. 1-45 at 3 (Energy Innovation Report) (explaining that data center loads "are not 24/7 blocks. Instead, they are choppy, with swings of hundreds of megawatts over short intervals, undermining assumptions of steady baseload behavior and potentially affecting the stability of the grid if safeguards are not put in place"); *see also* Ex. 1-32 at 16 (NARUC Coal Report) (discussing typical coal plants' startup and cycling costs); Ex. 1-33 at 26 (IEA Flexibility Report) (discussing coal plant start-ups). "[L]arge, voltage-sensitive loads like data centers require flexible, responsive grid solutions, not slow-ramping generators that can take 12 or more hours to come online." Ex. 1-44 at PDF 3 (RMI Analysis of Coal Plants' Threats to Reliability) (relying on NERC).

*Figure 6: Minutes Needed for a Power Plant to Reach
Max/Min Capacity*



Source: Ex. 1-44 at 3 (RMI Analysis of Coal Plants'
Threats to Reliability).

In short, the Order fails to examine inherent mismatch between the problem it diagnoses and the mandate it imposes. This is not reasoned decision-making.

Additionally, the Order provides no reasoned basis for determining that Centralia best meets the claimed emergency that may arise years into the future (which, again, the Department does not have authority to address under section 202(c)). Transmission and myriad other facilities, as well as hydropower, are available alternatives over the multi-year span addressed by the Order. And the Order fails to identify a resource shortfall that is imminent and specific enough to identify any best-placed resource. Additionally, the Order, like the Department's Section 202(c) orders to other plants, causes economic damage by, *inter alia*, crowding out otherwise competitive resources, disrupting planning, and creating policy-driven uncertainty. *See* Ex. 1-46 (R Street Institute Commentary: *DOE "Zombies" Are Eating Competitive Power Markets*); Ex. 1-01 at 4 (Expert Report of Current Energy Group) ("The [reviewed] studies do not support a proposition that extraordinary federal interventions into established processes are necessary to address the challenges in the latter part of the decade. Rather, federal intervention sends mixed and counterproductive signals to the market that undermine existing planning and procurement practices."). Additionally, Centralia's operations cause significant

68

environmental harm, a factor the Department does not evaluate in reflexively selecting Centralia to meet its (unproven) emergency. For all these reasons too, the Order is without support in the record and unreasoned.

> 4. *The Department Assigns, Without Explanation, Responsibility to Direct Centralia's Operation to Entities that Do Not Manage the Generator, Creating Reliability Risk.*

The Order instructs TransAlta to ensure Centralia is available to operate at the direction of Bonneville, in its role as balancing authority, and California Independent System Operator Corporation Reliability Coordinator West [Reliability Coordinator West], in its role as reliability coordinator. The Order offers no explanation for assigning that role to Bonneville and Reliability Coordinator West.

Leading up to the Order, Bonneville and Reliability Coordinator West have not managed Centralia, and Centralia has not been part of the Bonneville balancing authority. Centralia has been part of the Gridforce balancing authority. *See* Ex. 1-63 at 6 (Gridforce 2019 Audit Report). And the reliability coordinator for Gridforce is Southwest Power Pool, Inc., not Reliability Coordinator West. *See* Ex. 1-64 at 3 (Gridforce 2022 Audit Report).

Balancing Authorities play an important role in keeping the lights on. As the Department's Energy Information Administration explains:

> The actual operation of the electric system is managed by entities called balancing authorities. . . .
>
> A balancing authority ensures, in real time, that power system demand and supply are finely balanced. This balance is needed to maintain the safe and reliable operation of the power system. If demand and supply fall out of balance, local or even wide-area blackouts can result.
>
> Balancing authorities maintain appropriate operating conditions for the electric system by ensuring that a sufficient supply of electricity is available to serve expected demand, which includes managing transfers of electricity with other balancing authorities. Balancing authorities are responsible for maintaining operating conditions under mandatory reliability standards issued by the North American Electric Reliability Corporation and approved by the U.S. Federal Energy Regulatory Commission and, in Canada, by Canadian regulators. These operators monitor the grid to identify potential problems before a situation becomes critical.

Ex. 1-65 (EIA Explainer on Balancing Authorities).

69

The Department's assignment of responsibility to two entities that have not managed Centralia leading up to the Order has real consequences. Bonneville likely must develop processes to determine whether, how, and when to direct the operation of a generation resource which has not been part of its balancing area and over which it likely has had less information than other generators in its balancing area. Bonneville likely must develop processes to coordinate with Gridforce and TransAlta. Presumably due in part to complexities and the gravity of balancing authority management, Bonneville recommends that "[a]ny load or generator contemplating requesting a change of [Balancing Authority Area], either to [Bonneville] or to another Balancing Authority, should contact the appropriate Transmission Account Executive at the earliest opportunity" and provides an illustrative graph, shown below in Figure 7, of the many milestones involved in the typical three-year length of establishing a new balancing authority relationship. Ex. 1-66 (Bonneville's Typical Balancing Authority Milestones).

*Figure 7: Bonneville's Typical Balancing Authority Area Project Milestones*



Source: Ex. 1-66 (Bonneville's Typical Balancing Authority Milestones).

With the stroke of a pen and without explanation or guidance, the Department introduces avoidable complexity into the careful process of keeping the lights on. The Department's "Rube Goldberg"-like Order is unreasoned and unexplained.

## C. The Order Exceeds Other Limits on the Department's Authority.

### 1. The Department Lacks Jurisdiction to Impose the Availability Requirements.

In directing TransAlta to take "all measures" to ensure that Centralia is "available to operate," Order at 3, the Department exceeds its authority under Section 202(c) of the Federal Power Act and impermissibly intrudes on the authority over generating facilities that Section 201(b) of the statute reserves to the states, 16 U.S.C. §§ 824(b)(1), 824a(c)(1). The sweeping language in the Department's Order would encompass physical and all other changes necessary to revive a generating plant undergoing closure pursuant to a state-approved retirement process. The Federal Power Act's language, structure, legislative history, and interpretation by the courts all confirm that the Department's Order is unlawful.

The structure and language of the Federal Power Act reflect Congress's deliberate choices to preserve the states' traditional authority over generating facilities and to circumscribe the Department's emergency authority in light of the states' role. The first sentence of the Federal Power Act declares that federal regulation extends "only to those matters which are not subject to regulation by the States." *Id.* § 824(a). Section 201(b)(1) states that, except as otherwise "specifically" provided, federal jurisdiction does not attach to "facilities used for the generation of electric energy." *Id.* § 824(b)(1). The courts have held that Section 201(b)(1) reserves to the states authority over electric generating facilities, *see, e.g., Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150, 155 (2016), including the authority to order their closure, *Conn. Dep't of Pub. Util. Control v. FERC*, 569 F.3d 477, 481 (D.C. Cir. 2009) (explaining that under Section 201(b), states retain the right "to require the retirement of existing generators" or to take any other action in their "role as regulators of generation facilities"). Congress also recognized the states' exclusive authority over generating facilities in Section 202(b), which provides that FERC's interconnection authority does not include the power to "compel the enlargement of generating facilities for such purposes." 16 U.S.C. § 824a(b).

There is a clear distinction between authority to regulate generation facilities and the Department's authority under Section 202(c) to require generation of electric energy. Electric energy is an electromagnetic wave, and its "generation, delivery, interchange, and transmission" is the creation and propagation of that wave. *See* Brief *Amicus Curiae* of Electrical Engineers, Energy Economists and Physicists in Support of Respondents at 2, *New York v. FERC*, 535 U.S. 1 (2002); *see also* Edison Electric Institute Glossary of Electric Utility Terms (1991 ed.) (defining electric generation as "the act or process of transforming other forms of energy into electric energy"). Section 202(c)(1), like the rest of the Federal Power Act, is written "in the technical language of the electric art" and federal jurisdiction generally "follow[s] the flow of electric energy, an engineering and scientific, rather than a legalistic or governmental test." *Conn. Light & Power v. Fed. Power Comm'n*, 324 U.S. 515, 529

71

(1945); *see also Fed. Power Comm'n v. Fla. Power & Light Co.*, 404 U.S. 453, 454, 467 (1972).

The scope of the Department's emergency power under Section 202(c) is bounded both by the provision's specific language and Congress's clear intention and repeated direction in the Federal Power Act to respect the states' authority over generating facilities. When an actual emergency exists, Section 202(c)(1) authorizes the Department to order only two specific things: (1) "temporary connections of facilities" and (2) "generation, delivery, interchange, or transmission of electric energy." *Id.* § 824a(c)(1). The only reference to "facilities" in the authorizing provision of Section 202(c)(1) appears in the clause relating to temporary connections, not in the clause pertaining to "generation" of electric energy. And that clause only authorizes connections "of" facilities; it does not provide authority to regulate the facilities. The differences in Congress's word choice in these clauses—referencing "facilities" in one authorizing provision but not the other—must be given effect. *See, e.g., Gallardo v. Marstiller*, 596 U.S. 420, 430 (2022); *Gomez-Perez v. Potter*, 553 U.S. 474, 486 (2008).

Given Congress's use of the term "generating facilities" elsewhere in the statute, if it had intended to give the Department authority over generating facilities in Section 202(c)(1), it would have done so explicitly. Instead, the provision conspicuously excludes authority to manage the physical characteristics of power plants. Congress purposely limited and particularized the Department's emergency powers, carefully avoiding intrusion on the states' authority over generating facilities recognized in Section 201(b)(1). *See* S. Rep. No. 74-621, at 19 (explaining that the emergency powers in Section 202(c)(1) "which were indefinite in the original bill have been spelled out with particularity"); *compare* S. 1725, Cong. Tit. II § 203(a) (providing in original, unenacted bill that control of the production and transmission of electric energy "except in time of war or other emergency declared to exist by proclamation of the President, shall, as far as practicable, be by voluntary coordination"), *with* 16 U.S.C. § 824a(c)(1) (providing particularized, specific authorities and circumstances in which the authorities may be exercised).

In certain circumstances, the Department may require generation of electric power, and a utility may properly take steps at the facility to produce the power. It is commonplace in the electric sector for the federal regulator properly acting within its authority to cause effects in a state regulator's jurisdictional sphere, and vice versa. *See Elec. Power Supply Ass'n*, 577 U.S. at 281. But the federal regulator may neither directly regulate generation facilities nor impose requirements aimed at the facilities, even if nominally regulating within its sphere. *See id.* at 281–82; *see also Hughes*, 578 U.S. at 164–65. Such encroachment is impermissible, even in a real emergency or in a wrongly claimed one. *See Conn. Light & Power*, 324 U.S. at 530 ("Congress is acutely aware of the existence and vitality of these state governments. It sometimes is moved to respect state rights and local institutions even when some degree of efficiency of a federal plan is thereby sacrificed."). Thus, the Department may not require

72

generation that necessitates the utility taking steps under state authority, such as building a new generating unit or refurbishing a broken one.

The Federal Power Act does not give the Department sweeping authority to order "all measures" needed to make a generation facility "available to operate." 16 U.S.C. § 824a(c). Nowhere does the statute empower the Department to order "all" steps that may be needed to ensure Centralia's availability, which could include repairs or modifications to physical facilities and other measures going far beyond electric power generation. Because the plant is at the end of its useful life, the Order could essentially require rebuilding significant parts of the plant. On its face, the Department's Order is *ultra vires*. The Order also contravenes the Federal Power Act's repeated direction to respect the states' authority over generating facilities, which includes the authority that Washington State exercised to compel Centralia's closure. The Order therefore is unlawful and should be withdrawn.[12]

2. *The Department's Capacity Decree Is Not the Product of Reasoned Decision-Making and Beyond the Department's Authority.*

The Order includes a cryptic statement that further undermines its legality. It decrees that, "[b]ecause this order is predicated on the shortage of facilities for generation of electric energy and other causes, Centralia Unit 2 shall not be considered a capacity resource." Order at 4. The Order provides no further explanation of the import of this direction.

The statement is not the product of reasoned decision-making. The Order does not indicate what "capacity resource" means in this context and who is governed by this direction and toward what end. The Order also fails to tie this direction to the purported emergency underlying the Order. Nor does the Order articulate any rational connection between this direction and the Department's limited authority to "order such temporary connections of facilities and such generation, delivery, interchange, or transmission of electric energy as in its judgment will best meet the emergency and serve the public interest." 16 U.S.C. § 824a(c)(1).

To the extent this direction is meant to govern ratemaking matters, it is beyond the Department's authority under Section 202(c). Under Section 202(c), "the Commission may prescribe by supplemental order such terms as it finds to be just and reasonable." *Id.* The Department of Energy Organization Act transferred some authorities of the Federal Power Commission to the Department, except as provided in 42 U.S.C. subchapter IV. 42 U.S.C. § 7151(b). And that subchapter transfers to and

---

[12] A utility that takes steps subject to state authority cannot point to a Section 202(c) order as the basis for a right to recover associated costs. *See* 16 U.S.C. § 824a(c)(1) (providing for compensation or reimbursement to be paid based on just and reasonable terms for carrying out an authorized Section 202(c) order).

73

vests in the Federal Energy Regulatory Commission "the establishment, review, and enforcement of rates and charges for the transmission or sale of electric energy." 42 U.S.C. § 7172(a).

Additionally, to the extent the decree is directed to state and local officials, the Order violates the Tenth Amendment by commandeering state and local officials to implement a federal program. See, e.g., *Printz v. United States*, 521 U.S. 898, 933 (1997).

## D. The Order Fails to Provide the Conditions Required Under Section 202(c) to Lessen Conflicts with Environmental Standards and Minimize Environmental Harm.

Where an order "may result in a conflict with a requirement of any Federal, State, or local environmental law or regulation," Section 202(c) imposes several requirements. 16 U.S.C. § 824a(c). The Department must "ensure" that the order "requires generation, delivery, interchange, or transmission of electric energy only during hours necessary to meet the emergency and serve the public interest." *Id.* The Department must also "ensure," "to the maximum extent practicable," that the order "is consistent with any applicable Federal, State or local environmental law or regulation." *Id.* Additionally, the Department must ensure that the order minimizes any adverse environmental impacts, regardless of the facility's compliance (or non-compliance) with environmental standards. *See id.*

### 1. Legal Framework: Section 202(c) Further Limits the Department's Authority and Mandates Affirmative Steps to Maximize Environmental Compliance and Minimize Environmental Harm Where the Order "May Result in a Conflict" with a Federal, State, or Local Environmental Law or Regulation.

The Federal Power Act obligates the Department to include precautions in a Section 202(c) Order where the order "may result in a conflict" with environmental laws or regulations. This is a forward-looking inquiry with a low threshold.[13]

The word "may" in this context denotes a mere possibility, not a certainty. This is especially apparent when matched against the term "shall" used in Section 202(c)(2) and the other provisions added to Section 202(c) at the same time. *See* Fixing America's Surface Transportation Act of 2015, Pub. L. No. 114-94, 129 Stat. 1312 § 61002 (codified at 16 U.S.C. § 824a). Congress' use of the two disparate terms must be given effect. *See, e.g.*, *Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 172 (2016) (discussing significance of the words "may" and "shall" in the same statutory provision).

---

[13] If actual noncompliance with environmental laws and regulations occurs to carry out the order, the statute provides a safe harbor. 16 U.S.C. § 824a(c)(3).

74

Moreover, the consequences need not be "noncompliance" or "violation" of environmental law, both of which are terms Congress also used in 2015 adding other provisions to Section 202(c). A potential "conflict" suffices. *Cf. Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372–73 (2000) (explaining that courts find "conflict" in the preemption context where, for instance, a law or order "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress"). Taken together, anytime a Department order creates circumstances that might obstruct the accomplishment or execution of environmental laws or regulations, Section 202(c)(2) imposes duties on the Department to maximize compliance with the law and minimize adverse environmental effects.

Congress adopted the requirements of Section 202(c)(2) to address environmental issues arising in response to emergencies on the grid. Congress was well aware of environmental issues stemming from 202(c) orders when it imposed the requirements in Section 202(c)(2). *See, e.g.*, Rolsma, 57 Conn. L. Rev. at 807–09 (discussing prior incidents of tension between environmental requirements and responses to emergencies on the grid, and congressional hearings addressing the matter as part of the passage of Section 202(c)(2)). Congress struck a reasonable balance requiring that environmental concerns not be left by the wayside while the Department responds to actual emergencies. Rather than requiring the Department to engage in a probing review of environmental laws and permits at all levels of our federalist system before acting, Congress set a low threshold for imposition of the mandatory Section 202(c)(2) duties to minimize conflicts with state environmental laws and environmental harms flowing from a Section 202(c) order.

> ### 2. *The Order May Result in a Conflict with a Federal, State, or Local Environmental Law or Regulation.*

Here, the Department implicitly acknowledges the possible conflict. The Order is limited to a 90-day duration. Order at 3–4. That temporal limitation exists for a 202(c) order that may result in a conflict with environmental requirements. 16 U.S.C. § 824a(c)(4). The Order also imposes the 90-day duration "[t]o minimize adverse environmental impacts." Order at 3–4.

Moreover, the Order may, and in some instances unquestionably will, result in a conflict with state environmental legal requirements. There are at least five reasons.

*First*, the Order may result in a conflict with—and appears to directly conflict with—the orders issued by Ecology imposing site-specific requirements on Centralia to meet Clean Air Act requirements. Ecology issued two orders to TransAlta—one in 2011, and a revised order in 2020—that require the shutdown of Centralia by the end of 2025. Ex. 1-49 at 2 (2011 BART Order); Ex. 1-51 at 3 (2020 Revised BART Order). After describing the Energy Transition Act's deadlines for Centralia to meet the state's greenhouse gas emissions performance standard, Ecology unambiguously requires one of the Centralia units to permanently cease coal-fired power generation

operations by December 31, 2020, and the other by December 31, 2025. Ex. 1-51 at 3 (2020 Revised BART Order). Centralia Unit 1 permanently ceased coal-fired power generation operations by December 31, 2020. *See, e.g.*, Ex. 1-95 at PDF 2 (Centralia Summary by TransAlta). As such, under requirements mandated by Ecology's enforcement order, Unit 2 must permanently cease coal-fired power generation operations by December 31, 2025. Ex. 1-51 at 3 (2020 Revised BART Order). Every day of continued coal-fired power generation operations beyond December 31, 2025, violates the BART order.

*Second*, the Order may result in a conflict with—and appears to undermine—the core assumptions underlying Ecology's state implementation plan to reduce haze pollution, rendering that plan inadequate to meet Ecology's Clean Air Act obligations. The Clean Air Act requires Ecology to develop and obtain EPA approval of a state air quality implementation plan describing how Washington will implement and enforce the Clean Air Act's haze pollution reduction mandates. 42 U.S.C. § 7401. In September 2025, EPA approved Ecology's state implementation plan to make reasonable progress toward reducing haze pollution by 2028. Ex. 1-09 at 1 (Ecology 2018-2028 Regional Haze Plan); *see* 90 Fed. Reg. 46070 (Sept. 25, 2025) (EPA approval). In its approved plan, Ecology assumed Centralia's emissions would be zero beginning in 2026. Ex. 1-09 at 74, 90, 172–74 (Ecology 2018-2028 Regional Haze Plan); Ex. 1-51 at 7 (2020 BART Order Technical Support). This assumption is an important part of Ecology's finding that the state will make legally required reasonable progress toward restoring air quality by 2028, the plan's compliance timeframe, as Centralia's air pollution adversely affects air quality in the state's three national parks and many of its widely used wilderness areas. Ex. 1-09 at 74, 90, 172–74 (Ecology 2018-2028 Regional Haze Plan); Ex. 1-51 at 7 (2020 BART Order Technical Support).

In fact, in the approved plan, Ecology specifically explains that continued operation of from Centralia after 2025 could require revisions to the plan. Ex. 1-51 at 13 (2020 BART Order Technical Support) ("Repowering would change the emission reduction used in determining the 2028 further progress goals for the nearby Class I Areas (Mt. Rainier and Olympic National Parks, and the Goat Rocks and Alpine Lakes Wilderness Areas) under the 2021 Regional Haze State Implementation Plan."

*Third*, the Order may result in a conflict with, or violation of, the Model Toxics Control Act. WASH. REV. CODE § 70A.305.010D. Under the law, Ecology determines whether detected hazardous substances exceed cleanup levels; designates sites requiring clean up; and ensures potentially responsible parties, like facility owners, conduct and pay for remediation activities to achieve cleanup levels. WASH. REV. CODE § 70A.305.030.

According to a recent Ecology investigation, Centralia's "operation as a coal burning power generation plant likely released particulate containing dioxins and furans, SVOCs, and select metals including mercury from its smokestacks into the

environment surrounding the facility." Ex. 1-52 at 2 (Centralia Hazardous Substances Releases: Preliminary Determination (Sept. 2025)); Ex. 1-07 at 1 (Cleanup Site Details (Oct. 2025)); Ex. 1-53 at 4 (Centralia Pollution Inspection (June 2025)). And, as part of the investigation, Ecology identified several hazardous substances in soil and groundwater in amounts exceeding cleanup levels. Ex. 1-07 at 1 (Cleanup Site Details (Oct. 2025)). Ecology determined that TransAlta is liable for cleaning up hazardous substances at the Centralia site under Model Toxics Control Act. Ex. 1-54 at 1 (Centralia Hazardous Substances Liability Determination (Oct. 2025)). On December 29, 2025, Ecology and TransAlta entered into an agreed-upon order requiring TransAlta to conduct a remedial investigation and feasibility study, develop a draft cleanup action plan, and implement the final cleanup plan for the site. Ex. 1-113 at 2, 7–10 (Ecology-TransAlta Agreed Order on Centralia Cleanup). The Agreed Order assumes Centralia will stop burning coal, as required under the Energy Transition Act and Memorandum of Agreement, implementing the shutdown agreement. *Id.* at 20.

Continuing to operate the plant would perpetuate Centralia's air emissions, likely resulting in additional air pollution depositing in and contaminating soil, sediment, and groundwater. *See* Ex. 1-54 at 1 (Centralia Hazardous Substances Liability Determination (Oct. 2025)) (finding that TransAlta is currently liable for cleaning up releases of hazardous substances at Centralia). Such pollution may result in exacerbated and additional conflicts with, and violations of, the Model Toxics Control Act.

*Fourth*, the Order may result in a conflict with Washington State's greenhouse gas emissions performance standard, which applies to all baseload electric generation for which electric utilities enter into long-term financial commitments. WASH. REV. CODE § 80.80.040(1). The Energy Transition Act amended the performance standard by making it applicable to "[a] coal-fired baseload electric generation facility that emitted more than one million tons of greenhouse gases in any calendar year prior to 2008." WASH. REV. CODE § 80.80.040(3)(C)(i). This amendment refers to Centralia. *See id.*

The amendment specifies that, if Centralia operates after December 31, 2025, the plant must either cap operations or meet the performance standard. *Id.* For the first option, the performance standard does not apply if Centralia has an enforceable limit that keeps annual operations below a 60% capacity factor, meaning it would not be considered a baseload power plant. WASH. REV. CODE § 80.80.010(4); *see* Ex. 1-51 at 6–7 (2020 BART Order Technical Support) (explaining that Centralia would be a baseload power plant subject to the performance standard unless its operations were capped at 60% capacity factor). Alternatively, Centralia "must comply with the lower of the following greenhouse gas emissions performance standard . . . (A) One thousand one hundred pounds of greenhouse gases per megawatt-hour; or (B) The average available greenhouse gas emissions output as determined under [WASH. REV. CODE § ] 80.80.050." *See* WASH. REV. CODE § 80.80.40(3)(c)(i). The current

77

performance standard for greenhouse gas emissions under WASH. REV. CODE § 80.80.050 is 876 pounds of greenhouse gases per megawatt-hour. Ex. 1-55 at 3 (Emissions Performance Standard).

Centralia is covered by the performance standard by continuing to burn coal after December 31, 2025. And the Order may result in Centralia not complying with the performance standard. Unless an enforceable limit exists on Centralia's annual capacity factor, Centralia's greenhouse gas emissions—around 2,233 pounds of greenhouse gases per megawatt-hour, *see* Ex. 1-56 at 10 (Puget 2024 Annual EEI Report) (reporting emissions of 3,015,251 metric tons of $CO_2e$ for 2,700,452 MWh); *see generally* Ex. 1-96 at 3 (MIT Article) (discussing carbon content of coal)—far exceed what is permissible under the performance standard. As a result, the Order may result in a conflict with, or a violation of, the performance standard, which is a mechanism to meet the state's greenhouse gas reduction targets. WASH. REV. CODE § 70A.45.020 (Washington's greenhouse gas reduction targets).

*Fifth*, the Order may result in a conflict with the Clean Energy Transformation Act. WASH. REV. CODE § 19.405.030. Building on the legal commitment to shutdown Centralia, the Clean Energy Transformation Act requires all electric utilities to eliminate coal-fired generation for Washington State customers on or before December 31, 2025. WASH. REV. CODE § 19.405.030(1); *see* WASH. REV. CODE § 19.405.030(1)(c) (exempting power purchases from Bonneville Power Administration unless the source of the electricity is known to be from a coal-fired generating unit). The Order may result in a conflict with the Clean Energy Transformation Act by causing the purchase or use of power from coal-fired generation in Washington State after December 31, 2025. *See* Ex. 1-57 at 4, 6 (Wash. Utils. Comm'n Rejection of Colstrip Investments in Puget Rates); Ex. 1-68 at 1, 66–69 (Wash. Utils. Comm'n Rejection of Colstrip Investments in Avista Rates).

### 3. The Order Lacks the Conditions Required by Section 202(c).

#### i. The Order's Terms Must Be Clarified or, Alternatively, Fail to Require Generation Only During Hours Necessary to Meet the Purported Emergency.

The Order instructs TransAlta to ensure Centralia is available to operate at the direction of either of two entities, Bonneville or Reliability Coordinator West. The Department's instruction must be clarified.

The law requires the Department to "ensure" that it "requires generation . . . only during hours necessary to meet the emergency and serve the public interest." 16 U.S.C. § 824a(c)(2). And the emergency nominally described by the Order is "the potential loss of power to homes, businesses, and facilities critical to the national defense in the areas that may be affected by curtailments or power outages." Order at 3. Thus, Centralia Unit 2 may be compelled to operate only when there is an actual

78

risk of a "loss of power to homes, businesses, and facilities critical to the national defense." *Id.*

This also means that the Department must clarify that Bonneville or Reliability Coordinator West may direct TransAlta to generate electric energy from Centralia only as necessary to address a "loss of power to homes, businesses, and facilities critical to the national defense" that would occur absent Centralia's generation. Public Interest Organizations move the Department to provide that clarification. 18 C.F.R. § 385.212; Ex. 1-03 at PDF 2 (DOE 202(c) Webpage) (providing that "[a]ll . . . requests related to FPA section 202(c) should be sent via email to AskCR@hq.doe.gov").

Without the necessary clarification requested above, the Order's terms fail to ensure that TransAlta does not generate electric energy from Centralia when other resources are available to prevent the claimed emergency, placing the Department in breach of its obligation to "ensure" that it "requires generation . . . only during hours necessary to meet the emergency and serve the public interest." 16 U.S.C. § 824a(c)(2). This is because the Order fails to provide *any* limitations on when generation from Centralia is required. The absence of such limitations differentiates the Order from Section 202(c) orders issued before 2025. S*ee, e.g.*, Ex. 1-14 at 9 (DOE Order No. 202-17-4 Summary of Findings) ("authorizing operation of" units subject to emergency order "only when called upon . . . for reliability purposes," according to "dispatch methodology" approved by the Department). And the Order's further instructions—limiting "operation of Centralia Unit 2 to the times and within the parameters established in paragraph A," Order at 3–4—do not provide the necessary limitation either; they simply repeat that initial instruction without any further limitation.[14]

### ii. The Order Fails to Ensure Maximum Practicable Consistency with Environmental Rules and to Minimize Adverse Environmental Impacts.

The Order further fails to "ensure" that Centralia operates, "to the maximum extent practicable," consistent with applicable environmental rules. *Id.* The Order paraphrases the statutory text—that "operations of Centralia Unit 2 must comply with applicable environmental requirements . . . to the maximum extent feasible," but fails to specify *who* bears that responsibility or *what* such operation entails. Order at 4. It imposes no further conditions beyond stating that the Order provides no relief from any obligation to "pay fees or purchase offsets or allowances for emissions that occur." *Id.* The direction to "comply . . . to the maximum extent feasible" is, as a result, wholly unenforceable; the Order provides no basis for the Department, or anyone else, to determine whether the plant is in fact complying or who might face the

---

[14] That direction further fails to conform to the statute's command to compel only the generation that will "best meet the emergency." 16 U.S.C. § 824(c)(1).

consequences of any failure to do so. *Cf.* Ex. 1-13 at 5–7 (DOE Order No. 202-22-4) (requiring, *inter alia,* reporting of "number and actual hours each day" of operation "in excess of permit limits or conditions," and information describing how generators met requirement to comply with environmental requirements to maximum extent feasible). As such, the Order does not meet the Department's statutory obligation to "*ensure*" the maximum feasible consistency with applicable environmental standards—an obligation that requires the Department to offer some discrete direction as to the plant's operations, rather than merely parroting the statutory text. 16 U.S.C. § 824a(c)(2) (emphasis added).

The most definitive way to maximize consistency with state environmental laws and regulations would be to limit Centralia's generation to the as-needed basis discussed in the motion for clarification *supra* sec. V.D.3.i. That clarification would reduce air pollution and greenhouse gas emissions that exceed levels permitted under state environmental laws.

The Order also makes no attempt to maximize consistency with the greenhouse gas emissions performance standard the Energy Transition Act made applicable to Centralia. The Order neither imposes an enforceable 60% cap on Centralia's capacity factor nor sets a limit on greenhouse gas emissions to meet or reduce the disparity between Centralia's greenhouse gas emissions and what the law requires. Such limits would also reduce the possible conflict with the state's greenhouse gas reduction targets. WASH. REV. CODE § 70A.45.020 (Washington's greenhouse gas reduction targets).

Another easily attainable measure to maximize consistency with state environmental laws would be a prohibition on the sale or use of energy produced by Centralia in Washington State. Such a prohibition would respect the state law requirement that coal-fired power be eliminated from electricity purchased for use in the state by December 31, 2025. WASH. REV. CODE § 19.405.030. The Order contains no such prohibition to maximize consistency with Washington's environmental laws.

In addition, the Order fails to "minimize[] any adverse environmental impacts." 16 U.S.C. § 824a(c)(2). That mandate is textually and substantively distinct from the Department's (also unfulfilled) obligation to ensure maximum practicable compliance with environmental standards. *Id.*

The Order claims to minimize impacts by "limit[ing] operation of Centralia to the times and within the parameters determined by [utility/grid operator] pursuant" to the Order's "Paragraph A." Order at 3–4. But Paragraph A contains only a command that TransAlta "take all measures necessary to ensure that the Centralia Unit 2 is

80

available to operate" as directed. *Id.*[15] An instruction demanding availability has no rational relationship to a requirement to minimize environmental harm. And the Order includes no measures that would mitigate impacts when compliance with environmental standards proves impracticable—measures that have been routinely included in past orders. *See, e.g.*, Ex. 1-14 at 9 (DOE Order No. 202-17-4 Summary of Findings) (permitting non-compliant operation only during specified hours, and requiring exhaustion of "all reasonably and practically available resources," including demand response and identified behind-the-meter generation resources selected to minimize an increase in emissions); Ex. 1-13 at 7 (DOE Order No. 202-22-4) (requiring "reasonable measures to inform affected communities" of non-compliant operations).

The Order makes no attempt to minimize adverse environmental impacts. As stated above, the clearest way to minimize adverse environmental impacts would be to limit Centralia's generation to the as-needed basis discussed in the motion for clarification *supra* sec. V.D.3.i. Without that clarification, the Order allows Centralia to emit air pollution unneeded to meet the Department's claimed (and unsupported) emergency. That air pollution is likely to harm human health and the environment. Centralia is the state's largest emitter of nitrogen oxide and a significant source of sulfur dioxide and particulate matter emissions. Ex. 1-09 at 74–77, 172–74 (Ecology 2018-2028 Regional Haze Plan). Because of its large emissions and tall stacks, air pollution from Centralia adversely affects air quality in the state's three national parks and widely used wilderness areas. Limiting operation of the plant is necessary to minimize this harm, as well as the harm from deposition of the air emissions where it is already contaminating soil, sediments, and groundwater, necessitating remediation under the Model Toxics Control Act. Ex. 1-113 at 6–7 (Ecology-TransAlta Agreed Order on Centralia Cleanup).

Moreover, the statute requires the Department to include sufficiently detailed reporting obligations to ascertain what impacts result from emergency operations; without such reporting, the Department has no ability to "ensure" that adverse impacts are minimized. *See, e.g.*, Ex. 1-21 at 5 (DOE Order No. 202-24-1) (requiring detailed data on emissions of pollutants). The Order here instead only requires "such additional information" as the Department, in the future, may (or may not)

---

[15] To the extent the Order allows Bonneville and Reliability Coordinator West to independently devise conditions limiting environmental impacts, that mere possibility, first, cannot satisfy the Department's own statutory obligation to "ensure" that its "order" minimizes environmental impacts (and limits hours to those necessary to meet the emergency, and mandates the maximum practicable compliance). 16 U.S.C. § 824a(c)(2). And even if it could, the Order requires TransAlta to "ensure that Centralia Unit 2 is available to operate," a direction that is inconsistent with the statute's requirements to minimize the plant's adverse environmental impacts.

"request[] . . . from time to time." Order at 4. That possibility of future, unspecified inquiry cannot satisfy the statute's demand that the Department "ensure" that its Order minimizes environmental impacts. 16 U.S.C. § 824a(c)(2).

## VI. REQUEST FOR STAY

Public Interest Organizations further move the Department for a stay of the Order until the conclusion of judicial review. 18 C.F.R. § 385.212.[16] The Department has the authority to issue such a stay under the Administrative Procedure Act and should do so where "justice so requires." 5 U.S.C. § 705. In deciding whether to grant a request for stay, agencies consider (1) whether the party requesting the stay will suffer irreparable injury without a stay; (2) whether issuing a stay may substantially harm other parties; and (3) whether a stay is in the public interest. *Nken v. Holder*, 556 U.S. 418, 434, 436 (2010); *Ohio v. EPA*, 603 U.S. 279, 291 (2024); *see, e.g.*, *Midcontinent Indep. Sys. Operator, Inc.*, 184 FERC ¶ 61,020, at P 41 (2023); *ISO Eng. Inc.*, 178 FERC ¶ 61,063, at P 13 (2022), *rev'd on other grounds sub nom. In re NTE Conn., LLC*, 26 F.4th 980, 987–88 (D.C. Cir. 2022).

Injuries under this standard must be actual, certain, imminent, and beyond remediation. *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015); *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985); *ANR Pipeline Co.*, 91 FERC ¶ 61,252, at 61,887 (2000); *City of Tacoma*, 89 FERC ¶ 61,273, at 61,795 (1999) (recognizing that, absent a stay, options for "meaningful judicial review would be effectively foreclosed"). Financial injury is only irreparable where no "adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation." *Wis. Gas Co.*, 758 F.2d at 674 (*quoting Va. Petroleum Jobbers Ass'n v. Fed. Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958)); *see also In re NTE Conn., LLC*, 26 F.4th 980, 991 (D.C. Cir. 2022). Environmental injury, however, "can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable. If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987).

Under those standards, a stay of the Order is appropriate.

### A. Intervenors Will Suffer Irreparable Harm Without a Stay of the Order.

A stay is necessary to protect Public Interest Organizations, their members, and the public from harm from continued coal-fired power operations at Centralia caused

---

[16] Pursuant to FPA Section 313(c) and Rule 713(e) of the applicable rules, the filing of a request for rehearing does not automatically stay a Department Order. 16 U.S.C. § 825*l*(c); 18 C.F.R. § 385.713(e).

by the Department's Order. For instance, as noted extensively *supra* sec. IV.B.1, the Centralia plant emits health- and environment-harming air pollutants like nitrogen oxides, sulfur dioxide, particulate matter, and volatile organic compounds. *See, e.g.*, Ex. 1-09 at 74–77, 90, 172–74 (Ecology 2018-2028 Regional Haze Plan); Ex. 1-51 at 7 (2020 BART Order Technical Support). Just this past year, its emissions have exceeded the limits in its air operating permit for particular matter. Ex. 1-130 at 24, 27, 29 (Southwest Clean Air Agency Compliance Evaluation On-Site Inspection Report (Dec. 12, 2025)); Ex. 1-134 (Southwest Clean Air Agency Notice of Violation No. 10642) (noticing significant visible emissions in violation of opacity standard). And operation of the Centralia plant has produced toxic contamination of soil, sediment, and groundwater exceeding binding cleanup thresholds, leading to a mandatory cleanup order. Ex. 1-113 at 4-6 (Ecology-TransAlta Agreed Order on Centralia Cleanup); Ex. 1-52 at 2 (Centralia Hazardous Substances Releases: Preliminary Determination (Sept. 2025)); Ex. 1-07 at 1 (Cleanup Site Details (Oct. 2025)); Ex. 1-53 at 4 (Centralia Pollution Inspection (June 2025)). These harmful emissions would have ceased under the Centralia shutdown mandated by state law and state clean air enforcement orders. *See e.g.*, WASH. REV. CODE § 80.80.40(3)(c); Ex. 1-50 (2020 BART Order). The health and environmental harms from this pollution flow directly from the Department's Order and are actual, specific, and imminent, and can be deadly. *See, e.g.*, Ex. 1-08 at 2 (Mercury Mortality Risks of Coal); Ex. 1-11 at PDF 4–5 (EPA COBRA Health Effects Estimate); Clean Air Task Force, *Toll from Coal* (last visited Jan. 4, 2025), https://www.tollfromcoal.org. The pollution threatens to impair the lives and well-being of Public Interest Organizations and their members. The stark public health stakes of Public Interest Organizations' request for stay require the Department to pause implementation of its Order until a Court reviews its validity.

Additionally, without a stay, the Order creates other injuries too. It needlessly forces TransAlta to divert attention and investment dollars away from compliance with its retirement agreement with the State, thereby denying Public Interest Organizations' members the benefits of Washington State laws designed to benefit them and the public. In return for the legally binding commitment to shut down coal-burning operations, a subset of the Public Interest Organizations agreed to not pursue legal avenues to compel Centralia to install state-of-the-art pollution controls, Ex. 1-107 (Shutdown Memorandum of Understanding), and because of the Order their members will suffer the pollution consequences for an inordinate amount of time before regulators impose needed pollution controls on the plant. In addition, in forcing ratepayers to pay for the availability and operation of a coal-burning facility that the State, stakeholders, and the plant's owner want to close, *see supra* sec. IV.B, the Department's Order jeopardizes the diversification of generating resources the Department itself has said increases grid reliability and will inherently and unjustifiably add to ratepayer costs. Ex. 1-122 (Dep't of Energy, *Energy Reliability and Resilience*).

*B. A Stay Would Not Result in Harm to Any Other Interested Parties.*

No other interested parties would be harmed by a stay. The issuance of a stay would not harm end-use electricity consumers because the lack of an actual emergency means that a stay would not disrupt the provision of electricity. *See, e.g.*, *supra* sec. V.A. Furthermore, because Washington State, regional entities, and utilities have already planned for Centralia's closure and continue to plan for resource adequacy, a stay would only have the effect of relieving them of the administrative, compliance, and planning burdens imposed by the Order. On the balancing of equities, there is therefore no meaningful countervailing harm that would follow from a stay.

*C. A Stay Is in the Public Interest Given the Significant Evidence Demonstrating There is No Factual or Legal Support for The Order, and Given the Harm it Produces to the Broader Public.*

There is no public interest served by the Order, and a stay will only benefit the public. First, the Order exceeds the Department's authority; it has provided no reasonable grounds to substantiate any near-term or imminent shortfall in electricity supply that would justify Centralia's continued operation. *See League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (noting "there is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations'") (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)). Second, the Order overrides Washinton's exercise of its "authority to choose [its] preferred mix of energy generation resources." *Citizens Action*, 125 F.4th at 239. By doing so, it unlawfully intrudes into states' reserved authority over in-state "facilities used for the generation of electric energy." 16 U.S.C. §824(b)(1); *see Pac. Gas & Elec.*, 461 U. S. at 205 ("Need for new power facilities, their economic feasibility, and rates and services, are areas that have been characteristically governed by the States."); *see also Hughes*, 578 U.S. at 154 (cleaned up) ("Under the [Federal Power Act], FERC has exclusive authority to regulate the sale of electric energy at wholesale in interstate commerce. . . . But the law places beyond FERC's power, and leaves to the States alone, the regulation of any other sale—most notably, any retail sale—of electricity."). And third, it would protect the broader public—beyond Public Interest Organizations and their members—from the onerous costs and dangerous pollution produced by Centralia's unnecessary operation and availability.

VII. CONCLUSION

For the reasons set forth above, the undersigned Public Interest Organizations respectfully request that the Department grant intervention; stay the Order; grant clarification of the Order; grant rehearing of the Order; rescind the Order (and any renewals of the Order); and allow Centralia to retire.

Filed on January 14, 2026.

Submitted by:

/s/ Michael Lenoff
Michael Lenoff
Jennifer Yun
1001 G St. NW, Suite 1000
Washington, DC 20001
(202) 660-0519
mlenoff@earthjustice.org
jyun@earthjustice.org

Patti Goldman
Nico Wedekind
810 Third Ave., Suite 610
Seattle, WA 98104
(206) 578-5868
pgoldman@earthjustice.org
nwedekind@earthjustice.org

Hema Lochan
48 Wall Street, 15th Floor
New York, NY 10005
(212) 284-8021
hlochan@earthjustice.org

*Counsel for Northwest Energy Coalition, Washington Conservation Action, Climate Solutions, and Public Citizen*

Attachment: Index of Exhibits

/s/ Gregory E. Wannier
Gregory E. Wannier
Rose Monahan
Sierra Club Environmental Law Program
2101 Webster St., Suite 1300
Oakland, CA 94612
(415) 977-5646
greg.wannier@sierraclub.org
rose.monahan@sierraclub.org

*Counsel for Sierra Club*

/s/ Ted Kelly
Ted Kelly
Tomás Carbonell
Environmental Defense Fund
555 12th St. NW, #400
Washington, DC 20004
(919) 449-4600
tcarbonell@edf.org
tekelly@edf.org

*Counsel for Environmental Defense Fund*

INDEX OF EXHIBITS

| No. | Exhibit Name | Document Name | URL |
|---|---|---|---|
| 1-01 | Expert Report of Current Energy Group | Brad Cebulko et. al., *Resource Adequacy in the Pacific Northwest: An Assessment of Resource Adequacy Studies Following the Planned Retirement of Centralia*, Current Energy Group (Jan. 2026) | |
| 1-02 | Declaration of Nancy Hirsh | Declaration of Nancy Hirsch (Jan. 13, 2026) | |
| 1-03 | DOE 202(c) Webpage | U.S. Dep't of Energy, *DOE's Use of Federal Power Act Emergency Authority* (last visited Jan. 14, 2026) | https://www.energy.gov/ceser/does-use-federal-power-act-emergency-authority |
| 1-04 | Cooke Email to Alle-Murphy | Email from Lot Cooke, DOE to Linda Alle-Murphy Re: Rehearing procedures for DOE Order No. 202-05-3 (Dec. 30, 2005) | https://www.energy.gov/oe/articles/question-and-answer-procedural-questions-application-rehearing-order-no-202-05-02?nrg_redirect=397676 |
| 1-05 | DOE Rehearing Procedures | U.S. Dep't of Energy, *DOE 202(c) Order Rehearing Procedures* (last visited June 17, 2025) | https://www.energy.gov/ceser/doe-202c-order-rehearing-procedures |
| 1-06 | Groundwater Report (Jan. 2025) | Jacobs, *2024 Annual Groundwater Monitoring Report for the Limited Purpose Landfill at the TransAlta Centralia Mine, near Centralia, Washington* (Jan. 2025) | https://transalta.com/wp-content/uploads/2025/02/TCM_CCR_2024_ANNUAL-REPORT.pdf |
| 1-07 | Cleanup Site Details (Oct. 2025) | *Cleanup Site Details*, Wash. Dep't of Ecology (Oct. 9, 2025) | https://apps.ecology.wa.gov/cleanupsearch/site/17302 (click "Download Site Report") |

86

| No. | Exhibit Name | Document Name | URL |
|---|---|---|---|
| 1-08 | Mercury Mortality Risks of Coal | *Particulate Pollution from Coal Associated with Double the Risk of Mortality than PM2.5 from Other Sources*, Harvard T.H. Chan Sch. of Pub. Health (Nov. 23, 2023) | https://hsph.harvard.edu/news/particulate-pollution-from-coal-associated-with-double-the-risk-of-mortality-than-pm2-5-from-other-sources/ |
| 1-09 | Ecology 2018-2028 Regional Haze Plan | Air Quality Program, *State Implementation Plan Revision: Second Regional Haze Plan (2018-2028)*, Wash. Dep't of Ecology (Jan. 2022) | https://apps.ecology.wa.gov/publications/documents/2202005.pdf |
| 1-10 | Landfill Inspection Report (Jan. 2025) | TransAtla Centralia Mining LLC*, Limited Purpose Landfill, Annual Inspection Report* (Jan. 15, 2025) | https://transalta.com/wp-content/uploads/2025/02/CCR-Annual-Inspection_2025jan15.pdf |
| 1-11 | EPA COBRA Health Effects Estimate | Envtl. Prot. Agency, *COBRA Web Edition* (last visited Jan. 12, 2025) | Go to https://cobra.epa.gov/. In Step 1.A, select Washington. In Step 1.B, select "Fuel Combustion: Industrial." In Step 1.C, input reduce SO2 by 934.72 tons and reduce NOx by 2,804.53 tons (based on Centralia-specific data for annual emissions from 2024, available at https://campd.epa.gov/data/custom-data-download). In Step 1.C, also input reduce PM2.5 by 120 tons (based on Centralia-specific 2020 National Emissions Inventory ("NEI") data for annual PM2.5 Filterable emissions, scaled by the ratio of Centralia's 2024 SO2 and NOx emissions to their 2020 NEI SO2 and NOx emissions. NEI 2020 data is available at https://www.epa.gov/air-emissions-inventories/2020-national-emissions-inventory-nei-data). Use a 2% discount rate and run scenario. |
| 1-12 | Washington Agencies Winter Readiness Meeting Materials Website as of November 9, 2025 | Wash. Utils. & Transp. Comm'n., *Resource Adequacy in Washington State* (last visited Jan. 11, 2026) | https://web.archive.org/web/20251109040601/https://www.utc.wa.gov/regulated-industries/utilities/energy/resource-adequacy-washington-state |

| No. | Exhibit Name | Document Name | URL |
|---|---|---|---|
| 1-13 | DOE Order No. 202-22-4 | U.S. Dep't of Energy, Order No. 202-22-4 (Dec. 24, 2022) | https://www.energy.gov/sites/default/files/2022-12/PJM%20202%28c%29%20Order.pdf |
| 1-14 | DOE Order No. 202-17-4 Summary of Findings | U.S. Dep't of Energy, Summary of Findings DOE Order No. 202-17-4 (Sept. 14, 2017) | https://www.energy.gov/sites/default/files/2017/09/f36/Order%20202-17-4%20Summary%20of%20Findings.pdf |
| 1-15 | DOE Order No. 202-02-1 | U.S. Dep't of Energy, Order No. 202-02-1 (Aug. 16, 2002) | https://www.energy.gov/sites/default/files/202%28c%29%20order%20202-02-1%20August%2016%2C%202002%20-%20CSC.pdf |
| 1-16 | DOE Order No. 202-20-2 | U.S. Dep't of Energy, Order No. 202-20-2 (Sept. 6. 2020) | https://www.energy.gov/oe/articles/federal-power-act-section-202c-caiso-september-2020?nrg_redirect=454296 |
| 1-17 | DOE Order No. 202-22-2 | U.S. Dep't of Energy, Order No. 202-22-2 (Sept. 4, 2022) | https://www.energy.gov/ceser/federal-power-act-section-202c-banc-september-2022 |
| 1-18 | DOE Order No. 202-21-1 | U.S. Dep't of Energy, Order No. 202-21-1 (Feb. 14, 2021) | https://www.energy.gov/oe/articles/federal-power-act-section-202c-ercot-february-2021?nrg_redirect=364318 |
| 1-19 | FERC Energy Primer | FERC, *Energy Primer: A Handbook of Energy Market Basics* (Dec. 2023) | https://www.ferc.gov/media/energy-primer-handbook-energy-market-basics |
| 1-20 | DOE Order No. 202-08-1 | U.S. Dep't of Energy, Order No. 202-08-1 (Sept. 14, 2008) | https://www.energy.gov/sites/prod/files/202%28c%29%20order%20202-08-1%20September%2014%2C%202008%20-%20CenterPoint%20Energy.pdf |
| 1-21 | DOE Order No. 202-24-1 | U.S. Dep't of Energy, Order No. 202-24-1 (Oct. 9, 2024) | https://www.energy.gov/sites/default/files/2024-10/Duke%20202%28c%29%20Order_100924%20FINAL_JMG%20signed.pdf |

| No. | Exhibit Name | Document Name | URL |
|---|---|---|---|
| 1-22 | Overview of Power Council's Resource Adequacy Approach | Northwest Power and Conservation Council, *Resource Adequacy* (last visited Jan. 12, 2025) | https://www.nwcouncil.org/energy/energy-topics/resource-adequacy/ |
| 1-23 | Overview of Power Council's Approach to Load Forecasting | Northwest Power and Conservation Council, *Explaining How the Council Forecasts Load Growth for the Pacific Northwest Power System* (Mar. 20, 2025) | https://www.nwcouncil.org/news/2025/03/20/explaining-pacific-northwest-load-forecasting/ |
| 1-24 | Sylvan & GridLab Independent Evaluation of E3 Presentation | Sylvan Energy Analytics & GridLab, *Near-Term Winter Resource Adequacy Challenges in the Pacific Northwest: A Review of E3's Northwest RA Study Phase 1 and Independent Evaluation of Near-Term Winter Challenges* (Jan. 2026) | https://gridlab.org/portfolio-item/pnw_nearterm_winterra/ |
| 1-25 | MISO LOLE Presentation | MISO, *LOLE 101: Probabilistic Analyses* (May 8, 2018) | https://cdn.misoenergy.org/LOLE%20101%20Training624875.pdf |
| 1-26 | Wash. Dep't of Commerce Summary of Utilities' 2024 IRPs (Dec. 1, 2025) | Aaron Tam et al., Washington State Dep't of Commerce, *Washington State Electric Utility Resource Planning: 2024 Report* (version 4 published Dec. 1, 2025) | https://app.leg.wa.gov/ReportsToTheLegislature/Home/GetPDF?fileName=Washington%20State%20Electric%20Utility%20Resource%20Planning%202024%20Report_FINAL_2be3ab47-13c7-45fc-a113-808ee29dbc69.pdf OR Navigate to https://app.leg.wa.gov/reportstothelegislature and filter for Report Date of "12/1/2025," Organization Name of "Commerce, Department of," and RCW of "19.280," then click link for Report Title of "Electric Utility Resource Planning, 2024 Report (843k)" |

89

| No. | Exhibit Name | Document Name | URL |
|---|---|---|---|
| 1-27 | NERC 2025 Summer Reliability Assessment | NERC, *2025 Summer Reliability Assessment* (May 2025) | https://www.nerc.com/globalassets/programs/rapa/ra/nerc_sra_2025.pdf |
| 1-28 | 2019–24 NERC Summer Reliability Assessments | NERC, *Summer Reliability Assessments for 2019-2025* (compiled) | 2019 Reliability Assessment: https://www.nerc.com/globalassets/programs/rapa/ra/nerc_sra_2019.pdf<br><br>2020 Reliability Assessment: https://www.nerc.com/pa/RAPA/ra/Reliability%20Assessments%20DL/NERC_SRA_2020.pdf<br><br>2021 Reliability Assessment: https://nerc.com/pa/RAPA/ra/Reliability%20Assessments%20DL/NERC%20SRA%202021.pdf<br><br>2022 Reliability Assessment: n/a<br><br>2023 Reliability Assessment: https://www.nerc.com/globalassets/programs/rapa/ra/nerc_sra_2023.pdf<br><br>2024 Reliability Assessment: https://www.nerc.com/pa/RAPA/ra/Reliability%20Assessments%20DL/NERC_SRA_2024.pdf |
| 1-29 | FERC Staff Winter Reliability Assessment | Office of Technical Reporting & Office of Electric Reliability, *Winter Energy Market and Electric Reliability Assessment 2025–2026: A Staff Report to the Commission*, FERC (Nov. 20, 2025) | https://www.ferc.gov/news-events/news/2025-2026-winter-energy-market-and-reliability-assessment |
| 1-30 | Winter Storm Elliott System Operations Inquiry | FERC, NERC, and Regional Entity Staff Report, *Inquiry into Bulk-Power System Operations During December 2022 Winter Storm Elliott* (Oct. 2023) | https://www.ferc.gov/media/winter-storm-elliott-report-inquiry-bulk-power-system-operations-during-december-2022# |

| No. | Exhibit Name | Document Name | URL |
|---|---|---|---|
| 1-31 | PJM Elliott Report | PJM, *Winter Storm Elliott: Event Analysis and Recommendation Report* (July 17, 2023) | https://www.pjm.com/-/media/DotCom/library/reports-notices/special-reports/2023/20230717-winter-storm-elliott-event-analysis-and-recommendation-report.pdf?ref=blog.gridstatus.io |
| 1-32 | NARUC Coal Report | Phillip Graeter & Seth Schwartz, *Recent Changes to U.S. Coal Plant Operations and Current Compensation Practices*, Nat'l Assoc. of Regulatory Util. Commissioners (Jan. 2020) (excerpt) | https://www.osti.gov/servlets/purl/1869928 |
| 1-33 | IEA Flexibility Report | Colin Henderson, *Increasing the Flexibility of Coal-Fired Power Plants*, International Energy Agency Clean Coal Centre (Sept. 2014) (excerpt) | https://usea.org/sites/default/files/092014_Increasing%20the%20flexibility%20of%20coal-fired%20power%20plants_ccc242.pdf |
| 1-34 | Secretary Wright's West Virginia Remarks | Charles Young, *Energy Secretary Chris Wright: Future of U.S. Coal is 'long and bright'*, West Virginia News (July 5, 2025) | https://www.wvnews.com/news/wvnews/energy-secretary-chris-wright-future-of-u-s-coal-is-long-and-bright/article_948eb88e-2509-42a3-b985-07c47f1ee151.html |
| 1-35 | July Resource Adequacy Report | U.S. Dep't of Energy, *Resource Adequacy Report: Evaluating the Reliability and Security of the United States Grid* (July 2025) | https://www.energy.gov/sites/default/files/2025-07/DOE%20Final%20EO%20Report%20%28FINAL%20JULY%207%29.pdf |
| 1-36 | Energy Emergency EO | Exec. Order No. 14,156, 90 Fed. Reg. 8433, Declaring a National Energy Emergency (Jan. 29, 2025) | https://www.federalregister.gov/documents/2025/01/29/2025-02003/declaring-a-national-energy-emergency |

91

| No. | Exhibit Name | Document Name | URL |
|---|---|---|---|
| 1-37 | Grid EO | Exec. Order No. 14,262, 90 Fed. Reg. 15521, Strengthening the Reliability and Security of the U.S. Electric Grid (Apr. 14, 2025) | https://www.federalregister.gov/documents/2025/04/14/2025-06381/strengthening-the-reliability-and-security-of-the-united-states-electric-grid |
| 1-38 | NY Times Coal Article | Brad Plumer & Mira Rojanasakul, *Trump Signs Orders Aimed at Reviving a Struggling Coal Industry*, NY Times (Sept. 3, 2025) | https://www.nytimes.com/2025/04/08/climate/trump-order-coal-mining.html |
| 1-39 | DOE July 7 Press Release | U.S. Dep't of Energy, *Department of Energy Releases Report on Evaluating U.S. Grid Reliability and Security* (July 7, 2025) | https://www.energy.gov/articles/department-energy-releases-report-evaluating-us-grid-reliability-and-security |
| 1-40 | PIOs' RFR of July Resource Adequacy Report | *Motion to Intervene and Request for Rehearing of Nat. Res. Def. Council, the Ecology Ctr., Envtl. Def. Fund, Envtl. Law and Pol'y Ctr., Pub. Citizen, Sierra Club, and Vote Solar*, U.S. Dep't of Energy Resource Adequacy Report (Aug. 8, 2025) | https://sustainableferc.org/wp-content/uploads/2025/08/2025-08-06_NRDC-et-al-Request-for-Rehearing-DOE-Resource-Adequacy-Report.pdf |
| 1-40a | Department's Response to PIOs' RFR of July Resource Adequacy Report | Letter from Tina Francone, Acting Director, Grid Deployment Office, Dep't of Energy, to Caroline Reiser et al., Nat. Res. Def. Council, RE: August 8, 2025 Submission (Sept. 5, 2025) | |

92

| No. | Exhibit Name | Document Name | URL |
|---|---|---|---|
| 1-41 | Inst. Pol'y Integrity Report | Jennifer Danis, Christopher Graf & Matthew Lifson, *Enough Energy: A Review of DOE's Resource Adequacy Methodology*, Inst. Pol'y Integrity (July 2025) | https://policyintegrity.org/files/publications/IPI_EnoughEnergy_FinalReport.pdf |
| 1-42 | GridLab Report | Ric Oconnell, *GridLab Analysis: Department of Energy Resource Adequacy Report*, GridLab (July 11, 2025) | https://gridlab.org/gridlab-analysis-department-of-energy-resource-adequacy-report/ |
| 1-43 | Duke University Rethinking Load Growth Study | Tyler H. Norris et al., *Rethinking Load Growth: Assessing the Potential for Integration of Large Flexible Loads in US Power Systems*, Duke University Nicholas Institute for Energy, Environment & Sustainability (2025) | https://nicholasinstitute.duke.edu/sites/default/files/publications/rethinking-load-growth.pdf |
| 1-44 | RMI Analysis of Coal Plants' Threats to Reliability | Gabriella Tosado, Ashtin Massie & Joe Daniel, RMI, *Reality Check: We Have What's Needed to Reliably Power the Data Center Boom, and It's Not Coal Plants* (Aug. 12, 2025) | https://rmi.org/reality-check-we-have-whats-needed-to-reliably-power-the-data-center-boom-and-its-not-coal-plants/ |
| 1-45 | Energy Innovation Report | Eric G. Gimon, *Dodging the Firm Fixation for Data Centers and the Grid*, Energy Innovation (Nov. 2025) | https://energyinnovation.org/wp-content/uploads/Dodging-the-Firm-Fixation-for-Data-Centers-and-the-Grid.pdf |
| 1-46 | R Street Institute Commentary: DOE "Zombies" Are Eating Competitive Power Markets | Michael Giberson, *Low-Energy Fridays: DOE "Zombies" Are Eating Competitive Power Markets*, R Street (Nov. 13, 2025) | https://www.rstreet.org/commentary/low-energy-fridays-doe-zombies-are-eating-competitive-power-markets/ |

93

| No. | Exhibit Name | Document Name | URL |
|---|---|---|---|
| 1-47 | Palgrave Handbook | Manfred Hafner & Giacomo Luciana, *Palgrave Handbook of International Economics*, Palgrave Macmillan (2022) (excerpt) | https://link.springer.com/book/10.1007/978-3-030-86884-0 |
| 1-48 | IEA Report | International Energy Agency, *The role of CCUS in low-carbon power systems* (July 17, 2020) (excerpt) | https://www.iea.org/reports/the-role-of-ccus-in-low-carbon-power-systems |
| 1-49 | 2011 BART Order | First Revision Order No. 6426, In the Matter of An Administrative Order Against: TransAlta Centralia Generation, LLC. (Dec. 13, 2011) | https://ecology.wa.gov/getattachment/a18d9a89-f87a-44a6-b679-13efe5a8fa9a/20111213TransAltaBARTOrderRevised.pdf |
| 1-50 | 2020 BART Order | Second Revision Order No. 6426, In the Matter of An Administrative Order Against: TransAlta Centralia Generation, LLC., (Jul. 29, 2020) | https://ecology.wa.gov/getattachment/ed5e15c0-331a-4a36-97fb-c7fb4433a3fc/20200729TransAltaBARTOrderRevised.pdf |
| 1-51 | 2020 BART Order Technical Support | Wash. Dep't of Ecology, *Technical Support Document for Second BART (Best Available Retrofit Technology) Order Revision, TransAlta Centralia Generating Plant* (July 2020) | https://ecology.wa.gov/getattachment/8b3b3084-e5a4-49c0-98aa-7b50fdcfdbab/202007TransAltaBART2TSD.pdf |
| 1-52 | Centralia Hazardous Substances Releases: Preliminary Determination (Sept. 2025) | Wash. Dep't of Ecology, *Preliminary Determination of Liability for Release of Hazardous Substances* at the following Contamintated Site (Sept. 4, 2025) | https://apps.ecology.wa.gov/cleanupsearch/document/163984 |
| 1-53 | Centralia Pollution Inspection (June 2025) | Wash. Dep't. Of Ecology, *Centralia MTCA Inspection Report* (Jun 2, 2025) | |

| No. | Exhibit Name | Document Name | URL |
|---|---|---|---|
| 1-54 | Centralia Hazardous Substances Liability Determination (Oct. 2025) | Wash. Dep't Of Ecology, *Determination of TransAlta Liability to Clean Up Hazardous Substances* (Oct. 14, 2025) | |
| 1-55 | Emissions Performance Standard | Wash. Dep't. Of Commerce, *Emissions Performance Standard (EPS)* (last visited Jan. 6, 2026) | https://www.commerce.wa.gov/energy-policy/electricity-policy/eps/ |
| 1-56 | Puget 2024 Annual EEI Report | Puget Sound Energy, *Annual Energy and Emissions Intensity ("EEI") Metrics Report* (May 31, 2025) | https://apiproxy.utc.wa.gov/cases/GetDocument?docID=3&year=2023&docketNumber=230391 |
| 1-57 | Wash. Utils. Comm'n Rejection of Colstrip Investments in Puget Rates | Final Order 05, DOCKET UE-240729, Wash. Utils. & Transp. Comm'n. v. Puget Sound Energy (Dec. 19, 2025) | https://apiproxy.utc.wa.gov/cases/GetDocument?docID=585&year=2024&docketNumber=240729 |
| 1-58 | EPA CEMS Data 2021-2025 | United States Environmental Protection Agency, Clean Air Markets Program Data Download Results for Annual Emissions for Centralia 2021-2025 (last visited **) | https://campd.epa.gov/data/custom-data-download (Results for Annual Emissions for Centralia 2021-2025) |
| 1-59 | NERC 2025-26 Winter Assessment | North American Electric Reliability Corp., *2025-2026 Winter Reliability Assessment* (Nov. 2025) | https://www.nerc.com/globalassets/our-work/assessments/nerc_wra_2025.pdf |
| 1-60 | Department Press Release on Centralia Order | U.S. Dep't of Energy, *Energy Secretary Ensures Washington Coal Plant Remains Open to Ensure Affordable, Reliable and Secure Power Heading into Winter* (Dec. 17, 2025) | https://www.energy.gov/articles/energy-secretary-ensures-washington-coal-plant-remains-open-ensure-affordable-reliable-and |
| 1-61 | Department Export Authorizations Library | U.S. Dep't of Energy, *Export Authorization Library* (last visited Jan. 4, 2026) | https://www.energy.gov/gdo/export-authorization-library |

95

| No. | Exhibit Name | Document Name | URL |
|---|---|---|---|
| 1-62 | Department Export Authorization EA-365-C (Oct. 21, 2025) | Research Power Corp., Order No. EA-365-C (Oct. 21, 2025) | https://www.energy.gov/gdo/ea-365-c-research-power-corporation |
| 1-63 | Gridforce 2019 Audit Report | Western Electricity Coordinating Council, *Compliance Audit Report of Gridforce Energy Management, LLC* (Dec. 20, 2019) | https://www.nerc.com/globalassets/our-work/reports/regional-audit-reports-of-registered-entities/wecc/2022/ncr11393_grid_wecc_pub_2019.pdf |
| 1-64 | Gridforce 2022 Audit Report | Western Electricity Coordinating Council, Compliance Audit Report of Gridforce Energy Management, LLC (Nov. 30, 2022) | https://www.nerc.com/globalassets/our-work/reports/regional-audit-reports-of-registered-entities/wecc/2023/ncr03050_grba_wecc_pub_2022.pdf |
| 1-65 | EIA Explainer on Balancing Authorities | Sara Hoff, U.S. Energy Info. Admin., U.S. Dep't of Energy, *U.S. Electric System Is Made up of Interconnections and Balancing Authorities* (July 20, 2016) | https://www.eia.gov/todayinenergy/detail.php?id=27152 |
| 1-66 | Bonneville's Typical Balancing Authority Milestones | Bonneville Power Admin., *Balancing Authority Area Services* (last visited Jan. 6, 2026) | https://www.bpa.gov/energy-and-services/transmission/interconnection/balancing-authority-area |
| 1-67 | Email Correspondence with E3 | Email Thread Between Arne Olson, Energy and Envtl. Economics, Inc., and Brad Cebulko, Current Energy Group, Re: E3 NW RA study and Centralia (Dec. 31, 2025 to Jan. 9, 2025) | |
| 1-67a | E3's Attachment to Email Correspondence with E3 | E3's Attachment (in PDF form) to Email Thread in Ex. 1-68 | |
| 1-67b | E3's Attachment to Email Correspondence with E3 (as transmitted in Excel form) | E3's Attachment (as transmitted in Excel form) to Email Thread in Ex. 1-68 | |

96

| No. | Exhibit Name | Document Name | URL |
|---|---|---|---|
| 1-68 | Wash. Utils. Comm'n Rejection of Colstrip Investments in Avista Rates | Final Order 08, DOCKET UE-240891, Wash. Utils. & Transp. Comm'n v. Avista Corp., D/B/A Avista Utils. (Dec. 19, 2025) | |
| 1-69 | Power Council Overview | Northwest Power and Conservation Council, *Overview* (last updated July 2025) | https://www.nwcouncil.org/fs/19572/2025overview.pdf |
| 1-70 | Power Council 2021 Power Plan | Northwest Power and Conservation Council, *The 2021 Northwest Power Plan* (Mar. 10, 2022) | https://www.nwcouncil.org/fs/17680/2021powerplan_2022-3.pdf |
| 1-71 | Power Council 2029 Power Supply Adequacy Assessment | Northwest Power and Conservation Council, *Pacific Northwest Power Supply Adequacy Assessment for 2029* (Aug. 2024) | https://www.nwcouncil.org/fs/18853/2024-4.pdf |
| 1-72 | FERC Western Energy Markets Explainer | Office of Public Participation, FERC, *Western Energy Markets Explainer* (last visited Jan. 2, 2026) | https://ferc.gov/OPP/western-markets-explainer |
| 1-73 | Bonneville 2024 Fact Sheet | Bonneville Power Administration, *BPA Facts* (Oct. 2025) | https://www.bpa.gov/-/media/Aep/about/publications/general-documents/bpa-facts.pdf |
| 1-74 | Department Export Authorization EA-479-A (July 11, 2025) | Macquarie Energy, LLC, Order No. EA-479-A (July 11, 2025) | https://www.energy.gov/sites/default/files/2025-08/EA-479-A%20Macquarie%20Energy%20LLC%20Export%20Authorization%20Order.pdf |
| 1-75 | Bonneville Resource Plan (compiled 2022 & 2024) | Bonneville Power Administration, *2022 Resource Program* (2022)<br><br>Bonneville Power Administration, *2024 Resource Program* (2024) | 2022 Resource Plan: https://www.bpa.gov/-/media/Aep/power/resource-program/2022-resource-program.pdf<br><br>2024 Resource Plan: https://www.bpa.gov/-/media/Aep/power/resource-program/2024-rp-document.pdf |

| No. | Exhibit Name | Document Name | URL |
|---|---|---|---|
| 1-76 | Western Pool Reserve Sharing Program | Western Power Pool, *Northwest Power Pool Reserve Sharing Program Documentation* (effective Oct. 1, 2025) | https://www.westernpowerpool.org/private-media/documents/NWPP_RSG_Program_Doc_-_RSGC_Approved_effective_10.1.2025.pdf |
| 1-77 | Western Frequency Response Sharing Group | Western Power Pool, Western *Frequency Response Sharing Group* (last visited Jan. 2, 2026) | https://www.westernpowerpool.org/about/programs/western-frequency-response-sharing-group |
| 1-78 | WRAP Tariff | Western Power Pool, *Western Resource Adequacy Program Tariff* (effective Mar. 16, 2025) | https://www.westernpowerpool.org/private-media/documents/WRAP_Tariff_Effective_3.16.25.pdf |
| 1-79 | WRAP Notice | Rebecca Sexton, *WPP Notice to WRAP Resource Adequacy Participants Committee*, Western Power Pool (last modified Oct. 31, 2025) | https://www.westernpowerpool.org/news/wpp-notice-to-wrap-resource-adequacy-participants |
| 1-80 | Fisheries Report | Earl L. Finn, *Final Report Skookumchuck-Hanaford Creek Fisheries Investigation*, State of Washington Department of Fisheries (March 1973) | |
| 1-81 | "About WECC" Webpage | Western Elec. Coordinating Council, *About WECC* (last visited Jan. 2, 2026) | https://www.wecc.org/about/about-wecc |
| 1-82 | NERC Rules of Procedure | N. Am. Elec. Reliab. Corp., *Rules of Procedure* (effective Nov. 28, 2023) | https://www.nerc.com/globalassets/who-we-are/rules-of-procedure/nerc-rop-effective-20231128_with-appendicies.pdf |

| No. | Exhibit Name | Document Name | URL |
|---|---|---|---|
| 1-83 | WECC Contingency Reserve Whitepaper | Western Elec. Coordinating Council, *WECC-0142 BAL-002-WECC-3 Contingency Reserve Request to Retire* (Jan. 21, 2025) | https://www.nerc.com/globalassets/standards/approved-standards/bal/bal-002-wecc-3-cont.-rev.---req.-to-retire---white-paper---final_09162025.pdf |
| 1-84 | WECC Risk Factor Criteria | Western Elec. Coordinating Council, *WECC Risk Factor Criteria for Inherent Risk Assessment* (effective March 22, 2021) | https://www.wecc.org/sites/default/files/documents/program/2024/WECC%20Risk%20Factor%20Criteria%20for%20IRA.pdf |
| 1-85 | WECC 2024 Western Assessment of Resource Adequacy Appendix | Western Elec. Coordinating Council, *Western Assessment of Resource Adequacy Appendix* (Jan. 24, 2025) | https://www.wecc.org/sites/default/files/documents/products/2025/2024%20WARA%20%20Appendix.pdf |
| 1-86 | WECC Reliability Assessment Webpage | Western Elec. Coordinating Council, *Reliability Assessments* (last visited Jan. 2, 2026) | https://www.wecc.org/program-areas/reliability-planning-performance-analysis/reliability-assessments |
| 1-87 | TransAlta Form EIA-860 | Operating" tab, row 5359, plant name "TransAlta Centralia Gen LLC" (U.S. Energy Information Administration, Form EIA-860, Schedule 3: Generator Data (2024) (2024 Form EIA-860) | https://www.eia.gov/electricity/data/eia860/ (click Zip Folder to the right of "2024," then click "3_1_Generator_Y2024," then scroll to tab 5378) |
| 1-88 | Wash. Commerce Util. Res. Planning Report (Compiled 2022 & 2024) | Wash. Dept. of Commerce, Energy Policy Office, *Washington State Electric Utility Resource Planning, Report to the Legislature* (2022, 2024) | 2022: https://app.leg.wa.gov/ReportsToTheLegislature/Home/GetPDF?fileName=Washington%20State%20Electric%20Utility%20Resource%20Planning%202022%20Report%20-%20FINAL_6eb6fc4a-487b-483b-b5ae-d622e9bd2a0b.pdf<br><br>2024: https://app.leg.wa.gov/ReportsToTheLegislature/Home/GetPDF?fileName=Washington%20State%20Electric%20Utility%20Resource%20Planning%202024%20Report_FINAL_2be3ab47-13c7-45fc-a113-808ee29dbc69.pdf |

| No. | Exhibit Name | Document Name | URL |
|---|---|---|---|
| 1-89 | Washington Agencies Resource Adequacy Meeting Summaries (Compiled) | Wash. Utils. & Transp. Comm'n. & Wash. Dep't of Comm., *Letter to the Governor Re: Summary of the 2025 Long-Term Resource Adequacy Meeting* (Nov. 19, 2025)<br><br>Wash. Utils. & Transp. Comm'n. & Wash. Dep't of Comm., *Letter to the Governor Re: Summary of the 2025 Summer Resource Adequacy Meeting* (July 30, 2025)<br><br>Wash. Utils. & Transp. Comm'n. & Wash. Dep't of Comm., *Letter to the Governor Re: Summary of the 2025 Winter Preparedness Resource Adequacy Meeting* (Dec. 31, 2025) | Long Term RA Meeting: https://apiproxy.utc.wa.gov/cases/GetDocument?docID=121&year=2021&docketNumber=210096<br><br>Summer Readiness RA Meeting: https://apiproxy.utc.wa.gov/cases/GetDocument?docID=73&year=2021&docketNumber=210096<br><br>Winter Readiness RA Meeting: https://apiproxy.utc.wa.gov/cases/GetDocument?docID=125&year=2021&docketNumber=210096 |
| 1-90 | E3 Resource Adequacy Phase 1 Presentation | Arne Olson et. al., Energy and Envtl. Economics, Inc., *Resource Adequacy and the Energy Transition in the Pacific Northwest: Phase 1 Results* (Sept. 22, 2025) | https://www.utc.wa.gov/sites/default/files/2025-10/Revised%20V3%20E3%20Presentation%20RA%20Study%20September%2022%20WA%20RA%20Meeting.pdf |
| 1-91 | NERC Winter Assessments 2022-24 (Compiled) | N. Am. Elec. Reliab. Corp., *2022-2023 Winter Reliability Assessment* (Nov. 2022).<br>N. Am. Elec. Reliab. Corp., *2023-2024 Winter Reliability Assessment* (Nov. 2023) | 2022-2023 Reliability Assessment: https://www.nerc.com/globalassets/programs/rapa/ra/nerc_wra_2022.pdf<br><br>2023-2024 Reliability Assessment: https://www.nerc.com/globalassets/programs/rapa/ra/nerc_wra_2023.pdf |

| No. | Exhibit Name | Document Name | URL |
|---|---|---|---|
| 1-92 | WECC 2024 Western Assessment of Resource Adequacy Demand at Risk Analysis | Western Elec. Coordinating Council, *Western Assessment of Resource Adequacy 2024 Demand at Risk by Subregion* (2024) | https://www.wecc.org/sites/default/files/documents/products/2024/WARA%202024%20Demand-at-Risk%20Hours%20by%20Subregion%20%281%29.pdf |
| 1-93 | Bonneville Day-Ahead Market Policy | Bonneville Power Administration, *Day-Ahead Market Policy* (May 9, 2025) | https://www.bpa.gov/-/media/Aep/projects/day-ahead-market/20250509-dam-final-policy.pdf |
| 1-94 | Power Council 2024 Resource Program Results | Northwest Power and Conservation Council, *Bonneville's 2024 Resource Program Results* (Jan. 7, 2025) | www.nwcouncil.org/fs/19031/2025_01_4.pdf |
| 1-95 | Centralia Summary by TransAlta | TransAlta, *Centralia Summary Page* (last visited Jan. 6, 2026 | https://transalta.com/about-us/our-operations/facilities/centralia/ |
| 1-96 | MIT Article | MIT Climate Portal, *Why Does Burning Coal Generate More CO2 Than Oil or Gas* (Dec. 16, 2022) | https://climate.mit.edu/ask-mit/why-does-burning-coal-generate-more-co2-oil-or-gas |
| 1-97 | WECC Explainer | Western Elec. Coordinating Council, *WECC ODITY Threshold Interpretations* (Oct. 25, 2022) | https://www.wecc.org/sites/default/files/documents/program/2024/WECC%20One-day-in-ten-year%20metric%20explanation.pdf |
| 1-98 | NERC Emergency Operations | N. Am. Elec. Reliab. Corp., *EOP-011-4 Emergency Operations* (last visited Jan. 8, 2026) | https://www.nerc.com/globalassets/standards/reliability-standards/eop/eop-011-4.pdf |
| 1-99 | 2001 National Energy Policy | Nat'l Energy Pol'y Dev. Grp., *Reliable, Affordable, and Environmentally Sound Energy for America's Future* (May 16, 2001) | https://www.nrc.gov/docs/ml0428/ml042800056.pdf |
| 1-100 | Seattle Times Article | Amanda Zhou, Seattle Times, *Centralia Coal Plant to Burn Natural Gas* | https://www.seattletimes.com/seattle-news/climate-lab/centralia-coal-plant-to-burn-natural-gas-instead/ |

101

| No. | Exhibit Name | Document Name | URL |
|---|---|---|---|
| | | *Instead* (Dec. 11, 2025) | |
| 1-101 | TransAlta Annual Information Form for Year Ended Dec. 31, 2024 | Transalta, *Annual Information Form for the Year Ended December 31, 2024* (2024) | https://transalta.com/wp-content/uploads/2025/02/2024.12.31-TAC-EX-99.1-AIF.pdf |
| 1-102 | Park Service Comments on BART Proposals (Nov. 2009) | Dep't of the Interior, *Letter from Christine L. Shaver, Chief, Air Resources Division, Dep't of the Interior, to Stuart A. Clark, Air Quality Program Manager, Dep't of Ecology* (Nov. 20, 2009) | |
| 1-103 | Park Service Comments on Proposed Haze State Implementation Plan (June 2010) | Dep't of the Interior, *Letter from Christine L. Shaver, Chief, Air Resources, Dep't of the Interior, to Ted Sturdevant, Direct, Dep't of Ecology* (June 11, 2020) | |
| 1-104 | BART Order No. 6426 (June 18, 2010) | Wash. Dep't of Ecology, *Order No. 6426* (June 18, 2020) | |
| 1-105 | Sierra Club Comments on Proposed Haze State Implementation Plan | *Letter from Janette Brimmer, Earthjustice, to Doug Schnieder, Wash. Dep't of Ecology, Air Quality Program, Re: Washington Proposed Regional Haze State Implementation Plan Comments by National Parks Conservation Association, Sierra Club, and Northwest Environmental Defense Center (Oct. 5, 2010)* | |

102

| No. | Exhibit Name | Document Name | URL |
|---|---|---|---|
| 1-106 | Shutdown Memorandum of Agreement | *Memorandum of Agreement* (Dec. 23, 2011) | |
| 1-107 | Shutdown Memorandum of Understanding | *Memorandum of Understanding* (June 22, 2012) | |
| 1-108 | Order Approving Puget-TransAlta Power Purchase Agreement | Final Order 03 Granting Petition, Subject to Conditions, DOCKET UE-121373, Wash. Utils. & Transp. Comm'n v. Puget Sound Energy (Dec. 19, 2025) | |
| 1-109 | Centralia Conversion Announcement | TransAlta, *TransAlta Signs Long-Term Agreement for 700 MW at Centralia Facility Enabling Coal to Natural Gas Conversion* (Dec. 9, 2025) | https://transalta.com/newsroom/transalta-signs-long-term-agreement-for-700-mw-at-centralia-facility-enabling-coal-to-natural-gas-conversion/ |
| 1-110 | Centralia Conversion Reporting | Joseph O'Sullivan, *Washington's Last Coal Power Plant Will Transition to Natural Gas*, Washington State Standard (Dec. 9, 2025) | https://washingtonstatestandard.com/2025/12/09/washingtons-last-coal-power-plant-will-transition-to-natural-gas/ |
| 1-111 | 2023 GHG Washington Reporting Data | Washington State Open Data Portal, GHG Emissions Report for 2023, (last visited: Jan. 6, 2025) | https://data.wa.gov/Natural-Resources-Environment/GHG-Reporting-Program-Reporter-Emissions/84ua-fhbx |
| 1-112 | Energy Facility Site Evaluation Council 2007 Adjudicative Order | In the Matter of Application No. 2006-01, Energy Northwest Pacific Mountain Energy Center Power Project, Adjudicative Order No. 2, Council Order No. 833 Staying Adjudicative Proceeding (Nov. 27, 2007) | |

| No. | Exhibit Name | Document Name | URL |
|---|---|---|---|
| 1-113 | Ecology-TransAlta Agreed Order on Centralia Cleanup | Wash. Dep't of Ecology, *In the Matter of Remedial Action by: TansAlta Centralia Generation LLC for: TransAlta Centralia Agreed Order No. DE 24235* (Dec. 29, 2025) | https://apps.ecology.wa.gov/cleanupsearch/document/165601 |
| 1-114 | Wash. Exec. Order 09-05 (May 2009) | Wash. Exec. Order No. 09-05 (May 21, 2009) | https://governor.wa.gov/sites/default/files/exe_order/eo_09-05.pdf |
| 1-115 | TransAlta 2024 Annual Integrated Report | TransAlta, *2024 Integrated Report* (Feb. 19, 2025) | https://transalta.com/wp-content/uploads/2025/02/2024-Annual-Integrated-Report.pdf |
| 1-116 | Nat'l Park Serv. Testimony at BART Hearing re Centralia (2009) | *Statement of the National Park Service Before the Washington State Department of Ecology Regarding the TransAlta Centralia Power Plant* (Oct. 13, 2009) | |
| 1-117 | Sierra Club Comments on TransAlta-Ecology Proposed BART Settlement (Nov. 2009) | Letter from Jannette Brimmer, Earthjustice, to Sarah Rees, Wash. Dep't of Ecology, Air Quality Program Re: Proposed Ecology/TransAlta Settlement Agreement and Consent Decree TransAlta Centralia Generation, L.L.C., Centralia, Washington (Nov. 9, 2009) | |
| 1-118 | Energy Transition Bill, SB 5769 | S.B. 5769, 69th Leg. (Wash 2025) | |

104

| No. | Exhibit Name | Document Name | URL |
|---|---|---|---|
| 1-119 | 2023 Bonneville "White Book" | Bonneville Power Admin., *2023 Pacific Northwest Loads and Resources Study* (Apr. 2023) | https://www.bpa.gov/-/media/Aep/power/resource-program/2023-white-book.pdf |
| 1-120 | 2024 Bonneville "White Book" | Bonneville Power Admin., *2024 Pacific Northwest Loads and Resources Study* (Aug. 2024). | https://www.bpa.gov/-/media/Aep/power/white-book/2024-white-book.pdf |
| 1-121 | 2025 Bonneville "White Book" | Bonneville Power Admin., *2025 Pacific Northwest Loads and Resources Study* (May 2025) | https://www.bpa.gov/-/media/Aep/power/white-book/2025-whitebook.pdf |
| 1-122 | Energy Reliability and Resilience | U.S. Dep't of Energy, *Energy Reliability and Resilience* (webpage as of Oct. 21, 2025) | https://web.archive.org/web/20251021071021/https:/www.energy.gov/eere/energy-reliability-and-resilience |
| 1-123 | NERC 2024 Long-Term Reliability Assessment | N. Am. Elec. Reliab. Corp., *2024 Long-Term Reliability Assessment* (Dec. 2024) | https://www.nerc.com/globalassets/our-work/assessments/2024-ltra_corrected_july_2025.pdf |
| 1-124 | WECC's 2025–26 Winter Reliability Assessment Western Overview | Western Elec. Coordinating Council, *2025-2026 Winter Reliability Assessment Western Overview* (last visited Jan. 7, 2026) | https://feature.wecc.org/seasonal-assessment-western-overview/index.html |
| 1-125 | ECHO Pollutant Loading Report (DMR) | U.S. EPA, Enforcement and Compliance History Online, *Pollutant Loading Report (DMR)* (last visited Jan. 7, 2026) | https://echo.epa.gov/trends/loading-tool/reports/dmr-pollutant-loading?year=2025&permit_id=WA0001546 |
| 1-126 | ECHO Effluent Charts | U.S. EPA, Enforcement and Compliance History Online, *Effluent Charts* (last visited Jan. 7, 2026) | https://echo.epa.gov/effluent-charts#WA0001546 |

| No. | Exhibit Name | Document Name | URL |
|---|---|---|---|
| 1-127 | EPA Basic Information about NO2 | U.S. EPA, *Basic Information About NO2* (last updated July 10, 2025) | https://www.epa.gov/no2-pollution/basic-information-about-no2 |
| 1-128 | EPA Sulfur Dioxide Basics | U.S. EPA, *Sulfur Dioxide Basics* (last updated Jan. 2, 2026) | https://www.epa.gov/so2-pollution/sulfur-dioxide-basics |
| 1-129 | EPA Particulate Matter (PM) Basics | U.S. EPA, *Particulate Matter (PM) Basics* (last updated May 30, 2025) | https://www.epa.gov/pm-pollution/particulate-matter-pm-basics |
| 1-130 | Southwest Clean Air Agency Compliance Evaluation On-Site Inspection Report (Dec. 12, 2025) | Southwest Clean Air Agency, *Southwest Clean Air Agency Compliance Evaluation Report On-Site Inspection* (Dec. 12, 2025) | |
| 1-131 | Southwest Clean Air Agency Basis Statement for TransAlta 2021 Title V Air Operating Permit | Southwest Clean Air Agency, *TransAlta Centralia Generation, LLC: Centralia Plant: Title V Basis Statement* (Sept. 22, 2021) | https://www.swcleanair.gov/docs/permits/TitleV/SW98-8-R5-ABAS.PDF |
| 1-132 | Mercury in Fishes in National Parks Report | Collin A. Eagles-Smith, James J. Willacker Jr. & Colleen M. Flanagan Pritz, *Mercury in Fishes from 21 National Parks in the Western United States—Inter- and Intra-Park Violation in Concentrations and Ecological Risk*, U.S. Dep't of the Interior, U.S. Geological Survey & U.S. Nat'l Park Serv. (2014) | https://pubs.usgs.gov/of/2014/1051/pdf/ofr2014-1051.pdf |

106

| No. | Exhibit Name | Document Name | URL |
|---|---|---|---|
| 1-133 | High Levels of Mercury in Fish at Hoh Lake Article | *High Levels of Mercury Found in Fish at Olympic National Park's Hoh Lake*, Peninsula Daily News (May 27, 2014) | https://www.peninsuladailynews.com/news/high-levels-of-mercury-found-in-fish-at-olympic-national-parks-hoh-lake/ |
| 1-134 | Southwest Clean Air Agency Notice of Violation No. 10642 | Southwest Clean Air Agency, *Notice of Violation No. 10642* (Dec. 2, 2025) | |
| 1-135 | Southwest Clean Air Agency Notice of Violation No. 10643 | Southwest Clean Air Agency, *Notice of Violation No. 10643* (Dec. 16, 2025) | |
| 1-136 | *Sierra Club v. BNSF Ry. Co.* Consent Decree | *Sierra Club v. BNSF Ry. Co*, Consent Decree, No. 13-cv-967-JCC (W.D. Wash. May 2, 2017) | |
| 1-137-1 | WECC 2024 Western Assessment of Resource Adequacy | Western Elec. Coordinating Council, *Western Assessment of Resource Adequacy 2024* (last visited Jan. 2, 2026) | https://feature.wecc.org/wara/ |
| 1-137-2 | WECC 2024 Western Assessment of Resource Adequacy | Western Elec. Coordinating Council, *Western Assessment of Resource Adequacy 2024* (last visited Jan. 2, 2026) | https://feature.wecc.org/wara/ |
| 1-137-3 | WECC 2024 Western Assessment of Resource Adequacy | Western Elec. Coordinating Council, *Western Assessment of Resource Adequacy 2024* (last visited Jan. 2, 2026) | https://feature.wecc.org/wara/ |
| 1-137-4 | WECC 2024 Western Assessment of Resource Adequacy | Western Elec. Coordinating Council, *Western Assessment of Resource Adequacy 2024* (last visited Jan. 2, 2026) | https://feature.wecc.org/wara/ |

| No. | Exhibit Name | Document Name | URL |
|---|---|---|---|
| 1-137-5 | WECC 2024 Western Assessment of Resource Adequacy | Western Elec. Coordinating Council, *Western Assessment of Resource Adequacy 2024* (last visited Jan. 2, 2026) | https://feature.wecc.org/wara/ |

108